FILED

2018 FEB -1 PM 2:47

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

1  Fred Burbank, MD
2  FBurbank@cox.net
3  24040 Camino del Avion, A326
4  Dana Point, CA 92629
5  Tel: (949) 496-0026
6  Fax: (949) 496-3247
7  Counsel (Pro Se) for Plaintiff
8
9              **UNITED STATES DISTRICT COURT**
10             **CENTRAL DISTRICT OF CALIFORNIA**
11
12                    SACV18·00180 CJC (JDEx)
13

14  FRED BURBANK., MD                    Case No: _____
15  CEO, President, Board Chairman,
16    and stock holder,                  **COMPLAINT**
17    Sensory NeuroStimulation, Inc.
18  24040 Camino del Avion, A326
19  Dana Point, CA 92529
20                          *Plaintiff,*
21         -v-
22
23  ALEX AZAR,  Secretary
24  DEPARTMENT HEALTH
25    AND HUMAN SERVICES
26  200 Independence Avenue
27  SW Washington, DC 20201
28
29  SEEMA VERMA, Administrator
30  CENTERS FOR MEDICARE
31    AND MEDICAID SERVICES
32  200 Independence Avenue,
33  SW Washington, DC 20201,
34
35  DEMETRIOS KOUZOUKAS,
36    Principal Deputy Administrator
37  CENTERS FOR MEDICARE
38    AND MEDICAID SERVICES
39  200 Independence Avenue,
40  SW Washington, DC 20201,
41                          *Defendants*
42  (5 more Defendants continued on next page)
43
44

1

LAURENCE WILSON,
CENTERS FOR MEDICARE
  & MEDICAID SVC
Director, Chronic Care Policy Group,
7500 Security Blvd.
Baltimore, MD 21244

PETER J. GURK, MD
Medical Director, DME MAC, Jurisdiction D
Noridian Healthcare Solutions
900 42nd Street South
Fargo, ND 58103-2146

ROBERT D. HOOVER, JR., MD, MPH, FACP
Medical Director, DME MAC, Jurisdiction C
CGS Administrators, LLC
2 Vantage Way
Nashville, TN 37228-1504

STACEY V. BRENNAN, M.D., FAAFP
Medical Director, DME MAC, Jurisdiction B
National Government Services
8115 Knue Rd.
Indianapolis, IN 46250-1936

WILFRED MAMUYA, MD, PhD
Medical Director, DME MAC, Jurisdiction A
NHIC, Corp.
75 Sgt. William B. Terry Drive
Hingham, MA 02043-1518
                                                    *Defendants*

## Table of Contents

I. COMPLAINT ........................................................................................................... 5

II. EXECUTIVE SUMMARY ..................................................................................... 5

III. PARTIES ............................................................................................................... 8

IV. JURISDICTION, VENUE, AND STANDING ....................................................... 8
  A. Jurisdiction United States District Court for the Central District of California ......... 8
  B. Venue ................................................................................................................... 9
  C. Standing ............................................................................................................... 9

V. NATURE OF THE ACTION ................................................................................. 10
  A. Arbitrary and Capricious CMS Substantive Rulemaking ................................. 10
    1. Error #1 – Equating all Medical Devices that Vibrate ................................. 10
    2. Error #2 – Lumping Inhomogeneous "Conditions" into a Single Rule ........ 12
      a) "Conditions" in the Eyes of CMS Appear to be a Surrogates for Everyday Minor Aches and Pains .. 13
      b) Over-the-counter Therapeutic Massage Cushions or Pads ...................... 13
    3. Error #3 – Ruling that Relaxis is a "personal comfort items" ..................... 14
    4. Error #4 – Ruling that Treating a Disorder's most Worrisome Symptom is not really Treatment the Disorder at All ........................................................................... 15
  B. Procedural Errors .............................................................................................. 16
    1. What Should have Been ................................................................................ 16
    2. What Was ...................................................................................................... 18
      a) Preemptive Hit ......................................................................................... 18
      b) Consequences to Sensory of this Preemptive Hit .................................... 19
    3. The Authorities Quoted by CMS Supporting its Exclusion of Relaxis from Coverage ........... 19
      a) Social Security Act of August 14, 1935 [H.R. 7260] .............................. 19
      b) Social Security Act Amendments of 1965 [H.R. 6675] ........................... 19
      c) Definition of Durable Medical Equipment ("DME") ............................... 20
        (1) Included DME ..................................................................................... 21
        (2) Excluded DME .................................................................................... 21
    4. What Governmental Agency is Authorized, by Law, to Determine if one Medical Device is the Same as Another? .............................................................................................. 22
      a) USPTO "Yes" ........................................................................................... 22
      b) FDA "Yes" ............................................................................................... 23
      c) CMS "No" ................................................................................................ 25

VI. Deference to Agency Authority in the Face of Agency Errors ........................... 27
  A. Has Congress Spoken to the Precise Question at Issue? ................................... 28
  B. Need of a Symmetrical and Coherent Regulatory Scheme ............................... 28
  C. Scheme Rejection when Plainly Erroneous or Inconsistent with the Regulation ........ 28
  D. "Parroted" statutory language is not entitled to deference ............................... 29

VII. PERSONAL COMFORT ITEMS ........................................................................ 29
  A. Current Definition ............................................................................................. 29
  B. Older Definitions ............................................................................................... 30

VIII. WILSON'S EIGHT FORMAL DME RULE ERRORS ....................................... 32
  A. Formal BCD by Wilson ..................................................................................... 32
  B. The Authorities Referenced in the Final Formal BCD Contradict that Formal Ruling ..... 32
    1. Medicare National Coverage Determinations Manual ................................. 32
    2. Compilation of the Social Security Laws Sec. 1862. [42 U.S.C. 1395y](a)(6) ......... 33
    3. Title 42:Public Health→ Chapter IV → Subchapter B → Part 414 ............. 33

4. Medicare Benefit Policy Manual, Chapter 15 – Covered Medical and Other Health Services, Revised 07/11/2017, Section 110.1, Definition of Durable Medial Equipment ............................... 33

IX. RESTLESS LEGS SYNDROME ............................................................................................. 34
   A. What is RLS? .................................................................................................................. 34
      1. How is RLS currently Treated? ...................................................................................... 36
      2. Relaxis Counter-stimulation Treatment ......................................................................... 36

X. STATUTORY AND REGULATORY BACKGROUND ............................................................... 38
   A. Administrative Remedies Exhausted ............................................................................... 38
   B. Statutes Supporting Plaintiff's Action ............................................................................. 38
      1. Title XVIII of the Social Security Act of 1965 ................................................................. 38
      2. Administrative Procedure Act ("APA") Pub. L. 79-404, June 11, 1946 ............................. 39
         a) 5 U.S. Code § 706 - Scope of review ......................................................................... 39
         b) Action Challenged ...................................................................................................... 40
      3. 42 U.S.C. § 1395 *et seq.* "Prohibition against any Federal interference," ....................... 40
      4. Due Process ................................................................................................................... 41

XI. COUNT 1 - CMS Rulemaking is Inconsistent with the Will of Congress as Expressed throughout the Social Security Amendment Act (1965) ............................................................. 41
   A. Personal Comfort Items .................................................................................................. 41
   B. Generally Not Useful to a Person in the Absence of an Illness or Injury – [or, inversely, Is Useful to a Person in the presence of an illness or injury] .................................................... 42
   C. Not Primarily and Customarily Used to Serve a Medical Purpose – "not primarily medical in nature" ................................................................................................................. 43

XII. COUNT 2 – CMS Rulemaking is Inconsistent with Common Medical Understanding of what constitutes Medical Treatment ....................................................................................... 43

XIII. COUNT 3 - Procedures Used by DME MACs, HHS/ CMS Inconsistent with APA.... 44

XIV. COUNT 4 - Wilson practicing medicine .............................................................................. 44

XV. COUNT 5 – Violation of the Social Security Act (1965) ...................................................... 44

XVI. COUNT 6 – Violation of Due Process ................................................................................... 45

XVII. PRAYER FOR RELIEF .......................................................................................................... 45
   A. Summary Judgment and De Novo Administrative Remedy Exhaustion Order .................. 45
   B. Summary Judgment and De Novo Durable Medical Equipment Benefit Category Determination Order ........................................................................................................... 45
   C. Summary Judgment and De Novo National Coverage Determination Order .................... 45
   D. Prohibit CME or it Contractors From Future "Dry Gulch Assignations" and "Blind-side Tackling" .............................................................................................................................. 46

XVIII. LIST OF EXHIBITS .............................................................................................................. 47
   A. Exhibit A – August 21, 2014 Vibration Therapy Devices – Correct Coding ...................... 47
   B. Exhibit B – CMS and Sensory Timeline ........................................................................... 47
   C. Exhibit C – Formal Benefit Category Decision Wilson dtd March 30, 2017 ...................... 47
   D. Exhibit D – DME MAC Local Benefit Category ruling dtd March 31, 2016 revealing preemptive strike against Relaxis ......................................................................................... 47
   E. Exhibit E – United States Patent 9,017,273 B2 dtd April 28, 2015 .................................. 47
   F. Exhibit F – CV Fred Burbank, MD dtd June 7, 2016 ......................................................... 47
   G. Exhibit G – PowerPoint Presentation at Benefit Category Determination (BCDE) CMS Internal Review Hearing dtd June 2, 2017, CME Principle Deputy Administrator, Demetrios Kouzoukas, presiding ........................................................................................... 47

4

# I. COMPLAINT

Plaintiff Fred Burbank, MD, ("Burbank") chief executive officer (CEO), president, stockholder, and chairman of the board of directors of Sensory NeuroStimulation Inc. ("Sensory"), the manufacturer of the Relaxis® system ("Relaxis") for counter-stimulation treatment of sleep loss associated with restless legs syndrome ("RLS"), ("Plaintiff"), brings this complaint against ALEX AZAR, in his official capacity as Secretary of the Department of Health and Human Services ("HHS"), SEEMA VERMA, in her official capacity as Administrator, Centers for Medicare and Medicaid Services ("CMS"), DEMETRIOS KOUZOUKAS, ("Kourzoukas") in his official capacity as Principal Deputy Administrator, CMS, and LAURENCE WILSON, ("Wilson") in his official capacity as Director, Chronic Care Policy Group, CMS, WILFRED MAMUYA, MD, PhD, Medical Director, Durable Medical Equipment ("DME") Medicare Administrative Contractor ("MAC"), Jurisdiction A, STACEY V. BRENNAN, M.D., FAAFP, Medical Director, DME MAC, Jurisdiction B National Government Services, ROBERT D. HOOVER, JR., MD, MPH, FACP Medical Director, DME MAC, Jurisdiction C, CGS Administrators, LLC, and PETER J. GURK, MD, Medical Director, DME MAC, Jurisdiction D, Noridian Healthcare Solutions (collectively, "Defendants"), and allege the following:

# II. EXECUTIVE SUMMARY

In this filing it is shown and at trial it will be further exposed that on August 21, 2014 private companies working under CMS contract and commonly referred to as DME MACs, internally circulated a ruling that explicitly excluded a newly FDA-cleared, Class II, prescription-only, neurological device (Relaxis®) from Medicare insurance coverage. Through two Food and Drug Administration ("FDA") audited clinical trials, Relaxis had been shown to improve sleep in patients with Restless Legs Syndrome ("RLS").

5

1    These contractors excluded Relaxis from Medicare insurance coverage by claiming that

2    Relaxis was NOT durable medical equipment ("DME").  This ruling was internally circulated

3    twice (August 21, 2014 and September 30, 20124), and each time was titled "Correct Coding."

4    The document was created without notification of Medicare beneficiaries (an estimated

5    27,069,250 male and female Medicare beneficiaries suffer from RLS), without notification of the

6    manufacturer of Relaxis, Sensory NeuroStimulation, Inc. ("Sensory"), and without any

7    examination of the Relaxis system, itself.  The DME MACs based their "Correct Coding"

8    decision on an incorrect, fragmentary FDA publication.  Furthermore, the internally circulated

9    document was created 8 months and 3 days prior to Sensory ever approaching CMS seeking

10   coverage.  It was, in simple language, a "dry gulch" or "blind-sided" hit job.

11   RLS is a neurologically caused sleep disorder that robs patients of sleep.  Symptoms

12   come on in the evening when patients try to go to sleep.  Terribly uncomfortable (dysphoric)

13   RLS sensations are perceived to arise in the legs and are momentarily relieved by leg movements

14   while the patient is still in bed.  Ultimately, however, to continue relief the patient has to get up

15   and out of bed and walk around the house.  Walking about the house diminishes RLS dysphoria,

16   but is does so at the expense of sleep.

17   Two FDA-reviewed, clinical trials demonstrated that Relaxis is safe and effective at

18   improving sleep in RLS patients.  Relaxis is, in fact, comparable in effectiveness to RLS drugs at

19   improving sleep in RLS patients.  RLS drugs, however, have troubling side effects.  Relaxis has

20   none.

21   The Social Security Act Amendments of 1965 [H.R. 6675] created Medicare and

22   Medicaid to provide health insurance and thereby to provide better access to health care for the

23   aged and poor, respectively.  Section 1861, Part (n) introduced the term "Durable Medical

24   Equipment" listing "…iron lungs, oxygen tents, hospital beds…." as examples of DME.  All

6

1    other definitions of DME have evolved as "home brew" within CMS.  None has explicitly arisen

2    from the words of the enabling legislation or from the legislation's overall intent.

3         In addition, the Social Security Act Amendments of 1965, Section 1862(a)(6) excluded

4    DME that "...constitute personal comfort items."  Such items are not further defined in the

5    enabling legislation.  To assist Medicare beneficiaries in understanding what such items might

6    be, CMS has published examples of such items on one of its a current websites.  There it listed:

7    "radios, televisions, and beauty and barber services" as examples of "personal comfort items."

8    Repeatedly, CMS or its contractors have ruled that Relaxis is a personal comfort item on a par

9    with items such as "radios, televisions, and beauty and barber services."

10        In six separate rulings, August 21, 2014, September 30, 2014, June 8, 2015, June 24,

11    2015, November 10, 2015, March 21, 2016, and March 30, 2017 CMS and its contractors created

12    rulings out of whole cloth, untethered to the meaning or intent of Social Security Act

13    Amendments of 1965.  Sensory responded, in writing, to each of these rulings, but Sensory's

14    responses fell on deaf ears.  Furthermore, by making two of these rulings prior to Sensory every

15    contacting CMS (first contact date April 7, 2015) and by not obtaining any product information

16    directly from Sensory, CMS disregarded the letter and the spirit of the Administrative Procedure

17    Act of 1946 ("APA"), Pub.L. 79–404.

18        Sensory has exhausted all reasonable administrative remedies.  Beginning on August 21,

19    2014 and extending to March 30, 2017, Relaxis was rejected as DME six times.  The 6th rejection

20    was appealed in a face-to-face hearing in front of Deputy Administrator of CMS, Kouzoukas, on

21    June 2, 2017.  It is noteworthy that the author of the final, Formal Benefit Category

22    Determination ("BCD"), Wilson, failed to attend this hearing.  Despite 24 phone calls and 47

23    emails to the Kouzoukas and his direct staff, between 6/2/2017 and today's date, Kouzoukas has

24    chosen to not respond.  No response by Kouzoukas is functionally, for Sensory, another

25    rejection.

7

1    No new facts are introduced in this complaint.  All facts and reasoning have been

2    presented in detail to CMS over the pasts 2 years.

3    **III. PARTIES**

4

5    Fred Burbank, MD is a published epidemiologist, psychiatrist, radiologist,

6    cardiovascular interventionalist, and a medical device inventor.[1]  During his psychiatry

7    residence at Stanford University he learned the principles of Sleep Medicine from William

8    Dement, the "father of Sleep Medicine."  As an RLS sufferer, he invented the Relaxis system

9    because he did not want to take RLS medications.  The primary RLS medications, dopamine-

10   like drugs, have now been shown to actually make RLS worse, over time![2]  The one anti-

11   seizure medication that is FDA-cleared for RLS treatment has many worrisome side effects.

12   Opioids, an off-label RLS treatment, have considerable worrisome overdose problems

13   associated with them, and currently addiction to opioids is a serious epidemic in the United

14   States.  Without coverage of the Relaxis system, Medicare beneficiaries are being forced to

15   choose between no treatment or RLS drug treatment with its serious side effects.

16   **IV. JURISDICTION, VENUE, AND STANDING**

17   **A. Jurisdiction United States District Court for the Central District of California**

18

19   Court is final authority on issues of Statutory Construction.

20   The District Court for the Central District of California has subject matter jurisdiction

21   over this action under 28 U.S.C. § 1331:  "The district courts shall have original jurisdiction of

22   all civil actions arising under the Constitution, laws, or treaties of the United States."

---

[1] Exhibit F Curriculum Vitae Fred Burbank, MD
[2] See: http://www.sleepreviewmag.com/2018/01/rls-dopamine-agonists-psychiatric-adverse-events/ and
https://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/restless-legs-syndrome/what-is-rls/problems.html

8

1    CMS has (i) interpreted law, (ii) found facts, and (iii) used discretion to create a rule that

2    is flawed procedurally and substantively.

3    Article III of the Constitution establishes a "judicial department" with the "province and

4    duty ... to say what the law is" in particular cases and controversies.[3]  The Framers crafted this

5    charter with an expressed understanding that it gives the Federal Judiciary the power, not merely

6    to rule on cases, but to decide them conclusively, subject to review only by superior courts in the

7    Article III hierarchy.

8    **B. Venue**

9
10    Venue lies in United States District Court for the Central District of California pursuant

11    to 28 U.S.C. § 1391(e):

12    "(e) Actions Where Defendant Is Officer or Employee of the United States.—
13
14    In General.—
15    A civil action in which a defendant is an officer or employee of the United States or any
16    agency thereof acting in his official capacity or under color of legal authority, or an
17    agency of the United States, or the United States, may, except as otherwise provided by
18    law, be brought in any judicial district in which…(C) the plaintiff resides if no real
19    property is involved in the action…."
20
21    The injury occurred in the city of San Clemente, County of Orange, in the State of

22    California so the courthouse in which to file is:

23                        United Stated District Court
24                        Central District of California
25                        Southern Division
26                        411 West Fourth St., Rm 1053
27                        Santa Ana, CA 92701-4516

28    **C. Standing**

29    Plaintiff, as corporate officer and shareholder, has been adversely affected by the

30    Wilson's Formal BCD rule and therefore has standing to challenge this Formal BCD rule.

---

[3] Marbury v. Madison, 1 Cranch 137, 177

**9**

1    There exists an actual substantial and continuing controversy between the parties

2    regarding Wilson's Formal BCD Rule. This Court may declare the rights and legal relations of

3    the parties pursuant to 28 U.S.C. §§ 2201–2202:

4        § 2201: In a case of actual controversy within its jurisdiction …any court of the United
5        States, upon the filing of an appropriate pleading, may declare the rights and other legal
6        relations of any interested party seeking such declaration, whether or not further relief is
7        or could be sought. Any such declaration shall have the force and effect of a final
8        judgment or decree and shall be reviewable as such.
9
10       § 2202: Further necessary or proper relief based on a declaratory judgment or decree
11       may be granted, after reasonable notice and hearing, against any adverse party whose
12       rights have been determined by such judgment.
13

14   **V. NATURE OF THE ACTION**
15

16   **A. Arbitrary and Capricious CMS Substantive Rulemaking**
17
18   When writing statutes, the legislature intends to use ordinary English words in their

19   ordinary senses. The United States Supreme Court discussed the plain meaning rule in Caminetti

20   v. United States, 242 U.S. 470 (1917), reasoning "[i]t is elementary that the meaning of a statute

21   must, in the first instance, be sought in the language in which the act is framed, and if that is

22   plain... the sole function of the courts is to enforce it according to its terms."  If a statute's

23   language is plain and clear, the Court further warned that "the duty of interpretation does not

24   arise, and the rules which are to aid doubtful meanings need no discussion."  Twisted English

25   construction errors pervade the CMS rules challenged in this lawsuit.

26   **1. Error #1 – Equating all Medical Devices that Vibrate**
27
28   This substantive error first arose within CMS and its Durable Medical Equipment

29   ("DME") Medicare Administrative Contractors ("MACs") sometime on or before August 21,

10

1    2014 whereby CMS collected fragmentary, incomplete[4], and inaccurate[1] Food and Drug

2    Administration ("FDA") preliminary product information and, based on this information, on

3    August 21, 2014 generated an internal DME MAC "Correct Coding," legally binding, legislative

4    rule[5] excluding Sensory's product, Relaxis, from CMS coverage.

5           The rule was substantive because it has a potential impact on approximately 27,069,250

6    Medicare beneficiaries who are afflicted with RLS.  The rule is legally binding on these

7    Medicare beneficiaries.  Without the rule, Medicare beneficiaries would have had a choice

8    between drug therapy or Relaxis therapy for their RLS sleep disorder.  With the rule, they are

9    forced to choose between drug therapy or no therapy at all.  Additionally, CMS failed to give

10   notice and receive comments prior to issuing this substantive rule.

11          The "Correct Coding" rule stated that any device that vibrates and that treats "restless

12   legs" is excluded from Medicare coverage because:

13          "Equipment which is primarily and customarily used for a nonmedical purpose may not
14          be considered "medical" equipment for which payment can be made under the Medicare
15          program.  This is true even though the item has some remote medically related use.
16          Vibration devices are considered to be massage modalities.  As such they are not eligible
17          to be classified as Durable Medical Equipment.  Claims for these items must be coded
18          using: A9270: Non-Covered Item or Service."
19
20          At trial it will be demonstrates that the phrases "primarily and customarily used for a

21   nonmedical purpose," "some remote medically related use," and all "vibration devices are

22   considered to be massage modalities" are, as applied, gibberish and unsuited for utterance in a

23   substantive rule.

24          Relaxis is the only vibratory device on the market in the United States that has been

25   cleared by the FDA with a label to improve sleep quality in RLS patients.  CMS made a

---

[4] Devices built for use in the FDA-cleared Sensory clinical trial were terms "Symphony[TM]" devices and
were built to clinical trial standards but not commercial sales standards.  They were superseded with a
commercial version of the device that is now termed "Relaxis®."  The two devices vibrate in the same
frequency and amplitude ranges and are functionally, identical.
[5] Exhibit A – "Correct Coding" Rule dated August 21, 2014

**11**

1   substantive error by equating Relaxis (a newly available, unique, class II, prescription-only,

2   neurological medical device,[6] cleared and labeled by the FDA to improve sleep in RLS patients)

3   with over-the-counter, Class I, physical medicine therapeutic devices[7] labeled to "…relieve

4   minor muscle aches and pains."  These older devices have nothing to do with RLS.  They exist in

5   an entirely different FDA device classification.

6                    **2. Error #2 – Lumping Inhomogeneous "Conditions" into a Single Rule**
7
8            It is presumed that an agency rule will be interpreted so as to be internally consistent.  A

9   particular section of a rule should not be divorced from the Act that supports the rule.  The

10  ejusdem generis ("of the same kind") rule applies to resolve the problem of giving meaning to

11  groups of words where one of the words is ambiguous or inherently unclear. The rule results

12  when general words follow enumerations of particular classes or persons or things, the general

13  words shall be construed as applicable only to persons or things of the same general nature or

14  kind as those enumerated.

15          The "Correct Coding" rule strung together a list of "conditions" that is entirely

16  heterogeneous: "…arthritis, joint swelling, headache, neuropathic pain, and restless legs, etc.…"

17  implying that these conditions are somehow related.  Relaxis has nothing to do with "…arthritis,

18  joint swelling, headache, neuropathic pain.…"  In court it will be argued that placing RLS in a

19  heterogeneous list of "conditions" makes no medical or legislative sense.  RLS is not a

20  "condition."  It is a specific, well-recognized, neurological disease whose debilitating sequela is

21  sleep loss.

22          Furthermore, it is presumed that a rule will be interpreted so as to be internally consistent.

23  A particular section of the statute should not be divorced from the rest of the Act upon which it is

24  built. The ejusdem generis ("of the same kind") rule applies to resolve the problem of giving

---

[6] (§ 882.5895 Federal Register, Vol. 82, No. 48, Tuesday, March 14, 2017))
[7] (§ 890.5660 Federal Register, Vol. 48, No. 227, Wednesday, November 23, 1983)

**12**

1    meaning to groups of words where one of the words is ambiguous or inherently unclear. Where

2    general words follow enumerations of particular classes or persons or things, the general words

3    shall be construed as applicable only to persons or things of the same general nature or kind as

4    those enumerated. The "Correct Coding" rule has jumbled together a list of "conditions" that are

5    unrelated and meaninglessly connected.

6                    **a) "Conditions[8]" in the Eyes of CMS Appear to be a Surrogates for**
7                    **Everyday Minor Aches and Pains**

8

9            Anyone who has shoveled the first snowfall from the driveway, raked all the leaves in the

10   yard in the fall, squatted too many times planting the summer garden, or played touch football a

11   bit too vigorously knows every-day minor aches and pains. From time-to-time all of us

12   experience minor aches and pains. A trip to the drug store is generally as far as treatment needs

13   to go. A non-steroidal anti-inflammatory (Motrin, Advil, or the like), a pain killer (Tylenol or

14   Aspirin), a heating pad, an ice pack, or maybe even a massage cushion or pad might be

15   purchased over-the-counter and taken home.

16                    **b) Over-the-counter Therapeutic Massage Cushions or Pads**

17

18           Over-the-counter massage cushions and pads were first categorized by the FDA in the

19   Federal Register, Vol. 48, No. 227, November 23, 1983 and described as:

20           "§ 890.5975 Therapeutic vibrator: A therapeutic vibrator is an electrically powered
21           device intended for medical purposes that incorporates various kinds of pads and that is
22           held in the hand or attached to a table. It is intended for various uses, such as relaxing
23           muscles and relieving minor aches and pains"

24

25           It will be stipulated that these over-the-counter massage cushions and pads are not

26   covered by Medicare. The Medicare National Coverage Determinations Manual, Chapter 1, Part

27   4 (§§ 200 – 310.1), Coverage Determinations" page 126 states:

---

[8] Excluding "neuropathic pain" and "restless legs" which are distinct medical diseases/ disorders.

**13**

1       "Durable Medical Equipment Reference List (Effective May 5, 2005)
2
3       Massage Devices: Deny [coverage]—personal comfort items; not primarily medical in
4       nature (§1861(n) and 1862(a)(6) of the Act).
5
6       Heat and Massage Foam Cushion Pads: Deny [coverage]—not primarily medical in
7       nature; personal comfort item (§1861(n) and 1862(a)(6) of the Act)."
8
9       These coverage denials were updated in 2005, or earlier, long before Relaxis was

10      invented. The exclusion of "Massage Devices" and "Heat and Massage Foam Cushion Pads"

11      could not have anticipated the creation of a unique medical device that vibrates in very specific

12      ways and turns off vibration in a very specific way so as to create a counter-stimulus to the

13      disabling symptoms from a major neurological sleep disorder, RLS. It will be argued at trial that

14      lumping Relaxis in with massage devices and heat and massage foam cushion pads was a crude

15      CMS blunder.


16              **3. Error #3 – Ruling that Relaxis is a "personal comfort items"**
17
18              What constitutes personal comfort and what constitutes disease treatment is central to this

19      pleading. The words "personal comfort items" are the only words actually present in the

20      enabling legislation, Public Law 89-97, Section 1862(a)(6). All the other words and phrases

21      drummed up by CMS are homebrew gibberish, as they are applied to Relaxis.

22              "Personal comfort items" is not defined in that enabling legislation and CMS has

23      interpreted these three words bizarrely with respect to its Relaxis rulings. The term "personal

24      comfort items" will be examined in detail at trial. Briefly: when Relaxis was cleared for

25      marketing by the FDA, it created a new category of medial device and was defined as:

26              "A vibratory counter-stimulation device is a prescription device that provides electrically
27              powered mechanical vibration to improve the quality of sleep in patients with primary
28              Restless Legs Syndrome."
29
30              Relaxis was cleared for marketing in the United States after Sensory performed two,

31      FDA-reviewed, double-blind, randomized, sham-controlled, prospective clinical trials that

1    demonstrated that Relaxis improved sleep, the primary disturbance in patients with RLS.  Based

2    on the FDA clearance, Relaxis is, by legal definition, a safe and effective treatment of the major

3    sequela of RLS – sleep loss - thereby *not* making it a "personal comfort item."  At trial it will be

4    argued that sleep is an essential element of health, no less important than eating or breathing.

5            **4. Error #4 – Ruling that Treating a Disorder's most Worrisome Symptom is**
6            **not really Treatment the Disorder at All**
7
8            Before CMS could initiate a National Coverage Determination (NCD) – to determine if

9    Relaxis was "reasonable and necessary" as an RLS treatment for Medicare beneficiaries - Wilson

10   was charged with making a Formal BCD.  If Relaxis did not fit into one of the CMS device

11   categories, no NCD could be performed and Relaxis would be preemptively excluded from

12   coverage.

13           On page 3, lines 17-20, of his Formal BCD Wilson states,

14           "In the case of the Relaxis device, the FDA clearance does not indicate that the device is
15           effective in treating RLS, but probable benefits may include improved sleep quality.  The
16           review of clinical evidence you submitted does not show that the device is effective in
17           treating RLS."[9]
18
19           With those two sentences, Wilson vastly exceeded his CMS authority and showed his

20   "true colors."  He has presented, in print, an opinion about the effectiveness of Relaxis.

21   Effectiveness judgments are not the province of CMS.  Wilson has no authority, training, or

22   license to make effectiveness judgments.  Effectiveness judgments are the work of FDA

23   employees and the work of physicians.

24           Wilson said that because Relaxis FDA clinical trials did not demonstrate that Relaxix "is

25   effective in treating RLS," i.e. makes RLS go away, it is not an effective treatment, at all.

26           It will be argued at trial that in this statement Wilson's has overstepped his authority by

27   making an FDA proclamation not a CMS ruling, that Wilson has shown that he does not

---

[9] Determination as to what is safe and effective is an FDA function.

**15**

1   understand what constitutes disease treatment, and that these two faults contaminate all his

2   overall judgment about Relaxis.  Briefly:

3       Review of a parallel sleep disorder, sleep apnea, demonstrates the folly of Wilson's

4   efficacy statement.  Sleep apnea has received coverage from CMS for DME Continuous Positive

5   Airway Pressure (CPAP) devices.[10]  CMS covers the first 3 months of CPAP treatment during a

6   rental period for which Medicare Part B pays 80%. At the end of the 3-month trial period, if the

7   patient's physician decides that CPAP therapy is helping, CPAP therapy will continue to be

8   covered.  Medicare pays 80% of the Competitive Bid Price for up to 13 months at which time the

9   patient owns the CPAP device.

10      During certain phases of sleep, muscles throughout the body are paralyzed.  Sleep apnea,

11  initially called the Pickwickian Syndrome[11], is causes by muscle paralysis and collapse of soft

12  tissue that form the airway in the back of the nose and mouth.  When so collapsed, the patient

13  cannot inhale air, is startled, and awakens.  Like RLS, sleep apnea leads to interrupted sleep and

14  sleep loss.  Like RLS, sleep apnea is a sleep primary sleep disorder (code ICD-10-CM code

15  G47.33).  Like RLS, sleep apnea is associated with increased risk of cardiovascular disease and

16  death.

17      CPAP does not treat the underlying cause of sleep apnea: flaccid posterior airway tissue.

18  It treats the primary sequela of flaccid tissue thereby improving sleep.  Relaxis improves sleep;

19  CPAP improves sleep.  By Wilson's distorted logic, CPAP would not be covered by Medicare.

20      **B. Procedural Errors**

21      **1. What Should have Been**

22

---

[10] Medicare coverage – sleep apnea and CPAP devices and accessories;
https://www.medicare.gov/coverage/sleep-apnea-and-cpap-devices-and-accessories.html

[11] The Posthumous Papers of the Pickwick Club, Charles Dickens, Serialized1836

**16**

1      The Administrative Procedure Act ("APA"), Public Law 404, defines a "rule" as:

2       "the whole or a part of an agency statement of general or particular applicability and
3      future effect designed to implement, interpret, or prescribe law or policy or describing the
4      organization, procedure, or practice requirements of an agency and includes the approval
5      or prescription for the future of rates, wages, corporate or financial structures or
6      reorganizations thereof, prices, facilities, appliances, services or allowances therefore or
7      of valuations, costs, or accounting, or practices bearing on any of the foregoing." In short,
8      an agency creates a rule when it seeks to "implement, interpret, or prescribe law or
9      policy."

10

11      The APA requires a particular rulemaking process with which all government agencies

12  are required to comply. Typically, the agency must give a notice of a proposed rulemaking,

13  published in the Federal Register. The Federal Register "is the official daily publication for

14  rules, proposed rules, and notices of Federal agencies and organizations, as well as executive

15  orders and other presidential documents." The notice must include the date the rule will come

16  into effect, the legal authority the agency has proposed the rule under, and the substance of the

17  rule.

18      After notice is given, the agency is required to solicit and accept public comments on the

19  rule. There is no minimum period specified for the comment period to remain open, and it often

20  varies with the complexity of the rule. Most comment periods last between 30 and 60 days, and

21  some are re-opened if the agency believes that there was insufficient time for the public to

22  respond or that the agency did not receive as much feedback as it would like. The agency must

23  then consider all of the comments that are submitted in passing the final rule.

24      In certain cases, an agency must undergo formal rulemaking, which requires a courtroom-

25  style hearing. During formal rulemaking, decisions are reached on the basis of evidence given

26  and received on the record. Formal rulemaking is appropriate in two cases: (1) where a statute

27  provides that rules are "required to be made on the record after opportunity for an agency

28  hearing"; and (2) in rulemakings that involve adjudicative facts, or facts specific to the rights of

29  an individual.

1      A statute that requires more than an informal notice and comment rulemaking, but is less

2    stringent than a formal rulemaking, may result in a hybrid rulemaking that blends elements of

3    each.

4      CMS rulemaking with respect to Relaxis has not been formal, hybrid, or even informal

5    notice and comment rule making.  It has been behind-closed-doors, in the dark of night, and

6    lawless.

7      **2. What Was**

8

9      **a) Preemptive Hit**

10

11      The "Correct Coding" rule was covertly generated 8 months and 3 days prior to Sensory

12    ever contacting CMS[12].  It was, in the vernacular of the Western Movies I viewed in my youth, a

13    "dry gulch ambush."  Sensory should have been notified by CMS of its rulemaking intentions,

14    and CMS should have solicited comments from Sensory prior to making any such rule.[13]

15      This "Correct Coding" rule was only circulated in two, internal, DME MAC rulings, the

16    first on August 21, 2014 and the second on September 30, 2014.  Interested parties, including

17    Sensory, were not contacted prior to making this rule.  In the process CMS and its DME MACs

18    equated a serious, potentially life-threatening neurological disorder, RLS, with day-in-and-day-

19    out minor aches and pains.  Due to this twisted "logic," Defendants have incorrectly ruled that

20    Plaintiff's product, Relaxis, is NOT Durable Medical Equipment ("DME").  This set of errors

21    was parroted[14] in six separate CMS rulings each of which will be examined in detail at trial:

---

[12] Exhibit B, Timeline CMS and Sensory
[13] Administrative Procedure Act ("APA"), Pub.L. 79–404, 60 Stat. 237, enacted June 11, 1946
[14] Gonzales v. Oregon, 546 U.S. 243 (2006), the term "antiparroting" was coined by Justice Scalia in his dissent.

August 21, 2014 ("Vibration Therapy Devices – Correct Coding") – by DME MAC CGS
September 30, 2014 ("Vibration Therapy Devices – Correct Coding") – by DME MAC noridian
June 8, 2014 noridian rejection of Sensory's PDAC HCPCS code request
November 10, 2015 Informal BCD by Wilson
March 21, 2016 Local Benefit Category Determination ("BCD") made by DME MACs
March 30, 2017 Final Formal BCD by Wilson[15]

### b) Consequences to Sensory of this Preemptive Hit

In anticipation of usual interactions with CMS – interactions that do not start until Sensory contacts CMS – Sensory developed a nation-wide DME distributorship system. It will be shown at trial that in good faith and following prudent business practices, Sensory spent over $690,000 in this development of its distribution system. This money was wasted because of lawless CMS rulings. Sensory distribution is conducted by it's only paid employee out of his garage.

### 3. The Authorities Quoted by CMS Supporting its Exclusion of Relaxis from Coverage

### a) Social Security Act of August 14, 1935 [H.R. 7260]

The "Social Security Act of August 14, 1935 [H.R. 7260]" provided for the general welfare by establishing a system of Federal old-age benefits, and by enabling the several States to make more adequate provision for aged persons, blind persons, dependent and crippled children, maternal and child welfare, public health, and the administration of their unemployment compensation laws; to establish a Social Security Board; to raise revenue; and for other purposes." The 1935 Act was expanded to include health care insurance in 1965.

### b) Social Security Act Amendments of 1965 [H.R. 6675]

"Social Security Act Amendments of 1965" created Medicare, a health insurance program for the elderly, and Medicaid, a health insurance program for the poor, to aid the

---

[15] Exhibit C Formal BCD made by Wilson dated March 30, 2017, no page numbers, line numbers inserted

1    elderly and the poor in paying hospital bills, doctor bills and other health-related bills.

2    Medical equipment such as wheel chairs, walkers, and the like were subsequently defined.

3          It will be argued at trial that the Intent of Congress was to provide health insurance so

4    that Medicare beneficiaries could get access to a full range of up-to-the-minute treatment

5    choices for recognized medical diseases and disorders.

6                       **c) Definition of Durable Medical Equipment ("DME")**
7
8          "Sec. 1861. [42 U.S.C 1395x] Definition of Services Institutions, etc." Part (n)

9    introduces the term "Durable Medical Equipment" ("DME") and lists, as examples, such items

10   as "…iron lungs, oxygen tents, hospital beds….".

11         Using its "home brew" interpretation of Sec. 1861, workers within CMS created "The

12   Medicare National Coverage Determination Manual, Chapter 1, Part 4, (Sections 200-310.1)

13   Coverage Determinations, Rev. 198, 06-29-17, Section 280.1 - Durable Medical Equipment

14   Reference List." Note: Item (ii) is not a "categorization" item. It is a "coverage" item[16]. This

15   manual states that DME is medical equipment that:

1                              **(1) Included DME**

2          (i)"… has been approved for marketing by the Food and Drug Administration (FDA)
3          and is otherwise generally considered to be safe and effective for the purpose intended,
4          (ii) "… is reasonable and necessary for the individual patient."[16]
5          (iii) "Can withstand repeated use; i.e., could normally be rented and used by successive
6          patients,
7          (iv) "is primarily and customarily used to serve a medical purpose;"
8          (v) "Generally is not useful to a person in the absence of illness or injury; and,"
9          (vi) "Is appropriate for use in a patient's home."
10

11                              **(2) Excluded DME**

12         DME excluded from Medicare coverage is defined in "Sec. 1862. [42 U.S.C. 1395y] in

13    Part (a)(6)" which excluded devices "which constitute personal comfort items…."  The

14    legislative intent of the words "personal comfort items" will be examined in detail at trial.

15         In "The Medicare National Coverage Determination (NCD) Manual, Chapter 1, Part 4,

16    (Sections 200-310.1) Coverage Determinations, Rev. 198, 06-29-17" CMS employees

17    interpreted "personal comfort items" in such a way a to specifically exclude:

18         "Massage Devices" from coverage: "Deny – personal comfort items; not primarily

19    medical in nature (1861(n) and 1862(a)(6) of the Act)." and

20         "Heat and Massage Foam Cushion Pads" from coverage: "Deny – not primarily

21    medical in nature; personal comfort item (1861(n) and 1862(a)(6) of the Act)."

22         "Massage Devices" and "Heat and Massage Foam Cushion Pads" are defined by the

23    FDA in the "Federal Register, November 23, 1983, Vol. 48. No 277 pages 176, 189, and 194

24    under Subpart F  - Physical Medicine Therapeutic Devices are given the Section and Device

---

[16] Although CMS included the words "reasonable and necessary" in this section of their
manual, these words belong under discussions of device coverage, not device categorization.
Within CMS, a device has to first fit into an existing CMS category and then, if it does, it
has to be determined if the so-fitted device is "reasonable and necessary" for Medicare
beneficiary health care.  It is a two step process.  Benefit categorization is performed at
CMS in Center for Medicare, Chronic Care Policy Division.  Coverage determination (a
reasonable and necessary analysis) is performed at CMS in the Center for Clinical
Standards, Coverage and Analysis Division.

1    codes of 890.5650 md 890.5660." These Physical Medicine Therapeutic Devices are intended

2    to "… relieve minor muscle aches and pains and to increase circulation…."  Nowhere in

3    sections 890.5650 or 890.5660 is reference made to the counter-stimulation treatment of sleep

4    loss associated with RLS.

5        **4. What Governmental Agency is Authorized, by Law, to Determine if one**
6        **Medical Device is the Same as Another?**
7
8        To become commercially viable, all new medical devices are typically examined by

9    three governmental agencies: the United States Patent and Trademark Office (USPTO) which

10   determine if the new device is unique and thereby entitled to patent protection, the FDA which

11   determine if the new device is safe and effective (generally through clinically trials) and

12   generates a classification for a cleared new device, and the CMS which determine if the new

13   device falls into one of its benefit categories and, if it does, determines if the device is

14   reasonable and necessary for the treatment of an ill or injured beneficiary.  Sensory's

15   interactions with these three government agencies reads like a midnight horror movie.

16       **a) USPTO "Yes"**
17
18       On March 2, 2009 Sensory filed a Patent Application with the USPTO.  After many

19   years of correspondence with the patent examiner and that examiner's supervisor, a final office

20   action of rejection was issued on December 3, 2013.  On October 18, 2014 an Appeal Hearing

21   before three Administrative Patent Judges was held.  On December 1, 2014 the three-judge

22   panel reversed the patent examiner's rulings.  On April 28, 2015 US Patent 9,017,273 B2 was

23   issued.  Because of foot dragging and negligent examiner work, it took 6 years, 1 month, and

24   26 days for this patent to issue.

25       The USPTO determined that no device existed in the world with features of the Relaxis

26   system, stating that the Relaxis is:

1    "A system for generating a counter-stimulation in a patient suffering from restless leg
2    syndrome, the system comprising:
3
4        A vibration generator configured and arranged to generate a counter-stimulation
5    vibration in a patient suffering from restless leg syndrome, the counter-stimulation having a
6    frequency of between 50 hz and 10 per minute and of an amplitude and time duration either
7    lower than that which would wake the patient and higher than that sufficient to relieve restless
8    leg syndrome symptoms, or sufficient to relieve restless leg syndrome symptoms and allow the
9    patient to return to sleep; a controller configured and arranged to drive the vibration generator,
10   the controller in communication with the vibration generator, the controller being configured
11   and arranged to ramp down the counter-stimulation so as not to waken or alarm the patient;
12   and a base configured and arranged to hold the vibration generator adjacent to a patient, the
13   vibration generator attached to the base."
14
15       NOTE: No reference is made to "massage devices," "personal comfort items;" or "heat

16   and massage foam cushion pads." The USPTO evaluated the Relaxis system, compared it to

17   all remotely similar devices, and determined that Relaxis is NOT the same as a massage device

18   or heat and massage foam cushion pad intended for personal comfort.


19                      **b) FDA "Yes"**
20
21       Sensory first contacted the FDA on September 23, 2008 requesting a pre-IDE,

22   teleconference to help plan its clinical trial design to demonstrate safety and efficacy of the

23   Relaxis system. That teleconference was held on December 2, 2008. On September 28, 2010

24   a 510(k) market clearance request was submitted. On December 10, 2010 Laurence D. Coyne,

25   PhD Chief, Restorative Devices Branch, Center for Devices and Radiological Health (CDRH)

26   determined that:

27       "… we have considered that your device is similar in technology to therapeutic
28   vibrator devices (21 CFR 890.5975). However, these would not be appropriate
29   predicates because we are not aware of a legally marketed therapeutic vibrator labeled or
30   promoted for nerve stimulation for pain relief or for pain associated with RLS.
31   Therapeutic vibrators are typically indicated for relaxing muscles and/or relief of minor
32   aches and pains. The indications for use of your device alter the intended therapeutic
33   effect, impacting safety and effectiveness. Therefore, your device has a new intended
34   use."
35

36       The FDA determined that Relaxis was only superficially similar to therapeutic

1    vibrators since Relaxis had an entirely different indication for use (to treat sleep loss associated

2    with RLS), different potential effectiveness issues for RLS patients, and different potential

3    safety issues for RLS patients and was, therefore, not the same as therapeutic vibrator devices.

4            On June 14, 2011 Mark N. Melkerson, Director, Division of Surgical, Orthopedic, and

5    Restorative Devices, CDRH wrote to Sensory suggesting that application to the FDA be made

6    under the "Evaluation for Automatic Class III Designation (de novo)" provision.  A de novo

7    application is made to the FDA when safety issues are limited and when no similar device

8    exists in the FDA's huge catalog of medical devices.  If a de novo application is successful,

9    that application will create a NEW FDA device category.

10          On July 12, 2011 Sensory submitted a "Request for Evaluation of Automatic III

11    Designation under 513(f)(2) de novo classification" petition.  On December 20, 2012

12    Sensory's petition was denied by Jonette R. Foy, PhD, Deputy Director for Engineering and

13    Science Review, CDRH.  Internal CDRH Agency Review of this denial was requested and a

14    face-to-face review was held on May 10, 2013 in Conference Room 5425, White Oak Facility,

15    Silver Spring, MD.  Fourteen CDRH employees attended.  On June 28, 2013 William H.

16    Maisel, MD, MPH, Deputy Director for Science and Chief Scientist, Office of the Center

17    Director, CDRH was the presiding review officer.  He concluded that "I am setting aside the

18    decision to decline your de novo request…."  On December 18, 2013 Jonette Foy, PhD,

19    Deputy Director for Engineering and Science Review, CDRH wrote a letter to Sensory stating:

20          "After review of the information submitted in the de novo request, FDA has
21    determined that the Symphony Device indicated for improving the quality of sleep in
22    patients with primary Restless Legs Syndrome (RLS) through the use of vibratory
23    counter-stimulation can be classified in class II with the establishment of special
24    controls for class II.  As a result of this order, you may immediately market your device
25    as described in the de novo request, subject to the general control provisions of the
26    FD&C Act and the special controls identified in this order."

27

28        As a result of this December 18, 2013 letter, CDRH published an inaccurate,

1    incomplete, preliminary summary of the Symphony Device[17]:

## FDA

FDA Home[3] Medical Devices[4] Databases[5]

### Product Classification
New Search                                                 Back To Search Results

| | |
|---|---|
| Device | Vibratory Counter-stimulation |
| Regulation Description | Limited output transcutaneous piezoelectric stimulator for skin reactions associated with insect bites. |
| Definition | A vibratory counter-stimulation device is a prescription device that provides electrically powered mechanical vibration to improve the quality of sleep in patients with primary Restless Legs Syndrome. |
| Physical State | vibrating pad |
| Technical Method | Applies a mechanical vibration to the lower legs |
| Target Area | Lower legs |
| Regulation Medical Specialty | Neurology |
| Review Panel | Physical Medicine |
| Product Code | OVP |
| Premarket Review | Office of Device Evaluation [6] (ODE) Division of Neurological and Physical Medicine Devices (DNPMD) Physical Medicine and Rehabilitation Devices Branch (PMDB) |
| Submission Type | 510(K) Exempt |
| Regulation Number | 882.5894[7] |
| Device Class | 2 |
| Total Product Life Cycle (TPLC) | TPLC Product Code Report[8] |
| GMP Exempt? | No |
| **Note: Class II devices** the Food and Drug Administration (FDA) has also published a list of class II (special controls) devices[9] subject to certain limitations, that are exempt from premarket notification requirements under the Food and Drug Administration Modernization Act of 1997 (FDAMA) and the 21st Century Cures Act of 2016 (Cures Act). FDA believes that these exemptions will relieve manufacturers from the need to submit premarket notification submissions for these devices and will enable FDA to redirect the resources that would be spent on reviewing such submissions to more significant public health issues. FDA is taking this action in order to meet requirements of FDAMA and the Cures Act. | |
| Implanted Device? | No |
| Life-Sustain/Support Device? | No |
| Third Party Review | Not Third Party Eligible |

4          Note that this early, limited publication has the wrong product code (882.5894 instead of

5    882.5895) and makes reference to "insect bites" which has nothing to do with RLS.  It is on

6    information of this quality that CMS contractors made their first Relaxis DME ruling.

7                         **c) CMS "No"**

9          Sometime after December 18, 2013 but before August 21, 2014 one or more of the

---

[17] "Symphony" is the brand name of the pre-commercial, clinical trial version of the device and is functionally equivalent to Relaxis, the current commercial version.

1    DME MACs reviewed this limited FDA publication.  The device that was reviewed was the

2    Symphony device, a non-commercially available, clinical trial, only, device.  Based upon this

3    brief, limited, fragmentary, and incorrect publication, the DME MACs issued a "Joint DME

4    MAC Publication," an internal document, and generated a rule titled "Vibration Therapy

5    Devices – Correct Coding."  This internal document explicitly excluded the Relaxis system

6    from CMS coverage.  The methodology behind this closed-door rulemaking was described in a

7    letter written to Sensory by Peter Gurk dated 3/21/2016[18].  On page 2 of his letter he states:

8         "The DME MACs were made aware of the Relaxis™ device as a result of the FDA
9         clearance for the device in 2014 [Note: this date is in error; Relaxis was cleared
10        December 18, 2013]…. Upon review of the available information, it was determined that
11        the Relaxis™ device does not meet the definition as an item of Durable Medical
12        Equipment."

13

14         Subsequently, on March 14, 2017 Docket No. FDA-2017-N-1123 of the Federal

15    Register published the corrected, final order for the de novo classification of the Relaxis

16    device:

---

[18] Exhibit D - Gurk Local Benefit Category Determination rejection letter dtd 3/21/2016

1
2     **"DEPARTMENT OF HEALTH AND HUMAN SERVICES**
3     **Food and Drug Administration**
4     **21 CFR Part 882**
5     **[Docket No. FDA–2017–N–1123]**
6     **Medical Devices; Neurological Devices, Classification of the Vibratory Counter-**
7     **Stimulation Device**
8     **AGENCY:** Food and Drug Administration, HHS.
9     **ACTION:** Final order.
10
11    **PART 882—NEUROLOGICAL DEVICES**
12    ■ 1. The authority citation for part 882 continues to read as follows:
13    **Authority:** 21 U.S.C. 351, 360, 360c, 360e, 360j, 360*l*, 371.
14    ■ 2. Add § 882.5895 to subpart F to read as follows:
15    **§ 882.5895 device.**
16    **Vibratory counter-stimulation**
17
18    (a) *Identification*. A vibratory counter- stimulation device is a prescription device that
19    provides electrically powered mechanical vibration to improve the quality of sleep in
20    patients with primary Restless Legs Syndrome."
21
22    Note that Relaxis is defined as a new medical device category, category **§882.5895.**

23    Relaxis is a Class II, *neurological device*, that can only be obtained after a physician has

24    examined the patient, determined the patient has sleep loss associated with RLS, and prescribed

25    Relaxis to provide counter-simulation treatment to improve sleep loss associate with RLS.

26         This new, de novo category is in an entirely different category than **§890.5660,**

27    therapeutic massagers that are non-prescription, Class I, *physical medicine devices* intended to

28    relieve minor muscle aches and pains.  As will be shown in detail at trial, Wilson and others have

29    been deliberately unable or unwilling to comprehend the differences between these two device

30    categories.


31    **VI. DEFERENCE TO AGENCY AUTHORITY IN THE FACE OF AGENCY ERRORS**
32
33         Would Congress delegate a policy decision affecting 27,069,250 Medicare beneficiaries

34    to an agency (CMS) who, in turn, would delegated its authority to private, profit-driven data-

35    processing contractors (DME MACs) who make rules without public notice and comment?

36         Deference to government agencies is paid by courts under the notion (myth?) that persons

1   within these agencies have highly specialized knowledge that is far too complex for the court or

2   members of a jury to understand.  When the subject matter is easily understood, as in the present

3   action, no such deference need be given.  Briefly:

4   **A. Has Congress Spoken to the Precise Question at Issue?**

5

6       FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000) involves an agency's

7   construction of a statute it administers.  The Court's analysis is governed by Chevron U. S. A.

8   Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, under which a reviewing court

9   must first ask whether Congress has directly spoken to the precise question at issue, id., at 842.

10   If so, the court must give effect to Congress' unambiguously expressed intent. e.g., id., at 843.  If

11   not, the court must defer to the agency's construction of the statute so long as it is permissible.

12   See, e. g., INS v. Aguirre-Aguirre, 526 U. S. 415, 424.

13   **B. Need of a Symmetrical and Coherent Regulatory Scheme**

14

15       In determining whether Congress has specifically addressed the question at issue, the

16   court should not confine itself to examining a particular statutory provision in isolation.  Rather,

17   it must place the provision in context, interpreting the statute to create a symmetrical and

18   coherent regulatory scheme. Gustafson v. Alloyd Co., 513 U. S. 561, 569.  In addition, the

19   meaning of one statute may be affected by other Acts, particularly where Congress has spoken

20   subsequently and more specifically to the topic at hand. See, e. g., United States v. Estate of

21   Romani, 523 U. S. 517, 530-531.  Finally, the court must be guided to a degree by common

22   sense as to the manner in which Congress is likely to delegate a policy decision of such

23   economic and political magnitude to an administrative agency. Cf. MCI Telecommunications

24   Corp. v. American Telephone & Telegraph Co., 512 U. S. 218, 231. pp. 131-133.

25   **C. Scheme Rejection when Plainly Erroneous or Inconsistent with the Regulation**

26

28

1      The court can reject agency interpretation when "plainly erroneous or inconsistent with

2  the regulation" (Auer v. Robbins, 519 U.S. 452 (1997) controlling unless "'plainly erroneous or

3  inconsistent with the regulation.'" (Robertson v. Methow Valley Citizens Council, 490 U. S. 332,

4  359 (1989) quoting Bowles v. Seminole Rock & Sand Co., 325 U. S. 410, 414 (1945)).

5      **D. "Parroted" statutory language is not entitled to deference**

6

7      If a regulation "merely quotes statue language, the agency is entitled to no more

8  deference..." (Gonzales v. Oregon, 546 U.S. 243 (2006)  The Court first determined it did not

9  need to grant substantial deference to the Justice Department's interpretation of its own

10  regulation under Auer v. Robbins (1997) because the regulation merely restated the terms of the

11  CSA.  Interpretation that "parroted" the statutory language so is not entitled to deference

12  **VII. PERSONAL COMFORT ITEMS**

13

14      CMS ruling that Relaxis is a personal comfort item goes beyond whatever ambiguity

15  exists in the enabling legislation.[19]  CMS determination that Relaxis treatment of RLS sleep loss

16  is "personal comfort" is not reasonable.  CMS failure to include Relaxis as DME is not rationally

17  related to the goals of the enabling act.  It is arbitrary and capricious.[20]  CMS lacks discretionary

18  authority to rule that Relaxis RLS therapy is only personal comfort, similar to everyday aches

19  and pains.[21]

20      **A. Current Definition**

21

22      Since the words "personal comfort items" were not defined in the enabling Congressional

23  statute in which these words were first introduced, noscitur a sociis ("a word is known by the

24  company it keeps") needs to be applied.  When words are ambiguous, their meaning may be

---

[19] 480 U.S. 421 (1987) Immigration and Naturalization Service v. Cardoza-Fonseca and 480 U.S. 421 (1987), 511 U.S. 328 (1995) Plaut v. Spendthrift Farm, Inc., 514 U.S. 211 (1995)
[20] AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366 (1999)
[21] Christensen v. Harris County,529 U.S. 576 (2000)

1   determined by reference to the rest of the statute[22].  Nowhere in the Social Security Act

2   Amendments (1965) are these words further defined.  One must look elsewhere for guidance as

3   to their meaning.

4           On its current website, the DEPARTMENT OF HEALTH AND HUMAN SERVICES,

5   Centers for Medicare & Medicaid Services, Items and Services Not Covered Under Medicare,

6   ICN 906765 January 2017[23] states that:

7           "Personal comfort items are not covered because these items do not meaningfully
8           contribute to the treatment of a beneficiary's illness or injury or the functioning of a
9           malformed body member. Some examples of personal comfort items are:
10
11                   Radios
12                   Televisions
13                   Beauty and barber services."
14
15          Does it in any way seem reasonable to toss Relaxis, a Class II, prescription-only,

16   counter-stimulation, neurological device in with radios, televisions, and beauty services?

17   **B. Older Definitions**
18
19          "Personal comfort items" was amplified by workers within CMS and codified in

20   rulings published in "The Medicare National Coverage Determination (NCD) Manual, Chapter

21   1, Part 4, (Sections 200-310.1) Coverage Determinations."  This manual specifically excluded

22   "Massage Devices" and "Heat and Massage Foam Cushion Pads" from coverage."

23

---

[22] Sec. 182(a)(6)
[23] https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-
MLN/MLNProducts/Downloads/Items-and-Services-Not-Covered-Under-Medicare-Booklet-
ICN906765.pdf

**30**

1
2          Relaxis did not exist at the time this amplification occurred.  Therefore, these two

3   excluded device categories were directed at the FDA 21CFR 890.5975, Subpart F, Physical

4   Medicine Therapeutic Devices described as "A therapeutic vibrator … intended for various

5   uses, such as relaxing muscles and relieving minor aches and pains:"



FDA Home[3] Medical Devices[4] Databases[5]

### CFR - Code of Federal Regulations Title 21
#### The information on this page is current as of April 1 2017.
For the most up-to-date version of CFR Title 21, go to the Electronic Code of Federal Regulations (eCFR).[6]

New Search                                    Help[7] | More About 21CFR [8]

[Code of Federal Regulations]            
[Title 21, Volume 8]
[Revised as of April 1, 2017]
[CITE: 21CFR890.5975]


TITLE 21--FOOD AND DRUGS
CHAPTER I--FOOD AND DRUG ADMINISTRATION
DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBCHAPTER H--MEDICAL DEVICES
PART 890 -- PHYSICAL MEDICINE DEVICES

Subpart F--Physical Medicine Therapeutic Devices

Sec. 890.5975 Therapeutic vibrator.

(a) *Identification.* A therapeutic vibrator is an electrically powered
device intended for medical purposes that incorporates various kinds
of pads or that is held in the hand or attached to the hand or to a
table. It is intended for various uses, such as relaxing muscles and
relieving minor aches and pains.

(b) *Classification.* Class I (general controls). The device is exempt
from the premarket notification procedures in subpart E of part 807 of
this chapter, subject to the limitations in 890.9.

[48 FR 53047, Nov. 23, 1983, as amended at 61 FR 1125, Jan. 16, 1996;
66 FR 38818, July 25, 2001]

6

7

8          The "Correct Coding" rule advanced and adopted by the four DME MACs in their

9   internal memos was an attempt to lump an entirely new medical device, Relaxis, a device

1    identified by the USPTO as unique and distinct from therapeutic vibrators and identified by the

2    FDA as an entirely new category of medical device, in with therapeutic vibrators which were

3    excluded from coverage by unrelated and much earlier CMS rulings.  It will be shown at trial

4    that this slight of hand has no basis in engineering or medical logic.  It was an intellectually

5    impoverished and lawless act.

6    **VIII. WILSON'S EIGHT FORMAL DME RULE ERRORS**

7         **A. Formal BCD by Wilson**

8

9         On March 30, 2017 Wilson issued a negative Formal BCD rule thereby excluding the

10   Relaxis system from Medicare coverage.  His negative Formal BCD ruling excluded Relaxis

11   from coverage because a new device must fit into an existing DME category before it can be

12   covered by Medicare.  The eight fundamental errors made by Wilson were pointed out in the

13   June 2, 2017 administrative hearing in front of Kouzoukas[24] and will be further amplified at

14   trial.

15        **B. The Authorities Referenced in the Final Formal BCD Contradict that Formal**
16        **Ruling**

17

18        Wilson cited four legislative and CMS authorities that he used to reaching his final,

19   Formal BCD ruling:

20             **1. Medicare National Coverage Determinations Manual[25]**

21

22        Chapter 1, Part 4 (Sections 200 – 310.1), Coverage Determination Manual which cites
23        Sec. 1862(a)(6) of the Social Security Amendments of 1965 (Public Law 89-97) in two
24        locations:

25

26             Citation #1: "Heat and Massage Foam Cushion Pads, Deny [coverage] – not
27             primarily medical in nature; personal comfort item" and
28             Citation #2: "Massage Devices, Deny [coverage] – personal comfort items; not

---

[24] Exhibit G - Appeal of Formal BCD June_2_2017.pdf
[25] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c15.PDF

1     primarily medical in nature."

2     **2. Compilation of the Social Security Laws Sec. 1862. [42 U.S.C.**
3     **1395y](a)(6)[26]**

4
5     "EXCLUSIONS FROM COVERAGE AND MEDICARE AS SECONDARY PAYER,
6     (a) Notwithstanding any other provision of this title, no payment may be made under part
7     A or part B for any expenses incurred for items or services - (6) which constitute personal
8     comfort items (except, in the case of hospice care, as is otherwise permitted under
9     paragraph (1)(C))"

10    **3. Title 42:Public Health→ Chapter IV → Subchapter B → Part 414[27]**

11
12    "Subpart D—Payment for Durable Medical Equipment and Prosthetic and Orthotic
13    Devices, §414.202 Definitions, Durable medical equipment means equipment, furnished
14    by a supplier or a home health agency that meets the following conditions:

15
16    (1) Can withstand repeated use.
17    (2) Effective with respect to items classified as DME after January 1, 2012, has an
18    expected life of at least 3 years.
19    (3) Is primarily and customarily used to serve a medical purpose.
20    (4) Generally is not useful to an individual in the absence of an illness or injury.
21    (5) Is appropriate for use in the home."

22    **4. Medicare Benefit Policy Manual, Chapter 15 – Covered Medical and**
23    **Other Health Services, Revised 07/11/2017, Section 110.1, Definition of**
24    **Durable Medial Equipment[28]**

25
26    Note: Words most relevant to Wilson's Formal BCD are in bold and italicized.

27
28    "B. Medical Equipment

29
30    ***Medical equipment is equipment primarily and customarily used for medical purposes***
31    ***and is not generally useful in the absence of illness or injury***. In most instances, no
32    development will be needed to determine whether a specific item of equipment is medical
33    in nature. However, some cases will require development to determine whether the item
34    constitutes medical equipment. This development would include the advice of local
35    medical organizations (hospitals, medical schools, medical societies) and specialists in
36    the field of physical medicine and rehabilitation. ***If the equipment is new on the market,***
37    ***it may be necessary, prior to seeking professional advice, to obtain information from***
38    ***the supplier or manufacturer explaining the design, purpose, effectiveness and method***
39    ***of using the equipment in the home as well as the results of any tests or clinical studies***
40    ***that have been conducted.***

---

[26] https://www.ssa.gov/OP_Home/ssact/title18/1862.htm://
[27] https://www.ecfr.gov/cgi-
bin/retrieveECFR?gp=&SID=9697fc083478a3e99a40639a2c93c6d6&mc=true&n=pt42.3.414&r=PART
&ty=HTML#se42.3.414_1202
[28] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c15.PDF

1. Equipment Presumptively Medical

Items such as hospital beds, wheelchairs, hemodialysis equipment, iron lungs, respirators, intermittent positive pressure breathing machines, medical regulators, oxygen tents, crutches, canes, trapeze bars, walkers, inhalators, nebulizers, commodes, suction machines, and traction equipment *presumptively constitute medical equipment.* (Although hemodialysis equipment is covered as a prosthetic device (§120), it also meets the definition of DME, and reimbursement for the rental or purchase of such equipment for use in the beneficiary's home will be made only under the provisions for payment applicable to DME. See the Medicare Benefit Policy Manual, Chapter 11, "End Stage Renal Disease," §30.1, for coverage of home use of hemodialysis.) NOTE: There is a wide variety in types of respirators and suction machines. The DME MACs medical staff should determine whether the apparatus specified in the claim is appropriate for home use.

2. Equipment Presumptively Nonmedical

*Equipment which is primarily and customarily used for a nonmedical purpose may not be considered "medical" equipment* for which payment can be made under the medical insurance program. *This is true even though the item has some remote medically related use.* For example, in the case of a cardiac patient, an air conditioner might possibly be used to lower room temperature to reduce fluid loss in the patient and to restore an environment conducive to maintenance of the proper fluid balance. Nevertheless, because the *primary and customary use of an air conditioner is a nonmedical one*, the air conditioner cannot be deemed to be medical equipment for which payment can be made.

*Other devices and equipment used for environmental control or to enhance the environmental setting in which the beneficiary is placed are not considered covered DME. These include, for example, room heaters, humidifiers, dehumidifiers, and electric air cleaners. Equipment which basically serves comfort or convenience functions or is primarily for the convenience of a person caring for the patient, such as elevators, stairway elevators, and posture chairs, do not constitute medical equipment.* Similarly, physical fitness equipment (such as an exercycle), first-aid or precautionary-type equipment (such as preset portable oxygen units), self-help devices (such as safety grab bars), and training equipment (such as Braille training texts) are considered nonmedical in nature."

These governing documents will be examined, in detail, at trial.

**IX. RESTLESS LEGS SYNDROME**

**A. What is RLS?**

According to the National Institute of Neurological Disorders and Stroke (NINDS):[29]

---

[29]   http://www.ninds.nih.gov/disorders/restless_legs/detail_restless_legs.htm

**34**

1   "Restless legs syndrome (RLS) is a neurological disorder characterized by throbbing,
2   pulling, creeping, or other unpleasant sensations in the legs and an uncontrollable, and
3   sometimes overwhelming, urge to move them. Symptoms occur primarily at night when a
4   person is relaxing or at rest and can increase in severity during the night. Moving the legs
5   relieves the discomfort. Often called paresthesias (abnormal sensations) or dysesthesias
6   (unpleasant abnormal sensations), the sensations range in severity from uncomfortable to
7   irritating to painful.
8
9   The most distinctive or unusual aspect of the condition is that lying down and trying to
10  relax activates the symptoms. Most people with RLS have difficulty falling asleep and
11  staying asleep. Left untreated, the condition causes exhaustion and daytime fatigue. Many
12  people with RLS report that their job, personal relations, and activities of daily living are
13  strongly affected as a result of their sleep deprivation. They are often unable to
14  concentrate, have impaired memory, or fail to accomplish daily tasks. It also can make
15  traveling difficult and can cause depression.
16
17  Many individuals who are severely affected are middle-aged or older, and the symptoms
18  typically become more frequent and last longer with age."
19
20      As one can see from the NINDS description above, RLS is a serious neurological

21  disorder that "Left untreated, … causes exhaustion and daytime fatigue. Many people with RLS

22  report that their job, personal relations, and activities of daily living are strongly affected as a

23  result of their sleep deprivation."  In addition to significant loss of sleep, like patients with sleep

24  apnea, untreated or under-treated RLS patients additionally appear to be at increased risk of

25  *death* as the result of having RLS.  A study of 70,977 women reported that women who have had

26  RLS for at least 3 years were at elevated risk of heart attacks.[30]  Similarly, in a study of 18,425

27  men increased overall mortality was observed in RLS patients.[31]  Finally, in a recent study of

28  57,417 women (mean age 67 years) from the Nurses' Health Study without cancer, renal failure,

29  and cardiovascular disease ("CVD") at baseline demonstrate that participants with RLS had a

30  significantly higher risk of CVD mortality than those without RLS[32].  Unlike, "… arthritis, joint

---

[30] Berger K, Luedemann J, Trenkwalder C, John U, Kessler C. Sex and the risk of restless legs syndrome in the general population. Arch Intern Med 164:196-202, 2004.
[31] Hogl B, Kiechl S, Willeit J, Saletu M, Frauscher B, Seppi K, Muller J, Rungger G, Gasperi A, Wenning G, Poewe W. Restless legs syndrome: a community-based study of prevalence, severity, and risk factors. Neurology 64:1920-4, 2005.
[32] Prospective study of restless legs syndrome and total cardiovascular mortality among women.  Yinge Li, Yanping Li, John W. Winkelman, Arthur S. Walters, Jiali Han, Frank B. Hu, Xiang Gao, Neurology, Dec 2017.

1   swelling, headache, neuropathic pain….", RLS can kill.

2        RLS is a real disease.  Physician's who treat RLS patients bill for patient visits under the

3   International Classification of Sleep Disorders (ICSD-2) as an "Intrinsic Sleep Disorder" which

4   is coded as 780.52-5.  For CMS billing purposes this code is cross-walked to ICE-10-CM and

5   coded as G25.81.  Patient visits are reimbursed for Medicare beneficiaries who have RLS.  In

6   addition, Medicare, Part D, covers FDA-cleared RLS drugs.

7        **1. How is RLS currently Treated?**

8

9        The current "gold standard" for RLS treatment is FDA-cleared drugs.  RLS drugs are

10   prescribed by a patient's physician only after that physician has determined that the patient has

11   RLS.  The prescription is then dispensed by a pharmacist who fills each prescription.[33]  RLS

12   drugs are ingested every day whether a patient is having an RLA attack or not.  All RLS drugs

13   cross the blood-brain barrier and influence brain chemistry.  They are generally ingested in the

14   evening, at a specific time, because they cause dramatic drowsiness about one hour after

15   ingestion.  In most patients they also produce an array of disturbing side effects.  More

16   worrisome is the relatively new finding that the most commonly used drug to treat RLS,

17   dopamine-like drugs, actually make RLS **worse** over time.  Consequently, availability of an

18   FDA-cleared medical device with no drug side effects is desirable.

19        **2. Relaxis Counter-stimulation Treatment**

20   Vibration from the Relaxis device is not provided as a source of "personal comfort."  Vibration

21   is applied at the time of an RLS attack to serve as a source of counter-stimulation to the

22   dysphoria of RLS.  Compression, heat, cold, flashing lights, and various sounds could be applied

23   as a counter-stimulus but these sensory inputs are either difficult to apply or are incompatible

---

[33] Relaxis is prescribed in exactly the same way: A patient sees his or her doctor, is diagnosed with RLS, prescribed Relaxis, and obtains Relaxis from a licensed DME distributor.

**36**

1    with falling asleep.  The sensation of vibration was chosen by Sensory as the most efficient

2    counter-stimulus for breaking an RLS attack.

3         Anyone who has wielded a hammer and struck his or her thumb knows the phenomena.

4    Immediately after the thumb is struck, the hand of the struck thumb is shaken vigorously.  The

5    sensations that arise from shaking the injured hand reach the brain at the same time injured

6    thumb sensations reach the brain.  Hand-shaking, counter-simulation sensations diminish the

7    pain from the hammer blow.  At the time of a RLS attack, Relaxis delivers a counter-stimulus to

8    the awful, dysphoria of RLS.

9         Like RLS drugs, Relaxis can only be obtained after a face-to-face examination with the

10   doctor, after a diagnosis of RLS is made by that physician, after a prescription for Relaxis has

11   been written by that physician, and after that prescription has been filled by a licensed DME

12   supplier.

13        Unlike drugs, Relaxis is only used at the time of an RLS attack.  During an attack Relaxis

14   generates a counter-stimulus to the RLS attack.  At the earliest sign of an RLS attack, Relaxis is

15   placed under the legs at the area of greatest RLS discomfort and activated.  Activation of Relaxis

16   generates a counter-stimulus to the legs. The Relaxis counter-stimulus in the legs offsets the

17   dysphoric RLS sensations within the brain.  With RLS dysphoria extinguished, patients fall to

18   sleep.

19        The intensity of counter-stimulation is determined and set by each RLS patient through

20   an explicit process, starting with a very low power setting and increasing counter-stimulation

21   intensity until an RLS attack is broken.  To break an attack, some patients require high vibration

22   intensity; others, low or intermediate intensity.  Following 30 minutes of counter-stimulation, the

23   Relaxis controller slowly decreases vibration intensity until all vibration stops at minute number

24   35.  This slow ramp-down feature was designed to *not* awaken the sleeping RLS patient with a

1   sudden cessation of vibration and is a key feature of the Relaxis patent.[34]

2

3   ## X. STATUTORY AND REGULATORY BACKGROUND

4   ### A. Administrative Remedies Exhausted

5

6   HHS and CMS issuance of a Formal BCD through Wilson constitutes final agency

7   action of which Plaintiffs are entitled to judicial review under the APA.  Plaintiff has

8   exhausted all administrative remedies.  On June 2, 2017 appeal[35] was made, in-person, to

9   Demetrios Kouzoukas (Kouzoukas), Director, Center for Medicare and CMS Principal Deputy

10  Administrator at 3:00PM at the Hubert H. Humphrey Building, 200 Independence Avenue,

11  SW Washington, DC.  Of note, Wilson failed to show up at the hearing and, therefore, could

12  not be questioned.

13  As of this date of this Petition, no judgment has been issued by Kouzoukas.  Many

14  attempts were made to reach Kouzoukas to learn of his ruling.  These attempts were made (i)

15  by phone 24, (ii) by email 47 times, (iii) through assistance from the CMS Ombudsman Office,

16  James T. Bailey, 6 times, and (iv) through Congressman Darrel Issa's office, many, many

17  times.  As Kouzoukas has failed to deliver a timely ruling - it being over 7 months from the

18  date of the hearing – immediate judicial review is sought: "Justice delayed is justice denied"

19  ### B. Statutes Supporting Plaintiff's Action

20  #### 1. Title XVIII of the Social Security Act of 1965

21

22  This title established regulations for the Medicare program, which guarantees access to

23  health insurance for all Americans, aged 65 and older, younger people with specific

---

[34] Exhibit E United States Patent No. 9,017,273 B2, Date: April 28, 2015, Devices and Methods for Treating Restless Legs Syndrome, Burbank, et al.
[35] Exhibit G - Appeal of Formal BCD June_2_2017

1   disabilities, and individuals with end stage renal disease.  It is quite clear that access to health

2   insurance is intended to lead to access to better health care: the process of diagnosing and

3   treating illnesses, diseases, and disorders that are characterized and described in various

4   medical textbooks and governmental codes.

5   RLS is a neurological disorder that affects approximately 17,263,246 female Medicare

6   beneficiaries and 9,806,004 male Medicare beneficiaries.  CMS actions have distorted the will

7   of Congress and deprived these Medicare beneficiaries of a safe and effective alternative to

8   RLS drugs.  This CMS decision in question has had, therefore, a substantive impact on health

9   care within the United States.

10   **2. Administrative Procedure Act ("APA") Pub. L. 79-404, June 11, 1946**

11

12   **a) 5 U.S. Code § 706 - Scope of review[36]**

13

14   "To the extent necessary to decision and when presented, the reviewing court shall decide

15   all relevant questions of law, interpret constitutional and statutory provisions, and determine the

16   meaning or applicability of the terms of an agency action. The reviewing court shall:

17   "(1) compel agency action unlawfully withheld or unreasonably delayed; and
18   (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
19   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance
20   with law [*DISCRETON Issue*];
21   (B) contrary to constitutional right, power, privilege, or immunity [*LAW Issue*];
22   (C) in excess of statutory jurisdiction, authority, or limitations, or short of
23   statutory right [*LAW Issue*];
24   (D) without observance of procedure required by law [DIS*CRETION Issue*];
25   (E) unsupported by substantial evidence in a case subject to sections 556 and 557
26   of this title or otherwise reviewed on the record of an agency hearing provided by
27   statute [*FACT AND TEST Issue*]; or
28   F) unwarranted by the facts to the extent that the facts are subject to trial de novo
29   by the reviewing court [*FACT AND TEST Issue*].
30
31   In making the foregoing determinations, the court shall review the whole record or those
32   parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
33   (Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)"

---

[36] Plaintiff's insertions are italicized and inside brackets: [insertion].

1

2 **b) Action Challenged**

3

4      Plaintiffs bring this action under the APA to challenge that written Formal Benefit

5 Category Determination (BCD) rule issued by letter on March 30, 2017, signed by Laurence

6 Wilson ("Wilson,") Director, Chronic Care Policy Group, Center for Medicare, CMS, an

7 division within the Defendant HHS.

8      APA 5 USC §551 *et seq*. (1946) governs the process by which federal agencies develop

9 and issue regulations. It includes requirements for publishing notices of proposed and final

10 rulemaking in the Federal Register, and provides opportunities for the public to comment on

11 notices of proposed rulemaking.  In addition to setting forth rulemaking procedures, the APA

12 addresses other agency actions such as issuance of policy statements, licenses, and permits. It

13 also provides standards for judicial review if a person has been adversely affected or aggrieved

14 by an agency action.

15      The APA authorizes a court to set aside agency action, findings, and conclusions of law

16 found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

17 law" (5 U.S.C. § 706(2)(A)) or "in excess of statutory jurisdiction, authority, or limitations, or

18 short of statutory right." 5 U.S.C. § 706(2)(C).  The APA also provides a right to judicial

19 review of all "final agency action for which there is no other adequate remedy in a court." 5

20 U.S.C. § 704.

21      **3. 42 U.S.C. § 1395 *et seq*. "Prohibition against any Federal interference,"**

22

23      This section states that "… nothing in this subchapter shall be construed to authorize

24 any Federal officer or employee to exercise any supervision or control over the practice of

25 medicine or the manner in which medical services are provided, or over the selection, tenure,

26 or compensation of any officer or employee of any institution, agency, or person providing

1    health services; or to exercise any supervision or control over the administration or operation

2    of any such institution, agency, or person."

3         Wilson's confusion as to what constitutes treatment of a neurological disorder is

4    tantamount to practicing medicine.

5              **4. Due Process**

6         Plaintiffs bring this action under the Due Process provisions of the Fifth and Fourteenth

7    Amendments of Constitution of the United States because of the lawless procedures CMS and its

8    DME MACs have followed in arriving at Local, Informal, and Formal BCD rulings.

9    **XI. COUNT 1 - CMS Rulemaking is Inconsistent with the Will of Congress as Expressed**
10   **throughout the Social Security Amendment Act (1965)**

11        **A. Personal Comfort Items**
12
13        The intent of this Act was to facilitate access to treatments illnesses, injuries, diseases and

14   disorders affecting Medicare beneficiaries but not to provide for every day "personal comfort

15   items."   Unfortunately, Congress never created a clear, intelligible principle[37] as to what

16   constitutes a "personal comfort item."  Googling these three words plus the letters "CMS" brings

17   up this current CMS guideline document:

---

[37] J. W. Hampton, Jr. & Co. v. United States". Justia US Supreme Court Center. April 9, 1928. 276 U.S. 394 (1928)

1    "C) Personal Comfort Items and Services[38]
2
3    Personal comfort items are not covered because these items do not meaningfully
4    contribute to the treatment of a beneficiary's illness or injury or the functioning of a
5    malformed body member. Some examples of personal comfort items are:
6    •
7    Radios
8    Televisions
9    Beauty and barber services, except as described below under Exceptions (Items and
10   Services That May Be Covered)"
11
12   This is a long way from saying that an FDA-cleared, Class II, Neurological Device that is

13   physician-prescribed as a non-drug treatment of sleep loss associated with RLS is in the same

14   class as radios, televisions, and beauty services.

15       CMS has exceeded its delegated authority and misinterpreted the Will of Congress by

16   equating Relaxis with items such as radios, televisions, and beauty services.


17       **B. Generally Not Useful to a Person in the Absence of an Illness or Injury – [or,**
18       **inversely, Is Useful to a Person in the presence of an illness or injury]**
19
20       The intent of this act was to facilitate access to treatments that are useful to an injured or

21   ill person.  In his Formal BCD, page 3, lines 25-30, Wilson has ruled that:

22       "Electronically powered and controlled foam vibration massage cushion pads are useful
23       to a person in the absence of an illness or injury for soothing muscles, relieving pain, and
24       other indication.  The fact that one product may be prescribed by a physician for use in
25       improving sleep quality or for counter-stimulation purposes does not change the fact that
26       electronically powered and controlled foam vibration massage cushion pads generally are
27       useful to a person in the absence of an illness or injury."
28
29       Relaxis can only be obtained after a patient has visited his or her physician, received a

30   diagnosis of RLS, has then received a prescription for Relaxis, and then has the prescription

31   filled by a licensed durable equipment distributor.  It cannot be obtained "…for soothing

32   muscles, relieving pain, and other indication."  This claim by Wilson is nonsensical.

---

[38] https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-
MLN/MLNProducts/Downloads/Items-and-Services-Not-Covered-Under-Medicare-Booklet-
ICN906765.pdf

1  **C. Not Primarily and Customarily Used to Serve a Medical Purpose – "not**
2  **primarily medical in nature"**
3
4  The intent of this act was to facilitate access to treatments that are useful to an injured or

5  ill person.  In his Formal BCD, page 3, lines 14-16, Wilson has ruled that:

6  "The longstanding national program guidance indicates that foam massage cushion pads
7  and massage devices are not primarily medical in nature.  These devices are primarily
8  and customarily used for purposes other than treatment of an illness, such as relieving
9  minor muscle acnes and pains."
10
11  Relaxis can only be obtained after a patient has visited his or her physician, received a

12  diagnosis of RLS, has then received a prescription for Relaxis, and then has the prescription

13  filled by a licensed durable equipment distributor.  It cannot be obtained for "…for soothing

14  muscles, relieving pain, and other indication."  This claim by Wilson is nonsensical.

15  **XII. COUNT 2 – CMS Rulemaking is Inconsistent with Common Medical Understanding**
16  **of what constitutes Medical Treatment**
17
18  In his Formal Benefit Category Determination, page 3, lines 17-20, Wilson states,

19  "In the case of the Relaxis device, the FDA clearance does not indicate that the device is
20  effective in treating RLS, but probably benefits may include improved sleep quality.  The
21  review of clinical evidence you submitted does not show that the device is effective in
22  treating RLS."[39]
23
24  In effect, Wilson is saying the Relaxis does not cure the underlying cause of RLS.

25  Review of a parallel sleep disorder, sleep apnea, demonstrates the folly of this statement.

26  Sleep apnea has received coverage from CMS for Continuous Positive Airway Pressure (CPAP)

27  devices.[40]  CMS covers the first 3 months of CPAP treatment during a rental period for which

28  Medicare Part B pays 80%. At the end of the 3-month trial period, if the patient's physician

29  decides that CPAP therapy is helping, CPAP therapy will continue to be covered. Medicare will

---

[39] Determination as to what is safe and effective is an FDA function.
[40] Medicare coverage – sleep apnea and CPAP devices and accessories;
https://www.medicare.gov/coverage/sleep-apnea-and-cpap-devices-and-accessories.html

1    pay 80% of the Competitive Bid Price for up to 13 months at which time the patient owns the

2    CPAP device.

3         Sleep apnea, initially called the Pickwickian Syndrome[41], is causes by collapse of soft

4    tissue in the back of the nose and mouth during sleep.  When so collapsed, the patient cannot

5    inhale air and awakens.  Like RLS this leads to interrupted sleep and sleep loss.  Like RLS this is

6    associated with increased risk of cardiovascular disease.

7         CPAP does not treat the underlying disorder: flaccid posterior airway tissue rigidity.  It

8    keeps the posterior airway open and improves sleep.

9         Medical or surgical treatments do not have to demonstrate cure of an underlying illness or

10   injury to be true treatments.  Amelioration of a predominant symptom or complication is

11   sufficient to be considered a treatment.

12   **XIII. COUNT 3 - Procedures Used by DME MACs, HHS/ CMS Inconsistent with APA**
13
14        HHS through CMS has broken almost all rules and guide lines defined within the APA.

15   These failures will be defined in detail at trial

16   **XIV. COUNT 4 - Wilson practicing medicine**
17
18        By rendering judgments about device efficacy in his Final BCD ruling, Wilson has

19   introduced judgments reserved to practicing physicians.  The depth of this transgression will be

20   laid out at trial.

21   **XV. COUNT 5 – Violation of the Social Security Act (1965)**
22
23        The APA requires this Court to hold unlawful any agency action that is arbitrary and

24   capricious or contrary to law and that is in excess of the agency's statutory authority. 5 U.S.C.

25   § 706(2)(A), (C).

---

[41] The Posthumous Papers of the Pickwick Club, Charles Dickens, Serialized1836

**44**

1          The Formal BCD ruling made by Wison is arbitrary and capricious and contrary to law

2     and in excess of the Secretary's authority under 42 U.S.C.

3          § 1395*l*(t)(14)(A)(iii).

4

5     **XVI. COUNT 6 – Violation of Due Process**

6

7          Principle of due process, required by the Constitution in two Articles, requires that

8     governmental acts that impinge directly on a citizen of a life, liberty, or property interests, must

9     first be given notice and the opportunity to be heard.  No such notice or opportunity was afforded

10    Sensory.

11    **XVII. PRAYER FOR RELIEF**

12

13         WHEREFORE, Plaintiffs respectfully request that this Court issue judgment in its favor

14    and against Defendants and issue the following relief:

15         **A. Summary Judgment and De Novo Administrative Remedy Exhaustion Order**

16

17         An order stating that after over 2 years of unsuccessful CMS interactions, Sensory has

18    exhausted is administrative remedies.  The plaintiff pleads that the issue not be remanded back to

19    CMS as CMS has considered and reconsider this issue beyond any reasonable time frame (see

20    Exhibit B - Timeline) and has parroted the same erroneous rejections six times.

21         **B. Summary Judgment and De Novo Durable Medical Equipment Benefit Category**
22         **Determination Order**

23

24         An order directing Defendants to strike their six prior rejections, reverse all such BCD

25    rejections, and make a de novo judiciary decision ruling that Relaxis is DME within CMS.

26         **C. Summary Judgment and De Novo National Coverage Determination Order**

27

28         An order directing CMS to immediately declare that Relaxis is reasonable and necessary

1    for RLS treatment.

2        **D. Prohibit CME or it Contractors From Future "Dry Gulch Assignations" and**
3        **"Blind-side Tackling"**

4

5        An order directing the Defendants to cease and desist from preemptory exclusion of any

6    new device or drug - further directing HHS and CMS to follow APA procedures throughout the

7    Department HHS.

8        Such other relief as this Court may deem just and proper.

9

10   Dated: ____2/1____, 2018

11   Respectfully submitted,

12
13        *Fred Burbank MD*

14        Fred Burbank, MD (Litigant Pro Se)
15        24040 Camino Del Avion, A326
16        Dana Point, CA 92629
17        Tel: 949-496-0026
18        Fax949-496-3247
19        FBurbank@cox.net

20
21        *Attorney for Plaintiffs*
22

1

2      **XVIII. LIST OF EXHIBITS**

3

4          **A. Exhibit A – August 21, 2014 Vibration Therapy Devices – Correct Coding**

5

6          **B. Exhibit B – CMS and Sensory Timeline**

7

8          **C. Exhibit C – Formal Benefit Category Decision Wilson dtd March 30, 2017**

9

10         **D. Exhibit D – DME MAC Local Benefit Category ruling dtd March 31, 2016**
11         **revealing preemptive strike against Relaxis**

12

13         **E. Exhibit E – United States Patent 9,017,273 B2 dtd April 28, 2015**

14

15         **F. Exhibit F – CV Fred Burbank, MD dtd June 7, 2016**

16

17         **G. Exhibit G – PowerPoint Presentation at Benefit Category Determination (BCDE)**
18         **CMS Internal Review Hearing dtd June 2, 2017, CME Principle Deputy**
19         **Administrator, Demetrios Kouzoukas, presiding**

# Exhibit A



CGS
A CELERIAN GROUP COMPANY

myCGS Login | Contact Us | Join/Update ListServ

Corporate   Business Services

Medicare Home   DME MAC Jurisdiction B Implementation   DME MAC Jurisdiction C   Home Health & Hospice   KY & OH Part B   KY & OH Part A

myCGS
Claim Submission
Medical Review
Medicare Beneficiaries
Fee Schedules
Local Coverage Determinations
Education
CERT
FAQs
Forms
News & Publications

Home » DME MAC Home » News & Publications » News » Vibration Therapy Devices - Correct Coding

Print | Bookmark | Email | Font Size: + | –

August 21, 2014

## Vibration Therapy Devices - Correct Coding

*Joint DME MAC Publication*

Vibration therapy is the application of a vibratory stimulation to the body. It can be applied as in a variety of ways, ranging from whole-body vibration to stimulation of local areas such as joints, hands, face, etc. (not all-inclusive). It is promoted as a treatment for numerous conditions such as arthritis, joint swelling, headache, neuropathic pain, restless legs, etc. (not all-inclusive).

Equipment which is primarily and customarily used for a nonmedical purpose may not be considered "medical" equipment for which payment can be made under the Medicare program. This is true even though the item has some remote medically related use. Vibration devices are considered to be massage modalities. As such they are not eligible to be classified as Durable Medical Equipment. Claims for these items must be coded using:

A9270: Non-Covered Item or Service

For questions about correct coding, contact the PDAC Contact Center at (877)735-1326 during the hours of 8:30 a.m. to 4:00 p.m. CT, Monday through Friday, or e-mail the PDAC by completing the DME PDAC Contact Form located on the PDAC website.

# Exhibit B

| Events | Event Date | CMS Clock Time ...ates are from first Sensory contact with CMS | Interaction with CMS | Rejections | CMS problem |
|---|---|---|---|---|---|
| 1 | December 18, 2013 | MINUS 1 year, 3 months, 20 days from the date of the FIRST CMS contact | Based on the Sensory NeuroStimulation's (Sensory) Relaxis medical device de novo application, the FDA created a new, Class II, prescription medical device category with the Product Code, OVP, Vibratory Counter-Stimulation Device labeled specifically for the treatment of Sleep Loss associated with Restless Legs Synddrome (RLS) and cleard the Relaxis(R) (previously Symphony(TM)) device for comercial sale, | | |
| 2 | August 21, 2014 | MINUS 8 months 3 days | *DME MAC CGS internaly published "Vibration Therapy Devices - Correct Coding" for devices promoted as a treatment for numerous conditions such as arthritis, joint swelling, headache, neuropathic pain, restless legs, etc. (not all-inclusive). CODE: A9270 Non-Coverec Item or Service (see attached 1)* | *Preemptive Strike Rejecton #1* | No precidence for this in CMS law |
| 3 | September 30, 2014 | MINUS 7 months, 6 days | *DME MAC noridian internally published "Vibration Therapy Devices - Correct Coding" for devices promoted as a treatment for numerous conditions such as arthritis, joint swelling, headache, neuropathic pain, restless legs, etc. (not all-inclusive). CODE: A9270 Non-Coverec Item or Service* | *Preemptive Strike Rejecton #2* | No precidence for this in CMS law |
| 4 | April 7, 2015 | ZERO DAY = FIRST CMS contact | Sensory NeuroSimulation applied to noridian for a PDAC HCPCS code | | |
| 5 | June 8, 2015 | 2 months, 1 day | noridian rejected request for PDAC HCPCS code using "Correct Coding" A9270 reasoning from August 21, 2014 and September 30, 2014 internal. | Knee Jerk Rejection #3 | |
| 6 | June 24, 2015 | 2 months, 17 days | Sensory NeuroStimulation requested an 'informal' benefit category determination (BCD) directly from CMS. | | |
| 7 | November 10, 2015 | 7 months, 3 days | Laurence Wilson 'informally' determined the Relaxis device is "not Medicare DME" based upon the same logic as the "Correct Coding" from 8/21/2014 and 9/30/2014 above. He went on to recommend that Sensory return to the Jurisdicton D DME MAC, noridian, and request a local BCD, also know as a reasonable and necessary (R&N) analysis. | Knee Jerk Rejection #4 | |
| 8 | December 16, 2015 | 8 months, 9 days | Laurence Wilson wrote "I wanted to get back to you with contacts at the DME Medicare Administrative Contractors. Dr. Dick Whitten and Dr. Peter Gurk are medical directors for Noridian and I am advised by your Coverage and Analysis Group that they are the best points of contact to begin a conversation about Medicare coverage [R&N] of the Relaxis system. Dr. Whitten's phone number is 206-979-5007 and his email is dick.whitten@noridian.com. Dr. Gurk can be reached at peter.gurk@noridian.com. I have e-mailed them to alert them to your communication on the matter." | | A clear head-fake designed to waste Sensory time |
| 9 | March 21, 2016 | 11 months, 14 days | Peter Gurk wrote for Wilfred Mamuya (DME MAC, Jurisdiction A), Stacey Brennan (DME MAC,Jurisdiction B), Robert Hoover (DME MAC,Jurisdiction C), and himself DME MAC,(Jurisdiction D) rejected our request for an R&N analysis because the CMS MACs Benefit Category determination concluded that "The Relaxis(TM) device is appropriately classified as a type of massage therapy device, rendering an analysis [R&N] unnecessary at this time. Therefore the coding for the Relaxis device remains A9270: Non-Covered Ittem of Service." **NOTE:** on page 2, second to last paragraph of letter: **ADMISSION OF PREEMPTIVE STRIKE REJECTIONS** on August 21 2014 and September 30, 2014 by DME MACs! | Knee Jerk Rejection #5 | |
| 10 | June 16, 2016 | 1year, 2 months, 9 days | Sensory NeuroStimulation delivered request to Tamara Syrek-Jensen for a formal Noncoverage Determination (NCD) of the Relaxis device (see attached photo of application materials) | | |
| 11 | September 9, 2016 | 1 year, 5 mnths, 2 days | Tamara Syrek-Jensen wrote "In order for CMS to make a coverage determination there must be a benefit category for the particular item or service. Without a benefit category, we cannot make a reasonable and necessary determination (i.e., coverage decision). Therefore, because we are not sure if there is a benefit category we referred your NCD request to Laurence Wilson's group who will conduct a formal benefit category determination. | | Tamara Syrek-Johnson can not proceed with NCD without Wilson BCD |
| 12 | November 16, 2016 | 1 year, 7 months, 9 days | Laurence Wilson wrote "In your note below you make an allegation of inappropriate conduct involving CMS employees and contractors. I wanted to let you know that the Office of the Inspector General (OIG) of the Department of Health and Human Services is the appropriate authority to address such allegations. If you wish to contact them you can call the OIG Hot Line at 1-800-447-8477. They can also be contacted through their website at oig.hhs.gov/fraud/report-fraud/. | | Wilson does not like my pointing out improper preemptive strike rejections |
| 13 | March 30, 2017 | 1 year, 11 months, 23 days | Following this above outburst, Laurence Wilson wrote "In summary, national Medicare guidelines indicate that massage cushion pads and massage devices are excluded from coverage because they are considered personal comfort items and are not primarily medical in nature. In addition, regardless of whether these devices meet the durability criteria, they are not primarily and customarily used to serve a medical purpose and are generally useful to a person in the absence of an illness or injury. To change this policy would require a change to the national policy based on evidence that these type of devices as a whole are not personal comfort items and meet all of the criteria for classification as DME. Based on our review, the evidence and information for these devices currently does not support such a change." In closing, he doubles-down on the prior DME MAC work, stating "Finally, we note that our conclusion is consistent with our prior informal review and the review performed by the medical directors for the Durable Medical Equipment Medicare Administrative Contractors (DME MACs) as explained in their letter to you on March 21,2016." | Knee Jerk Rejection #6 | More jibberish. Same-old, same-old stuff + Plus double-down on content of preemptive strike rejections #1 & #2 |
| 14 | June 2, 2017 | 2 years, 1 month, 26 days | Internal Appeal to Demetrios Kouzoukas, Principal Deputy Administrator CMS | | |

# Exhibit C

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-08-27
Baltimore, Maryland 21244-1850



**CENTERS FOR MEDICARE & MEDICAID SERVICES**
**CENTER FOR MEDICARE**

Center for Medicare

MAR 3 0 2017

Fred Burbank, MD
Chief Executive Officer
Sensory NeuroStimulation, Inc.
1235 Puerta del Sol #500
San Clemente, CA  92673

Dear Dr. Burbank:

This is in further response to your June 2016, request for a Medicare National Coverage Determination (NCD) for the Relaxis device, submitted to Tamara Syrek-Jensen, Director of the Coverage and Analysis Group, in the Center for Clinical Standards and Quality, Centers for Medicare and Medicaid Services.  Your request was forwarded to my office for the purpose of determining if this device falls under a defined Medicare benefit category.  In your request, you state that the device "clearly meets all the criteria of DME," or the Part B benefit category for durable medical equipment.

The information you presented in support of Medicare coverage of the product was thoroughly reviewed by a team of CMS medical officers as well as subject matter experts that specialize in Medicare benefits policy.  Based on our analysis of the request and supporting documentation, the Relaxis device cannot be covered under Medicare Part B because it is considered a personal comfort item excluded from coverage by the Medicare statute, and because it does not meet the criteria for classification as DME.  We further note that Federal laws and regulations related to the process of evaluating and classifying devices for marketing purposes by the Food and Drug Administration (FDA) are different than the Federal laws and regulations related to Medicare coverage, classification, and reimbursement of devices.

Personal Comfort Items

Medicare program guidance at section 280.1 of chapter 1, part 4 of the Medicare National Coverage Determinations Manual indicates that heat and massage foam cushion pads and massage devices are personal comfort items excluded from Medicare coverage by section 1862(a)(6) of the Social Security Act.  These national Medicare guidelines also indicate that these devices are not primarily medical in nature, which makes them ineligible for classification as DME under current Federal regulations.  The Relaxis device consists of a foam pad, controller and a power supply that provides mechanical vibration.  At the onset of a restless leg syndrome (RLS) episode, the patient positions the pad underneath the legs while lying in bed and activates the device that continuously vibrates for 35 minutes before automatically turning off.  Vibration devices are considered to be massage modalities, and massage devices in general, and foam massage cushion pads in particular, are excluded from coverage per the national Medicare guidelines.  The national guidelines apply to this equipment in general and do not provide exceptions for massage devices or massage cushion pads prescribed by physicians.

Page 2 – Dr. Burbank

The Medicare Durable Medical Equipment Benefit

The term durable medical equipment (DME) is defined and addressed in regulation and program instructions (see 42 CFR 414.202 and section 110.1 of chapter 15 of the Medicare Benefit Policy Manual (Pub. 100-02), respectively). Under § 414.202, durable medical equipment means equipment which—

- Can withstand repeated use;
- Effective with respect to items classified as DME after January 1, 2012, has an expected life of at least 3 years;
- Is primarily and customarily used to serve a medical purpose;
- Generally is not useful to a person in the absence of an illness or injury; and
- Is appropriate for use in the home.

All requirements of the definition must be met before an item can be considered to be DME. The requirement that equipment have an expected life of at least 3 years was added to the regulation in 2012 in order to further clarify the requirement that equipment must be durable in order to be considered DME. Based on our review, we do not believe that the device meets all 5 of the criteria above to be considered DME, as explained in detail below.

**Ability to Withstand Repeated Use (Meets Criteria)**

Equipment must be able to withstand repeated use (i.e., equipment which can normally be rented) in order to be considered durable. Most electronically powered and controlled foam vibration massage cushion pads appear to be furnished on a purchase only basis. Information you submitted for the Relaxis device, as well as information on the internet indicates that the Relaxis device is reusable and available on a rental or purchase basis. The FDA documentation indicated that the outer cover is removable and can be cleaned. We therefore believe that the device can be rented.

**Expected Life of at Least Three Years (Not Confirmed)**

The criterion that equipment have an expected lifetime of at least 3 years was added to the regulatory definition of DME at 42 CFR 414.202 in 2012. This criterion further addresses the issue of "durability" and provides a clear minimum timeframe for how long an item of DME should last. Although many electronically powered and controlled foam vibration massage cushion pads appear to come with a 3-year limited warranty, and information you submitted for the Relaxis device states that the minimum expected product lifetime is 3 years, we do not have independent testing data or information to support a determination that electronically powered and controlled foam vibration massage cushion pads, and the Relaxis device in particular, meet this criterion.

Page 3 – Dr. Burbank

The FDA documentation indicates that life cycle testing and other tests were performed on the first generation device (Symphony), but we do not have the results of this testing or the process and assumptions used in performing this testing, nor do we have any indication that testing was performed on the second generation device (Relaxis).

**Primarily and Customarily Used to Serve a Medical Purpose (Does Not Meet Criteria)**

The longstanding national program guidance indicates that foam massage cushion pads and massage devices are not primarily medical in nature.  These devices are primarily and customarily used for purposes other than treatment of an illness, such as relieving minor muscle aches and pains.  In the case of the Relaxis device, the FDA clearance does not indicate that the device is effective in treating RLS, but probable benefits may include improved sleep quality.  The review of clinical evidence you submitted does not show that the device is effective in treating RLS.

**Generally Not Useful to a Person in the Absence of an Illness or Injury (Does Not Meet Criteria)**

Electronically powered and controlled foam vibration massage cushion pads are useful to a person in the absence of an illness or injury for soothing sore muscles, relieving pain, and other indications.  The fact that one product may be prescribed by physicians for use in improving sleep quality or for counter stimulation purposes does not change the fact that electronically powered and controlled foam vibration massage cushion pads generally are useful to a person in the absence of an illness or injury.

**Appropriate for Use in the Home ( Meets Criteria)**

Electronically powered and controlled foam vibration massage cushion pads are currently used in the home.

In summary, national Medicare guidelines indicate that massage cushion pads and massage devices are excluded from coverage because they are considered personal comfort items and are not primarily medical in nature.  In addition, regardless of whether these devices meet the durability criteria, they are not primarily and customarily used to serve a medical purpose and are generally useful to a person in the absence of an illness or injury.  To change this policy would require a change to the national policy based on evidence that these type of devices as a whole are not personal comfort items and meet all of the criteria for classification as DME.  Based on our review, the evidence and information for these devices currently does not support such a change.

Page 4 – Dr. Burbank

Finally, we note that our conclusion is consistent with our prior informal review and the review performed by the medical directors for the Durable Medical Equipment Medicare Administrative Contractors (DME MACs) as explained in their letter to you on March 21, 2016.

Although I regret that my response could not be more favorable, I hope that this information is helpful to you.

Sincerely,

Laurence D. Wilson
Director
Chronic Care Policy Group

**Exhibit D**



*Healthcare Solutions*

March 21, 2016

FINAL

Fred Burbank, M.D.
Chief Executive Officer
Sensory NeuroStimulaton, Inc.
1235 Puerta del Sol #700
San Clemente, CA 92673

Re:  Potential Medicare Reimbursement for Relaxis™

Dear Dr. Burbank,

The DME Contractor Medical Directors (DMDs) would like to thank you for the information you provided on our recent conference call, held on January 14, 2016.  This letter provides the DME MAC Medical Director WorkGroup's determination regarding Medicare payment status for your product.

<u>FDA Status</u>

The US Food and Drug Administration (FDA) gave commercial clearance for your product after completing a *de novo* request for classification on December 18, 2013 for the Symphony™ device and concluded that this device and substantially equivalent devices of this generic type are considered to be vibration devices. Symphony ™ is described as the first generation device used in the clinical trials. Relaxis™ is described as the second generation vibratory counterstimulation device which provides the same product specifications and same vibratory counterstimulation as the Symphony™[1].

FDA clearance is not the sole determinant of Medicare payment eligibility and HCPCS coding.  The FDA is a separate and independent agency charged with evaluating the safety and effectiveness of medical products to determine their suitability for marketing. On the other hand, the Medicare program is a health insurance program tasked with making payment policy and providing reimbursement.  For Medicare payment purposes, each product must be in compliance with the applicable FDA criteria in order to be considered for possible coverage; however, FDA approval does not automatically confer Medicare coverage.  The coding classifications used for payment purposes by Medicare are different from the classification system used by the FDA for their purposes.  Although FDA clearance is required, it does not replace or otherwise control Medicare's requirements.

<u>Medicare Benefit Category Eligibility</u>

Your company, Sensory Neurostimulation Inc. met with Laurence Wilson, Director of the CMS Chronic Care Policy Group, in November of 2015 seeking an informal benefit category determination for the Relaxis™ device and request for a HCPCS code. His letter indicated that the CMS had reached an informal benefit determination that the device does not meet the Medicare definition of Durable Medical Equipment (DME) since it may serve a non-

---

[1] Available at myrelaxis.com.

*A CMS Medicare Administrative Contractor*

Noridian Healthcare Solutions  LLC



29317044 (3203) 4-13

medical purpose to individuals who are not ill or injured and that this device is similar to that of other non-covered vibration therapy devices. The letter also referenced the NCD (280.1) which specifies that massage devices in general are not covered because they are personal comfort items and are not primarily medical in nature.

Medicare is a "defined-benefit" program which has specific product eligibility (Benefit Category) requirements that must be addressed before issues of medical effectiveness and "reasonable and necessary" (these are commonly referred to as "medical necessity") provisions of coverage are considered. Thus, the initial step in a coverage determination must evaluate whether the item is eligible for inclusion into an existing statutory benefit.  CMS *Benefit Policy Manual* (IOM 100-02) Chapter 15, § 110.1 (Definition of Durable Medical Equipment) which, in relevant part, states:

> Durable medical equipment is equipment which:
> - Can withstand repeated use;
> - Is primarily and customarily used to serve a medical purpose;
> - Generally is not useful to a person in the absence of an illness or injury; and
> - Is appropriate for use in the home.
>
> All requirements of the definition must be met before an item can be considered durable medical equipment.

In addition to these basic criteria, certain categories of products are explicitly excluded from classification as DME. The section goes on to say:

> Equipment which is primarily and customarily used for a nonmedical purpose may not be considered "medical" equipment for which payment can be made under the medical insurance program. This is true even though the item has some remote medically related use.

The DME MACs were made aware of the Relaxis™ device as a result of the FDA clearance for the device in 2014.   A decision was made to evaluate the product.  The DME MAC Medical Director Workgroup (DMDWG) applied the above standards in the analysis of the Relaxis™ device.  Upon review of the available information, it was determined that the Relaxis™ device does not meet the definition as an item of Durable Medical Equipment.  It was determined that vibration therapy devices are a type of massage equipment.  Massage devices may be used for a non-medical purpose, and thus may be useful in the absence of illness or injury.  Therefore, it would not be eligible for inclusion into the Durable Medical Equipment benefit. Subsequently, the DME MACs published a joint Correct Coding Article on Vibration Therapy Devices in August 2014. While not specifically mentioning the Relaxis™ device, the article informed DMEPOS Suppliers that vibration therapy devices are considered to be massage modalities, and "although they may have some medical related use that equipment which is not primarily and customarily used for a nonmedical purpose may not be considered 'medical' equipment for which payment may be made", and thus was assigned the HCPCS code of A9270: Non-Covered Item or Service.

Subsequently, an application for a HCPCS code was received by Medicare Product, Data Analysis, and Coding Contractor (PDAC) in April of 2015. The PDAC responded to Sensory Neurostimulation that the HCPCS code (A9270) had been assigned to the Relaxis™ for DME billing purposes on the basis that the device was determined to be a vibration therapy device.

Medicare Reasonable and Necessary (R&N) Determination

The DMDWG did not perform a "reasonable and necessary" analysis. The Benefit Category determination takes precedence over R&N considerations, rendering an analysis unnecessary at this time.

Determination

After the January conference call, the DMDWG re-evaluated the 2014 determination taking into account the informal benefit determination from CMS Chronic Care Policy Group, the additional information provided in conjunction with the conference call, and a review of the medical literature. The workgroup determined that the previous conclusion is accurate and correct. The Relaxis™ device is appropriately classified as a type of massage therapy device. Therefore the coding for the Relaxis™ device remains as A9270: Non-Covered Item or Service.

Thank you for your interest in the Medicare program.

Sincerely,

Peter J. Gurk, M.D.

On behalf of

| | |
|---|---|
| Wilfred Mamuya, MD, PhD<br>Medical Director, DME MAC, Jurisdiction A<br>NHIC, Corp.<br>75 Sgt. William B. Terry Drive<br>Hingham, MA 02043-1518 | Robert D. Hoover, Jr., MD, MPH, FACP<br>Medical Director, DME MAC, Jurisdiction C<br>CGS Administrators, LLC<br>2 Vantage Way<br>Nashville, TN 37228-1504 |
| Stacey V. Brennan, M.D., FAAFP<br>Medical Director, DME MAC, Jurisdiction B<br>National Government Services<br>8115 Knue Rd.<br>Indianapolis, IN 46250-1936 | Peter J. Gurk, MD<br>Medical Director, DME MAC, Jurisdiction D<br>Noridian Healthcare Solutions<br>900 42nd Street South<br>Fargo, ND 58103-2146 |

# Exhibit E

# CURRICULUM VITAE

Name:

**Fred Burbank, M.D.**
**12 Old Ranch Road**
**Laguna Niguel, CA 92677**
**U.S.A.**
**(949) 496-0026 (office)**

**Mailing Address**
**24040 Camino del Avion, Unit 326**
**Dana Point, CA 92629**

**e-Mail: Fburbank@cox.net**

Date of Birth:          February 21, 1942

Place of Birth:         Omaha, Nebraska U.S.A.

Marital Status:         Married



**PRIVATE COMMERCIAL ENTERPRISES**

May 1, 1980                  Palo Alto, CA
                             Incorporator of Burbank Enterprises, Inc.
                             A California Corporation formed for the
                             Production and Distribution of Audio-Safe$^{TM}$,
                             a patented, car radio lock. The Audio-Safe$^{TM}$ product
                             line was sold to Rebel Electronics in Montgomery,
                             Alabama.

December 15, 1988            Palo Alto, CA
                             Incorporator of Newport Digital Inc.
                             A California Corporation formed for the
                             Production and Distribution of Hewlett Packard-
                             compatible computer equipment.  The company operated profitably in
                             Irvine, CA until 2016 when it dissolved following the death of its founder,
                             John Haynie.
                                                                          c

July 6, 1993                 Palo Alto, CA
                             Incorporator of Biopsys Medical, Inc. (jointly with
                             Thomas J. Fogarty, M.D.), initially a California
                             Corporation formed for the Production and
                             Distribution of diagnostic breast biopsy
                             instruments.

                             CEO and Chairman of the Board of Biopsys Medical, Inc. from
                             incorporation in 1993 to the fall of 1995. Also, primary inventor of the
                             Mammotome breast biopsy device and related patents and originator of the
                             Breast Center Manager software system.

                             Biopsys went public at $15/share in 1996 and in 1997 was sold to Johnson
                             & Johnson for $27.33/share for a sale valuation of $310M.

August 18, 1997              Wilmington, Delaware
                             Incorporator of Vascular Control Systems, Inc. (formerly HysteRx, Inc.), a
                             Delaware corporation formed for the Production and Distribution of uterine
                             fibroid therapy instruments.

                             CEO and Chairman of the Board, 1997-2005. Executive Chairman, 2005-
                             2006.

                             First round financing 1.5M completed 4/6/99.
                             Second round financing 9.6M completed 5/1/2002
                             Third round financing 12.1M completed 6/7/04
                             Sold to Johnson and Johnson for 105M on 5/8/2006

January 21, 1998             Wilmington, Delaware
                             Incorporator of SenoRx, Inc. (formerly BiOpsolation, Inc.), a Delaware
                             corporation formed for the Production and Distribution of breast cancer
                             therapy and biopsy instruments.

                             CEO and Chairman of the Board from incorporation until 5/1/99, Chairman
                             of the Board until IPO in 2006.

                             Firsts round financing of 3M completed 3/24/98.
                             Second round financing of 8.7M completed 10/5/99.

Third round financing of 19M completed 7/5/01.
S-1 filed on 5/25/2006 with the SEC, NASDAQ listed
  with the symbol "SENO"
Purchased by C.R. Bard in May, 2010 for 213M

1999 – 2001              Director, Fischer Imaging Corporation
                         Denver, CO

2007 - present           Co-Founder and President, Salt Creek Fund I and Salt Creek Medical
                         Device Development, LLC (see http://www.saltcreekmedical.com/)
                         1235 Puerta del Sol, Unit 700
                         San Clemente, CA 92673

2007 – present           CEO, Sensory NeuroStimulation
                         www.myrelaxis.com
                         1235 Puerta del Sol, Unit 700
                         San Clemente, CA 92673

2009 – present           Co-Founder and President, The Salt Creek International Women's Health
                              Foundation (see http://saltcreekfoundation.org)
                         1235 Puerta del Sol, Unit 700
                         San Clemente, CA 92673

2008 - Present           Owner, Burbank Ranch in Templeton, LLC
                         44.5 acres of grape vines planted on an 84 acre Ranch with Winery
                         5685 El Pomar Drive
                         Templeton, CA 93465
                         www.burbankranch.com

## ACADEMIC HISTORY

Undergraduate

B.A. (Biology), 1963
Stanford University
Stanford, California 94305

Medical School

M.D., 1968
Stanford University School of Medicine
Stanford, California 94305

Academic Honors

Association of University Radiologists (AUR), Memorial Award, presented at the Annual AUR meeting, 1983
The Award is in honor of deceased members of the AUR and is presented annually to the resident or first year fellow who has submitted "An outstanding original paper on any aspect of radiology."

Stanford University School of Medicine, Robert H. Alway "Book" Award, presented at Graduation, 1968
The Award is named in honor of Dr. Alway, Dean of the Stanford University School of Medical from 1958 to 1964 and is given to the graduating senior student who has "Availed himself especially well of the Stanford five-year plan."

Graduation with Honors, 1963
Stanford University

Hall of Fame

Omaha Central High School
Omaha, Nebraska
Inducted, 2009

### INTERNSHIP, RESIDENCY, AND FELLOWSHIP

July 1981 - June 1983
and
July 1985 - June 1986

Resident, Diagnostic Radiology
Department of Diagnostic Radiology
Stanford University School of Medicine
Stanford, California 94305

July 1983 - June 1985

Fellow, Cardiovascular/Interventional Radiology
Department of Diagnostic Radiology
Stanford University School of Medicine
Stanford, California 94305

June 1971 - July 1974

Resident, Psychiatry
Department of Psychiatry
Stanford University School of Medicine
Stanford, California 94305

July 1968 - June 1969

Rotating Intern, Los Angeles County
Harbor General Hospital
1000 West Carson Street
Torrance, California 90509

See: http://www.latimes.com/news/local/la-me-gunshot-surgeon-20130818-dto,0,1798386.htmlstory

### OTHER STUDY AND RESEARCH

1976 - 1981

Analytic Candidate
C.G. Jung Psychoanalytic Institute of
    San Francisco
San Francisco, California 94109

1965 - 1968

Research Fellow
Dean's Office Fellowship
Stanford University School of Medicine
Stanford, California 94305
    and
Department of Pathology
Royal Postgraduate Medical School
London, England

1965 (Summer)

Teaching Assistant
NIH Sponsored Program for Black High
    School Students
Fleischman Medical Laboratories
Stanford University School of Medicine
Stanford, California 94305

1963 - 1965

Research Assistant
Department of Physiology
Stanford University School of Medicine
Stanford, California 94305

| 1964 (Summer) | Instructor |
| | Department of Chemistry |
| | Miles [an all Black] College |
| | Birmingham, Alabama |

| 1963 (Summer) | California Heart Research Fellow |
| | Department of Physiology |
| | Stanford University School of Medicine |
| | Stanford, California 94305 |

## MEDICAL BOARDS

American Board of Radiology
| June | 1987 | Passed Oral Examination |
| October | 1983 | Passed Written Examination |

American Board of Psychiatry and Neurology
| June | 1974 | Board Eligible |

National Board of Medical Examiners
| March | 1969 | Passed Part III |
| April | 1968 | Passed Part II |
| June | 1966 | Passed Part I |

## MEDICAL LICENSES

### Physician and Surgeon License

| 1969 - present | State of California License No. G016735 |

| 1971 & 1972 | Government of the District of Columbia No. 4552 |

### Controlled Substances Registration Certificate

| 1969 - present | U. S. Department of Justice DEA No. AB0063507 |

### Radiology X-ray Supervisor and Operator Certificate

| 1987 - 1997 | State of California Certificate No. 128333 |

### Radioactive Material License

| 1987 - 1997 | State of California License 2278-30 Amendment 34 |

**FAA LICENSES (PILOT LICENSES)**

July 13, 2009                    Airplane Single Engine Land

September 11, 2010               Airplane Single Engine Land, Instrument Airplane

August 27, 2014                  Airplane Single Engine Land, Airplane Multiengine Land,
                                 Instrument Airplane


**WINE AND SPIRIT EDUCATIONAL TRUST (WSET)**
**39-45 BERMONDSEY STREET**
**LONDON DE1 3XF UNITED KINGDOM**
**REGISTERED CHARITY NO 313766**


April 16, 2008                   WSET ® Level 2 Intermediate Certificate in Wines and Spirits, passed with
                                 Distinction

# EMPLOYMENT

**Academic Positions**

| | |
|---|---|
| 1986 - 1994 | Assistant Clinical Professor of Radiology<br>Department of Diagnostic Radiology<br>    and Nuclear Medicine<br>Stanford University School of Medicine<br>Stanford, California |
| 1974 - 1981 | Assistant Clinical Professor<br>Department of Psychiatry & Behavioral<br>    Sciences<br>Stanford University School of Medicine<br>Stanford, California |
| 1976 - 1981 | Founding Faculty<br>Pacific Graduate School of Psychology<br>Palo Alto, California |
| 1974 | Staff Psychiatrist<br>Locked Psychiatric Ward<br>Santa Clara Valley Medical Center<br>Stanford University Psychiatric Service<br>San Jose, California |
| 1972 - 1974 | Consultant & Administrator<br>Health Team Study Group<br>Sexual Dysfunction Clinic<br>Stanford University Medical Center<br>Stanford, California |
| 1970 - 1972 | Clinical Instructor & Attending Physician<br>Outpatient Clinics and Emergency Room<br>Department of Medicine<br>George Washington University Medical School<br>Washington, D.C. |

**Private practice**

| | |
|---|---|
| 1987 - 1997 | Private Practice of Radiology<br>Digital & Radiologic Imaging Associates, Inc.<br>26161 Marguerite Parkway, Suite D<br>Mission Viejo, CA 92691 |
| 1974 - 1981 | Private Practice of Psychiatry<br>770 Welch Road, Suite 335<br>Palo Alto, California 94305 |

**HOSPITAL STAFFS**

| | |
|---|---|
| 1987 - 1997 | Mission Hospital Regional Medical Center<br>Department of Surgery/ Section of Radiology<br>27700 Medical Center Road<br>Mission Viejo, CA 92691 |
| 1992 - 1997 | Irvine Medical Center<br>Department of Radiology<br>16200 Sand Canyon Avenue<br>Irvine, CA 92718 |
| 1986 - 1994 | Stanford University Hospital<br>Department of Nuclear Medicine and<br>        Diagnostic Radiology<br>Stanford, California 94305 |
| 1974 - 1981 | Stanford University Hospital<br>Department of Psychiatry<br>Stanford, California 94305 |
| 1974 - 1981 | El Camino Hospital<br>Department of Psychiatry<br>Mt. View, California |
| 1974 - 1981 | Santa Clara Valley Medical Center<br>Department of Psychiatry<br>San Jose, California |

**MEDICAL SOCIETY MEMBERSHIP**

| | |
|---|---|
| 1987 - present | Society for Cardiovascular and Interventional<br>Radiology (SCVIR), now, now Society of Interventional Radiology (SIR)<br>(elected FELLOW 4/94) |
| 1987 - 2001 | Western Angiography and Interventional Society |
| 1987 - 2007 | Radiology Society of North America |
| 1987 - 2003 | Orange County Radiological Society,<br>California Radiological Society, and<br>American College of Radiology |
| 1987 - 1997 | American Heart Association, Radiology Council |
| 1987 - 1991 | Orange County Medical Society, CMA, and AMA |

**PUBLIC SERVICE**

| | |
|---|---|
| 1975 - 1979 | Rehabilitation Panelist<br>State of California<br>State Department of Rehabilitation<br>San Jose, California |

| 1975 - 1979 | Forensic Psychiatry Panelist |
| | Criminal Division |
| | Superior Court of the State of California |
| | County of Santa Clara |
| | San Jose, California |

1974 - 1979      Disability Panelist
State of California
Disability Evaluation Program
State Department of Health
Oakland, California

1974 - 1975      Consulting Psychiatrist
State of California
Department of Youth Authority
Northern California Youth Center
Stockton, California

1969 - 1971      Surgeon
United States Public Health Service
Washington, D.C.

1969 - 1971      Staff Associate and Epidemiologist
Epidemiology Section
National Cancer Institute
National Institutes of Health
Bethesda, MD

1969 - 1970      Volunteer Family Physician
Anacostia Neighborhood Health Clinic
Washington, D.C.

**MEDICARE AND MEDICADE DEVICE COVERAGE**

1999      National Coverage Decision (NCD), Image-guided breast biopsy including vacuum assisted breast biopsy with the Biopsys Mammotome.  In Appendix A, I was an author in six of the cited publications at the same time I was CEO of Biopsys the company whose requests to CMS generated this NCD.

Center for Medicare and Medicaid Services "Decision Memo for Breast Biopsy (CAG-00040N)"

https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=13

https://www.cms.gov/Medicare/Coverage/DeterminationProcess/downloads/id13.pdf

## INVITED PRESENTATIONS

Counter-stimulation Treatment of Sleep Loss associated with RLS/ Willis-Ekbom Diseae.  Southern California RLS Support Group, St. Mary's Medical Center, 1050 Linden Avenue, Long Beach, CA 90813, Sunday, October 5, 2014, 1:00-3:00.

Postpartum Hemorrhage: New Science and Outstanding Questions, March 17-18, 2014, "Potential of the bilateral uterine artery clamp in PPH management," The Scandinavia House (58 Park Avenue), New York, New York.

Distinguished Lecture Series: Engineering for the Body: Reproducing body functions.  Thursday, October 24, 2013, 7:00-8:00 p.m., The Pointe Event and Conference Center at the Walter Pyramid, California State University, Long Beach, California.

Cardiology Fellow's Grand Rounds, "Device Innovation," April 18, 2013, University of California at Irvine Medical Center, 4th Floor Conference Room #403, 333 City Boulevard West, Orange, California.

Management, Science, and Engineering Department Course 450, "Lessons in Decision Making," April 8, 2013, Terman Auditorium, Stanford University, Stanford California.

IFPA Meeting 2010, October 19-22, Santiago, Chile at the Crown Plaza Hotel, "Fetus and Placenta: A Perfect Harmony." Poster Presentation: Placenta formation, childbirth, and fibroid treatment; An integration and review.

The Hopkins Medical Device Network Speaker Series, April 3, 2008, Homewood Campus, Computational Science and Engineering Building (CSEB), Room B17, Johns Hopkins University, Baltimore, Maryland.

Sociedad Chilena de Mastologia, "Biopsia guiada por Imagenes: Programa de Evaluacion de la Calidad, Centro de Eventos Saval, 11 November, 2006, Santiago, Chile.

19th Annual Techniques in Advanced Gynecologic, Endoscopic & Laparoscopic Surgery, Mayo Clinic School of Continuing Medical Education. Lecture #1 Uterine Fibroid Physiology, Growth, Histology, and Blood Supply: Why UAE is Not the Optimal Technique. Lecture #2 Temporary Uterine Artery Occlusion: A Novel, Non-invasive Technique to Treat Fibroids. Fairmont Scottsdale Princess, Scottsdale, Arizona, October 26-28, 2006

Symposium Mammographicum 2006. Lecture #1, The Sir John Stebbings Lecture: "Breast interventional devices: How they evolve and define new subspecialties. Lecture #2, "Image guided breast biopsy programme quality evaluation." July 9 - 11, 2006, Bournemouth International Centre, UK

Seventy-First Meeting of the FDA Obstetrics and Gynecology Devices Panel, Tuesday, March 28, 2006, Gaithersburg Hilton, Gaithersburg, Md. General Topic - Pivotal Studies to Evaluate New Treatment Modalities for Symptomatic Uterine Fibroids. Vascular Control Systems Presentation at the Open Public Hearing 10:15-11:15 A.M..

The Henry O. Rappold Memorial Symposium: Uterine Artery Closure for the Treatment of Uterine Fibroids. St. Luke's Hospital 232 South Woods Mill Road, Chesterfield, MO 63017, March 10, 2006

Global Congress of Minimally Invasive Gynecology & AAGL 34th Annual Meeting. Expert Panel 1, Management of Fibroids without Abdominal Entry, 10:30-11:30 am. Hilton Chicago, Chicago, Illinois, November 10, 2005

MedVenture Associates II, III, IV, and V, Annual Meeting of Limited Partners, Mandarin Oriental Hotel, San Francisco, CA, March 21-22, 2005

Case Western Reserve Medical School and the University Hospitals of Cleveland.

(1) Grand Rounds Lecture 7:30-8:30, "Temporary Uterine artery Occlusion for Fibroid Treatment, 1/7/2005
(2) Gynecology Resident Conference 9:30-10:30, 1/7/2005
(3) Obstetric Resident Conference 10:30-11:30, 1/7/2005

Reclaiming the Fibroid Patient: The Gynecologist's Answer to UAE: New Approaches to Uterine Artery Occlusion presented at Beyond Hysterectomy: The Contemporary Management of Fibroids – An International Congress, Hilton Scottsdale Resort, Scottsdale, AZ, April 13, 2003

MedVenture Associates II, III, and IV, Annual Meeting of Limited Partners, Claremont Resort and Spa, Berkeley, CA, March 3-4, 2003

Breast Imaging and Intervention into the 21st Century, Ocean Reef Club, Key Largo, FL, October 21-25, 2002

Breast Imaging and Intervention into the 21st Century, Sanibel Harbour Resort & Spa, Fort Meyers, FL, February 25 - March 1, 2002

Three Arch Partners, Annual Meeting of Limited Partners, Stanford Park Hotel, Menlo Park, CA, April 27, 2001

Breast Imaging and Intervention into the 21st Century, Amelia Island Plantation, Amelia Island, FL, March 19-23, 2001

Breast Imaging and Intervention into the 21st CenturyCamelback Inn Resort, Golf Club & Spa, Scottsdale, AZ, October 16-20, 2000

21st International Congress of Radiology 2000. Sheraton Buenos Aires Hotel and Convention Center, Buenos Aries, Argentina, September 4-8, 2000

Tuesday 16:45-18:30:
Burbank #1. Percutaneous breast biopsy equipment selection: stereotactic guidance machinery and biopsy devices (FNA, spring powered guns, the Mammotome, the MIBB, and the ABBI systems).
Burbank #2. The definitive treatment of uterine fibroids with uterine artery embolization.

Wednesday 8:30-10:00; 10:30-12:00:
Burbank #3. Ten steps needed to establish a percutaneous breast biopsy practice. Burbank #4. Percutaneous breast biopsy practice outcome analysis and standards. Wednesday 10:30-12:30
Burbank #5. The development of the Biopsys Mammotome -- When to use and how.
Burbank #6. Diagnostic accuracy of spring powered breast biopsy guns for atypia, for ductal carcinoma in situ, and for invasive breast cancers.

Breast Imaging and Intervention into the 21st Century, Sanibel Harbour Resort & Spa, Fort Meyers, FL, February 14-18, 2000

Uterine Artery Embolization: What is it and What are the Results, presented at Hysterectomies and Their Alternatives: the 10-Year Anniversary of the LAVH, The Royal Palms Hotel and Casitas, Phoenix, Arizona, September 30 - October 2, 1999.

Breast Imaging and Intervention into the 21st Century, La Costa Resort & Spa, Carlsbad, California, September 20 - 24, 1999.

A New Alternative to Uterine Artery Embolization, presented at the Second International Symposium on the Embolization of Uterine Myomata in conjunction with 11th Annual Scientific Meeting of the Society for Minimally Invasive Therapy, The Westin Hotel, Copley Place, Boston, Massachusetts, September 16-18, 1999.

Breast Imaging and Intervention into the 21st Century, Sanibel Harbour Resort & Spa, Fort Meyers, FL, February 8-12, 1999.

Making a Market in Male, Female Health, at the "Start-Up Symposium - from Models to Strategies", La Costa Resort, Carlsbad, California, November 8-10, 1998.

New Technologies in Breast Biopsy. The 2nd Annual Meeting of the Breast Cancer Society of Taiwan - Advanced Curses on Breast Imaging and Biopsy Technique, Grand Hyatt Hotel, Taipei, Taiwan, October 16, 1998.

Image Directed Breast Surgery, The 2nd Annual Terry Fox & Chang Gung Memorial Hospital International Cancer Symposium on Breast Cancer, Lin-Kou Medical Center/ Chang Gung Memorial Hospital, Taipei, Taiwan, October 17, 1998.

Breast Imaging and Intervention into the 21st Century, Beaver Run Resort, Breckenridge, CO, August 17-21, 1998.

Breast Diagnosis Update, Imaging and Clinical Issues. Park Nicollet Clinic, HealthSystem Minnesota, St. Louis Park, Minnesota, May 7-9, 1998:

   (1) Thursday, May 7: Keynote Address: Minimally Invasive Breast Surgery
   (2) Friday, May 8: Follow-up to Core Biopsy, final tabulation of accuracy for the 6000+ Core Biopsy Series and Devices beyond spring powered Tru-Cut needles,
   (3) Friday, May 8: Futuristic Look at Breast Interventions

Stereotactic Biopsy of the Breast, Breast Imaging and Intervention for the Practicing Radiologist, presented by the Association of University Radiologists at the Sheraton New Orleans Hotel, New Orleans, Louisiana, March 28, 1998.

Breast Imaging and Intervention into the 21st Century, Ocean Reef Club, Key Largo, Florida, February 23-27, 1998.

Stereotactic Biopsy, 3rd Annual Multidisciplinary Symposium on Breast Disease, A joint meeting of the American Society of Breast Disease, The Ritz-Carlton, Amelia Island, Florida, February 12-15, 1998.

How to Evaluate the Quality of an Image Guided Breast Biopsy Program, 3rd Annual Multidisciplinary Symposium on Breast Disease, A joint meeting of the American Society of Breast Disease, The Ritz-Carlton, Amelia Island, Florida, February 12-15, 1998.

Celebrate Research at Mission Hospital Day: Evaluation of a Percutaneous Biopsy Device, Mission Viejo, CA, December 4, 1997.

Stereotactic Breast Biopsy of ADH and DCIS Lesions: Improved Accuracy with a Directional, Vacuum-assisted Biopsy Instrument, Radiological Society of North America 83rd Scientific Assembly and Annual Meeting, Chicago, Illinois, November 30-December 5, 1997.

Mammazentrum Symposium, Abklarung Biopsie Chirurgie der Brustdiagnostik, Evangelisches Krankenhaus (Hospital), Parkhotel Schonbrunn, Vienna, Austria, November 20, 1997.

Stereotactic breast biopsy: improved tissue harvesting with the Mammotome. Mammadiagnostick 1997, Universitatsklinik fur Radiodiagnostik, University of Vienna, Vienna, Austria, November 21, 1997.

The 1997 Ray A. Carter Memorial Lecture: The Evolution of Stereotactic Breast Biopsy from Core Needle Biopsy to the Biopsys Mammotome, The Society of Graduate Radiologists & Faculty, 24th Annual Radiology Symposium of the LAC+USC Medical Center, The Laguna Cliffs Resort at Dana Point, California, October 19, 1997.

Development of the Mammotome breast biopsy system & review of stereotactic breast biopsy. The Middlesex Hospital, London, England, October 13, 1997.

Breast Imaging and Intervention into the 21st Century, La Costa Resort and Spa. Carlsbad, CA, September 22-26, 1997.

The Development of the Percutaneous Breast Biopsy Program at Mission Hospital, Keynote Speech at the National Cancer Survivors' Day, "A Celebration of Life," Mission Hospital Regional Medical Center parking lot tent, Mission Viejo, CA 5/31/97.

Percutaneous Breast Biopsy from the Tru-Cut needle to the Mammotome. Annual Meeting of the American Society of Breast Disease. The Four Seasons Olympic Hotel, Seattle, Washington, 4/12/97.

Stereotactic breast biopsy: a replacement for surgical breast biopsy. Noon CME Lecture, Encino-Tarzana Regional Medical Center, Tarzana, CA 3/17/97

Evolution of Minimally Invasive Breast Surgery. The New York Metropolitan Mammography Society, The Stern Auditorium, Annenberg Pavilion, Mount Sinai Medical Center, New York, New York, 11/13/96.

Visiting Professor, Resident's Noon Teaching Conference. Memorial Sloan-Kettering Cancer Center, 1275 York Avenue, New York, New York, 11/13/96.

Minimally Invasive Biopsy of the Breast by Phillip Z. Israel, M.D., Steve H. Parker, M.D., Fred H. Burbank, M.D., David Hollander, M.D., George D. Herman, B.S.M.E., Thomas J. Fogarty, M.D., F.A.C.S., Scientific Exhibit SE-264 at the American College of Surgeons 82nd Clinical Congress, San Francisco, CA, October 1996,

Frequency of Excisional Breast Biopsy with Clear Margins with the Biopsys Mammotome. The Western Angiographic & Interventional Society, 26th Annual Meeting, The Ritz-Carlton Hotel, Maui, Hawaii, 9/26/96.

Percutaneous Stereotactic Breast Biopsy: Improved Accuracy with the Biopsys Mammotome. Pamela Youde Nethersole Eastern Hospital, Chaiwan, Hong Kong, China, 9/23/96.

Percutaneous Stereotactic Breast Biopsy: Improved Accuracy with the Biopsys Mammotome. Prince of Wales Hospital, The Chinese University of Hong Kong, Shatin, N.T., Hong Kong, China, 9/23/96.

Frequency of Excisional Breast Biopsy with Clear Margins with the Biopsys Mammotome. Society for Minimally Invasive Therapy, 8th Annual International Meeting, Villa Erba, Cernobbio, Italy, 9/19/96.

Percutaneous Stereotactic Breast Biopsy: Improved Accuracy with the Biopsys Mammotome. The Busto Arsizio Hospital, U.S.L. 3, Busto Arsizio, Italy, 9/18/96.

Percutaneous Stereotactic Breast Biopsy: Improved Accuracy with the Biopsys Mammotome. The Martin Luther Universitat Halle-Wittenberg, Halle, Germany, 9/16/96.

Breast Imaging and Intervention into the 21st Century, The Broadmoor Resort Hotel, Colorado Springs, Colorado, August 12-13, 1996.

Breast Imaging and Intervention into the 21st Century, Ocean Reef Club, Key Largo, Florida, February, 26 - March, 1, 1996.

64th Annual Scientific Meeting & Postgraduate Course, Southeastern Surgical Congress, Hyatt Regency Tampa, Tampa, Florida, Postgraduate Course: Breast Disease: The role of the surgeon in early diagnosis, including the role of stereotactic core needle biopsy, "A Radiologist's view", February 4, 1996.

Eighth Annual Mammography: Continuing Education for the Technologist in the 1990's, "A Hands On Approach," American Cancer Society, The Sheraton Resort and Conference Center, Industry Hills, CA, January 14, 1996.

Breast Biopsy "How-to" Workshop, Course No. 850, 8:30 AM, 12/1/95. Radiological Society of North America 81st Scientific Assembly and Annual Meeting, Chicago, Illinois, November 26-December 1, 1985.

Breast Cancer Diagnosis at Mission Hospital -- State of the Art 1995. Mission Hospital Regional Medical Center, Mission Viejo, California, November 14, 1995.

Breast Imaging and Intervention into the 21st Century, The Four Seasons Biltmore Hotel, Santa Barbara, California, October 9-13, 1995.

Breast Imaging and Intervention into the 21st Century, The Broadmoor Resort Hotel, Colorado Springs, Colorado, July 10-14, 1995

The Carol J. Weinstein 2nd Annual Memorial Lecture Series, Portland, Oregon:

> (1) Establishing a Percutaneous Breast Biopsy Practice, Oregon Radiologic Society Monthly Meeting, 7:30-8:30 p.m. 5/18/95;
> (2) Core Breast Biopsy, The New Gold Standard, Medical Grand Rounds, Legacy Emanuel Hospital & Health Center, 7:30-8:30 a.m. 5/19/95;
> (3) Minimally Invasive Medicine - The Promise of the 21st Century, The Good Samaritan Foundation Annual Luncheon Meeting, The Heathman Hotel, Broadway Room, 12:30-1:30 p.m. 5/19/95.

Surgical or Stereotactic Biopsy?, My Perspective. Orange County Radiological Society monthly meeting. Orange, California, April 25, 1995

Breast Intervention: Workshop W112 (Sunday March 26), Workshop W412 (Tuesday March 28), Workshop W512 (Wednesday March 29), Workshop W812 (Thursday, March 30), each workshop 1.5 hours in length, SCVIR 20th Annual Scientific Meeting, Ft. Lauderdale, Florida, 1995

Breast Imaging and Intervention into the 21st Century, Marriott's Casa Marina Resort, Key West, Florida, February 13-17, 1995

Seventh Annual Mammography: Continuing Education for the Technologist in the 1990's, "A Hands On Approach," American Cancer Society, The Queen Mary Hotel, Long Beach Harbor, California, January 21&22, 1995

Core Breast Biopsy by Ultrasound and Stereotactic Guidance - The New Gold Standard. Grand Rounds, Northridge Hospital Medical Center, 18300 Roscoe Boulevard, Northridge, California, January 10, 1995
The Value of Stereotactic Breast Biopsy. Issues in Breast Cancer for the Primary Care Physician, St. Joseph Medical Center, Orange, California, October 29, 1994

How to Establish a Breast Biopsy Practice, Part I and Part II. Western Angiography and Interventional Society Annual Meeting, The Ritz-Carlton Hotel, Aspen, Colorado, September 24, 1994.

Breast Imaging and Intervention into the 21st Century, The Broadmoor Resort Hotel, Colorado Springs, Colorado, August 15-19, 1994

Stereotactic Core Needle Biopsy of the Breast. CME Lecture, Queen of the Valley Hospital, 1000 Trancas Road, Napa, CA, May 27, 1994

Establishing a Practice in Breast Biopsy, Plenary Session, 20th Annual Scientific Meeting of the SCVIR, San Diego Convention Center, San Diego, California, March 23, 1994

Breast Biopsy Workshop Leader, 20th Annual Scientific Meeting of the SCVIR, San Diego Convention Center, San Diego, California, March 23, 1994

Breast Imaging and Intervention into the 21st Century, The Ritz-Carlton Hotel, Laguna Niguel, California, February 21-25, 1994

Core Breast Biopsy by Ultrasound and Stereotactic Guidance -- The New Gold Standard. Medical Grand Rounds, Alta Bates Medical Center, Berkeley, California, January 4, 1994

Clinical Data Collection in a Breast Biopsy Clinic -- the Benign Follow-up Burden: 2.4 Follow-ups for every Breast Biopsy. Mammotest User's Meeting, 6:30-8:30 PM, (including Steve Parker, M.D., Apparao Mukkamala, M.D., Robert Schmidt, M.D., and Mary Lechner, M.D.) The Westin Hotel Chicago, Chicago, Illinois, November 28, 1993

Stereotactic and Ultrasound Directed Core Breast Biopsy. Department of Gynecology Grand Rounds, Hoag Memorial Hospital, Newport Beach, California, October 11, 1993

Breast Imaging and Intervention into the 21st Century, The Broadmoor Resort Hotel, Colorado Springs, Colorado, July 26-30, 1993

Image Directed Core Biopsies Throughout the Body with Special Reference to Breast Biopsies. Continuing Medical Education Programs:
>        (1) at Mission Hospital Regional Medical Center, Mission Viejo, California, May 11, 1993,
>        (2) at Irvine Medical Center, Irvine, California, May 12, 1993 and
>        (3) at Samaritan Medical Center, San Clemente, California, May 21, 1993

Stereotactic Breast Biopsy Licensing Requirements, Radiologic Technology Certification Committee (RTCC), Radiologic Health Branch, Department of Health Services, State of California Health and Welfare Agency Quarterly Meeting, Holiday Inn, Oakland, California, March 25, 1993.

Stereotactic Breast Biopsy. President's Cancer Panel Special Commission on Breast Cancer, 3:00 pm - 3:15 pm, The Hyatt Regency Miami, Miami, Florida, March 19, 1993

Biopsy Workshop Leader, SCVIR 18th Annual Meeting, New Orleans, Louisiana, March 4, 1993

Establishing a Percutaneous Core Breast Biopsy Program in Orange County, Orange County Radiological Society, 7:00 pm - 9:00 pm, Hoag Memorial Hospital Conference Center, Newport Beach, California, February 26, 1993

Stereotactic Breast Biopsy Techniques. California Society of Radiologic Technologists 2nd Annual Spring Symposium. 9:30 am - 10:30 am Bash Auditorium at Western Medical Center, Santa Ana, California, February 20, 1993.

Core Breast Biopsy Basics -- Adequate Sampling. Mammotest User's Meeting, 6:30-8:30 pm, (including Michael Nelson, M.D., Lazlo Tabar, M.D., Steve Parker, M.D., Gilda Cardenosa, M.D., and Jeff Lovin, M.D.) The Westin Hotel Chicago, Chicago, Illinois, November 29, 1992

Image Directed Biopsies with Special Reference to Breast Biopsies. Western Angiographic & Interventional Society Annual Meeting, Mauna Lani Bay Hotel, Kohala Coast, Hawaii, September 22-26, 1992

Contrast Media Tonicity, Part II. Isotonic Ioxaglate versus standard Renografin for IV-DSA evaluation of the carotid bifurcation,  a double blind prospective clinical trial: Association of University Radiologists Thirty-Third Annual Meeting, Nashville, Tennessee, May 12-17, 1985

Contrast Media Tonicity, Part I. Effects upon IV-DSA time-concentration curve peak and width, experimental studies: Association of University Radiologists Thirty-Third Annual Meeting, Nashville, Tennessee, May 12-17, 1985.

Region of Interest, "Spliced" Hybrid Subtraction Images: A Comparison with Standard Temporal Subtraction and Hybrid Subtraction Images: Radiological Society of North America Seventieth Scientific Assembly and Annual Meeting, Washington, D.C., November 25-30, 1984.

New Diagnostic Techniques: NMR and Digital Subtraction Angiography: 4th Annual Cardiovascular Nursing Symposium, Hyatt on Union Square, San Francisco, California, September 5-7, 1984.

Evaluation of Intravenous Hybrid Subtraction Digital Angiography for Carotid Artery Bifurcation Disease: Radiological Society of North America Sixty-Ninth Scientific Assembly and Annual Meeting, Chicago, Illinois, November 13-18, 1983.

Intravenous Digital Subtraction Angiography Contrast Media Time- concentration Curves: International Contrast Material Symposium, San Francisco, California, October 22&23, 1983.

Association of University Radiologists Memorial Award Paper: "Determinants of Contrast Enhancement for Digital Subtraction Angiography": Association of University Radiologists Thirty-First Annual Meeting, Mobile, Alabama, March 22-25, 1983.

The Effects of Volume and Rate of Contrast Media Injection on Intravenous Digital Subtraction Angiography: Radiological Society of North America Sixty-Eight Scientific Assembly and Annual Meeting, Chicago, Illinois, November 28-December 3, 1982.

A Quantitative In Vivo Comparison of Six Contrast Agents by Digital Subtraction Angiography: Association of University Radiologists Thirtieth Annual Meeting, Baltimore, Maryland, March 20-26, 1982.

Treatment of Behavioral Problems in a Group Environment: Golden Gate Group Psychotherapy Meeting, Palo Alto, California, June 9, 1973.

A Classification System for Sexual Dysfunction: Regional Meeting of the Society for the Scientific Study of Sexual Problems, Las Vegas, Nevada, June 1-3, 1973.

Computer Diagnostic Systems, Liver Disease: National Meeting on Computer Diagnostic Systems - American College of Clinical Pathologists, Atlanta, Georgia, 1971.

Computer Diagnostic Systems, An Overview: National Meeting on Computer Diagnostic Systems - American College of Clinical Pathologists, Las Vegas, Nevada, 1970.

## PUBLISHED ARTICLES

68. Burbank, F and Somers, S.  North Atlantic winter crossing: World War II history, headwinds, and frozen lunches in a Diamond Twin Star, DA42-VI (AKA Dash-6) 22 August 2015 at:
       http://angelcityflyers.com/blog/fly-outs/295-north-atlantic-winter-crossing-world-war-ii-history-
       headwinds-and-frozen-lunches-in-a-diamond-twin-star-da42-vi-aka-dash-6

67. Burbank, F.  Restless legs need not cause restless sleep. Sleep Diagnosis and Therapy 10: March-April, 2015 and at: http://www.sleepdt.com/restless-legs-need-not-cause-restless-sleep/

66. Burbank, F. Non-drug treatment for restless legs syndrome. August 4, 2014 and at: http://ceocfointerviews.com/interviews/SensoryMedical14.htm

65. Burbank, F.  The Relaxis pad for RLS patients.  American Association of Sleep Technologists (AAST) Journal ($A_2Zzz$), 23:23-25, 2014.

64. Burbank F and Buchfuhrer MJ.  Sensory stimuli and the restless legs syndrome [Letter to the Editor].  J. Clin Sleep Med 10:1363, 2014.

63. Burbank F. Sleep improvement for restless legs syndrome patients.  Part IV: meta-analysis comparison of effect sizes of vibratory stimulation sham pads and placebo pills. Journal of Parkinsonism and Restless Legs Syndrome 4:35-40, 2014

62. Burbank F and Fogarty T.  ObamaCare tax that is bad for your health.  Wall Street Journal Editorial Page, "Opinion" Section, June 8, 2013.

61. Burbank F. Sleep improvement for restless legs syndrome patients. Part III: Effect of treatment assignment belief on sleep improvement in RLS patients. A mediation analysis. Journal of Parkinsonism and Restless Legs Syndrome 3:1-10, 2013.

60. Burbank F. Buchfuhrer MJ, Kopjar B. Sleep improvement for restless legs syndrome patients. Part II: Meta-analysis of vibration therapy and FDA-approved restless legs syndrome drugs in the treatment of restless legs syndrome. Journal of Parkinsonism and Restless Legs Syndrome 3:11-22, 2013.

59. Burbank F. Buchfuhrer MJ, Kopjar B. Sleep improvement for restless legs syndrome patients.  Part I: pooled analysis of two prospective, double-blind, sham-controlled, multi-center, randomized clinical studies of the effects of vibrating pads on RLS symptoms.  Journal of Parkinsonism and Restless Legs Syndrome 3:23-29, 2013.

58. Burbank F. History of uterine artery occlusion and subsequent pregnancy. Am J Roentgenol 192:1593-1600, 2009.

57. Burbank F. Are fibroids that become endocavitary after uterine artery embolization necessarily a complication? Am J Roentgenol. 190:1227-1230, 2008.

56. Vilos GA, Hollett-Caines J, Burbank F. Uterine artery occlusion: What is the evidence? Clinical Obstetrics and Gynecology. 49:798-810. 2006.

55. Burbank F. Breast interventional devices: How they evolve and define new subspecialities [Abstract]. Breast Cancer Research 8 (Supplement 1):S1, 2008.

54. Burbank F. Uterine fibroids: embolization and other treatments. Journal of the American Association of Gynecologic Laparoscopists 11: 29 [Book Review]. 2004.

53. Burbank F. Childbirth and myoma treatment by uterine artery occlusion: Do they share a common biology? Journal of the American Association of Gynecologic Laparoscopists 11:138-152, 2004.

52. Burbank F. Pathologic features of uterine leiomyomas following uterine artery embolization [Letter]. Int J Gynecol Pathol 20:407-409, 2001.

51. Jackman RJ, Burbank F, Parker SH, Evans WP, Lechner MC, Richardson TR, Smid AA, Borofsky HB, Lee CH, Goldstein HM, Schilling KJ, Wray AB, Brem RF, Helbich TH, Lehrer DE, Adler SJ. Stereotactic Breast Biopsy of Nonpalpable Lesions: Determinants of Ductal Carcinoma in Situ Underestimation Rates. Radiology 218:497-502, 2001.

50. Burbank F, Hutchins FL Jr. Uterine artery occlusion by embolization or surgery for the treatment of fibroids: A unifying hypothesis -- Transient uterine Ischemia. Journal of the American Association of Gynecologic Laparoscopists 7 (No. 4, Supplement): S1-S49, 2000.

49. Garza Leal J, Burbank F, Altieri G, Jones M, Uyeno J. Myoma treatment by transient uterine ischemia [Abstract]. Journal of the American Association of Gynecologic Laparoscopists 7 (No. 3, Supplement): S31, 2000.

48. Burbank F, Altieri G, Jones M, Uyeno J. Fibroid treatment by transient uterine ischemia [Abstract]. Obstet Gynecol 95 (No. 4, Supplement 1):S26-S27, 2000.

47. Forcier N, Altieri G, Jones M, Burbank F. A new alternative to uterine artery embolization. 2nd International Symposium on the Embolization of Uterine Myomata, September 17-18,1999. UAE-02

46. Jackman RJ, Burbank FH, Parker SH, Evans PW, Lechner MC, Richardson TR, Tocino I, Wray AB. Accuracy of sampling ductal carcinoma in situ by three stereotactic breast biopsy methods [Abstract]. Radiology 209(P):197-198,1998.

45. Burbank F, Parker SH. Methods for analysis of one-step breast biopsy programs. Breast J 4:307-323,1998.

44. Carter JE, Belville J, Burbank F. The role of uterine artery embolization in the treatment of uterine leiomyomata and severe menorrhagia in a private community hospital [Abstract]. Annual Regional Meeting of the International Society for Gynecologic Endoscopy, , August 27-29, 1998, Okura Hotel, Amsterdam, The Netherlands.

43. Burbank F. Specimen weights obtained with 14- and 11-gauge breast biopsy probes [Letter]. Radiology 208:269-270,1998.

42. Burbank F, Parker SH. Methods for evaluating an image guided breast biopsy program. Seminars in Breast Disease: Radiologic, Pathologic, and Surgical Considerations. W. B. Saunders Company, Philadelphia, PA, pages 71-83,1998.

41. Jackman RJ, Burbank FH, Parker SH, Evans PW, Lechner MC, Richardson TR, Tocino I, Wray AB. Atypical ductal hyperplasia diagnosed by 11-gauge, directional, vacuum-assisted breast biopsy: How often is carcinoma found at surgery [Abstract]? Radiology 205(P):325,1997.

40. Jackman RJ, Burbank FH, Parker SH, Evans PW, Lechner MC, Richardson TR, Tocino I, Wray AB. Accuracy of sampling microcalcifications by three stereotactic breast biopsy methods [Abstract]. Radiology 205(P):325,1997.

39. Jackman RJ, Burbank FH, Parker SH, Evans PW, Lechner MC, Richardson TR, Tocino I, Wray AB. Atypical ductal hyperplasia diagnosed at stereotactic breast biopsy: improved reliability with 14-gauge, directional, vacuum-assisted biopsy. Radiology 204:485-488,1997.

38. Burbank F, Forcier N. Tissue marking clip for stereotactic breast biopsy; Initial placement accuracy, long-term stability, and usefulness as a guide for wire localization. Radiology 205:407-415,1997.

37. Burbank F. The current state of stereotactic core breast biopsy and mammotomy. Min Invas Ther & Allied Technol 6: 148-157,1997.

36. Burbank F. Mammotomy: Post-biopsy mammogram findings and CPT coding. Administrative Radiology 16:14-19,1997.

35. Burbank F. Mammographic findings after 14-gauge automated needle and 14-gauge directional vacuum-assisted stereotactic breast biopsy. Radiology 204:153-156,1997.

34. Burbank F. Stereotactic breast biopsy: Comparison of 14- and 11-gauge Mammotome probe performance and complication rates. The American Surgeon 63(11): 988-995,1997.

33. Burbank F. Stereotactic breast biopsy of atypical ductal hyperplasia and ductal carcinoma in situ lesions: improved accuracy with directional, vacuum-assisted biopsy. Radiology 202: 843-847,1997.

32. Burbank F. Frequency of excisional breast biopsy with clear margins with the Biopsys Mammotome [Abstract]. Min Invas Ther & Allied Technol 5 (Supplement 1): 39,1996.

31. Burbank F, Parker SH, Fogarty TJ. Stereotactic breast biopsy: improved tissue harvesting with the Mammotome. The American Surgeon 62(9):738-744,1996.

30. Parker SH, Burbank F. State of the art: a practical approach to minimally invasive breast biopsy. Radiology 200:11-20,1996.

29. Burbank F. Stereotactic breast biopsy: Its history, its present, and its future. The American Surgeon 62(2):128-150,1996.

28. Parker SH, Burbank FH, Hollander DS. Percutaneous breast biopsy with a new device [Abstract]. Radiology 197(P):408,1995.

27. Burbank F. Breast biopsy technique developed in tandem by manufacturer and clinic. Advance for Administrators in Radiology and Radiation Oncology 5:125-126,1995.

26. Parker SH, Burbank F. Percutaneous Core Biopsy of the Breast [Letter]. Radiology 196:582,1995.

25. Burbank F. Core Tissue Biopsy Using the Bard Biopsy System. A monograph published by C.R. Bard, Covington, GA,1994, pages 1-10.

24. Parker SH, Burbank F, Jackman RJ, et al. Final Reply [Letter]. Radiology 193:328,1994.

23. Parker SH, Burbank F, Jackman RJ, et al. Response to "Caution on Core" [Letter]. Radiology 193:326-327,1994.

22. Parker SH, Burbank F, Jackman R, Aucreman CJ, Cardenosa G, et al: Percutaneous large core breast biopsy: a multi-institutional study. Radiology 193:359-364,1994.

21. Burbank F. Nine steps to a new breast biopsy paradigm. Supplement to Diagnostic Imaging. 16 (5): 5-8,1994.

20. Burbank F, Kaye K, Belville J, Ekuan J, Blumenfeld M: 300 image guided automated core biopsies in the breast, chest, abdomen, and pelvis. Radiology 191:165-171,1994.

19. Burbank F and Belville J: Core breast biopsy, research, and what not to do [Letter]. Radiology 185:639-644,1992.

18. Burbank FH. Imaging-directed percutaneous biopsies with a biopsy gun [Letter]. Radiology 176:286-287,1990.

17. Burbank FH, Parish D, and Wexler L: Echocardiographic-like angled views of the heart by magnetic resonance imaging. Journal of Computer Assisted Tomography 12:181-195,1988.

16. Burbank FH, Enzmann DR, Brody WR: Carotid Bifurcation: Results of spliced hybrid subtraction angiography compared with standard temporal and hybrid images. Radiology 160: 227-229,1986.

15. Burbank FH, Bradley BR, Yegnashankaran S, Enzmann DR: Contrast media tonicity, Part II. Isotonic ioxaglate versus standard renografin for IV-DSA evaluation of the carotid bifurcation, a double blind prospective clinical trial. Invest Radiol 21:340-347,1986.

14. Burbank FH, Thompson WM: Contrast Media Tonicity, Part I. Effects upon IV-DSA time-concentration curve peak and width, experimental studies. Invest Radiol 21:240-247,1986.

13. Thompson WM, Burbank FH, Freimarck RD, Hall A, et al: Digital radiographic evaluation of the bile ducts. Invest Radiol 20:956-960,1985.

12. Burbank F, Enzmann D, Keyes GS, and Brody WR: Hybrid intravenous digital subtraction angiography of the carotid bifurcation. Radiology 152: 725-729,1984.

11. Rubin DL, Burbank FH, Bradley BR, and Brody WR: An experimental evaluation of central vs. peripheral injections for intravenous digital subtraction angiography. Invest Radiol 19:30-35,1984.

10. Burbank F, Brody WR, and Bradley BR: The effect of volume and rate of contrast media injection on intravenous digital subtraction angiographic contrast media curves. Journal of the American College of Cardiology 4:308- 315,1984.

9. Burbank F: Association of University Radiologists MEMORIAL AWARD PAPER: Determinants of contrast enhancement for digital subtraction angiography. Invest Radiol 18:308-316,1983.

8. Burbank F, Brody WR, Hall A, and Keyes G: A quantitative in vivo comparison of six contrast agents by digital subtraction angiography. Invest Radiol 18:610-616,1982.

7. Burbank F: U.S. lung cancer death rates begin to rise proportionately more rapidly for females than for males: A dose-response effect? J Chron Dis 25:473-479,1972.

6. Burbank F and Fraumeni J: U.S. cancer mortality: Nonwhite Predominance. J.N.C.I. 49:649-659,1972.

5. Burbank F: A sequential space-time cluster analysis of cancer mortality in the United States: Etiologic implications. Am J Epid 95:393- 417,1972.

4. Berg JW and Burbank F: Correlations between carcinogenic trace metals in water supplies and cancer mortality. Ann N Y Acad Sci 199:249-264,1972.

3. Burbank F: Males dominate once again: U.S. cancer mortality. N.E.J.M. 285:461-462,1971.

2. Burbank F and Fraumeni J: Synthetic sweetener consumption and bladder cancer trends in the United States. Nature 227:296-297,1970.

1. Burbank F: A computer diagnostic system for the diagnosis of prolonged liver disease. Am J Med 46:401-415,1969.

## BOOKS AND BOOK CHAPTERS

7. Burbank, F. Hemodynamic changes in the uterus and its blood vessels in pregnancy, In: A Comprehensive Textbook of Postpartum Hemorrhage, Arulkumaran, S, Karoshi M, Keith LG, Lalonde AB, and B-Lynch C, editors, Sapiens Publishing, London, pp 177-184, 2012. (CHAPTER)

6. Burbank F. Fibroids, Menstruation, Childbirth, and Evolution: The Fascinating Story of Uterine Blood Vessels, Wheatmark Publishing, Tucson, Arizona, 291 pages, 2009, ISBN: 978-1-60494-170-8. (**BOOK, see cover below**)

5. Burbank F and Parker S: Stereotactic core breast biopsy. A replacement for surgical breast biopsy, In: Surgical Technology International II, Michael H. Braverman, M.D. and Roy L. Tawes, M.D. editors, San Francisco, California, pp 179-186, 1993. (CHAPTER)

4. Burbank FH and Enzmann DR: Developpements recents de l'angiographie numerisee (Chapitre 21), In: Angiographie Numerisee, Frija G, Gardeur D, and Schouman-Claeys E, editors, Aubin Imprimeur and Edition Marketing (editeur des preparations grandes ecoles medecine), Paris, pp 337-345, 1987. (CHAPTER)

3. Burbank F and Brody WR: Intravenous digital subtraction angiography contrast media time-concentration curves, In: Digital Image Processing, James AE, Anderson JH and Higgins CB, editors, Williams & Wilkins Press, Baltimore, Maryland, pp 99 - 107, 1985. (CHAPTER)

2. Burbank F: The treatment of sexual problems by group therapy, In: Psychosexual Problems: Psychotherapy, Counseling and Behavioral Modification, S. Crown, editor, Grune & Stratton, New York, pp 31-58, 1976. (CHAPTER)

1. Burbank F: Patterns in cancer mortality in the United States, 1950-1967. Natl Cancer Inst Monogr No 33:1-594, 1971. (**BOOK, see cover below**)




## POSTGRADUATE MEDICAL COURSES

1991 - 1995, Director of a monthly course for new users of Stereotactic Breast Biopsy systems. The monthly course was held at the Mission Breast Care Center in Mission Viejo, CA. It was designed for 8-10 radiologists/ session to allow didactic instruction and direct "hands-on" experience on the theory and practice of percutaneous breast biopsy. Course carried 9 hours of CME credit.

1993 - 2002, co-originator (along with Steve H. Parker, M.D.), consultant, and lecturer at 20, week-long, "Breast Imaging and Intervention into the 21st Century," Continuing Medical Education courses (See collage of course booklet covers below).



| | **Course Dates** | **Locations** |
|---|---|---|
| 1) | 7/ 26-30/ 1993 | The Broadmoor Hotel, Colorado Springs, CO |
| 2) | 2/ 21-25/ 1994 | The Ritz-Carlton Hotel, Laguna Niguel, CA |
| 3) | 8/ 15-19/ 1994 | The Broadmoor Hotel, Colorado Springs, CO |
| 4) | 2/13-17/ 1995 | Marriott's Casa Marina Resort, Key West, FL |
| 5) | 7/ 10-14/ 1995 | The Broadmoor Hotel, Colorado Springs, CO |

| | | |
|---|---|---|
| 6) | 10/ 9-13/ 1995 | Four Seasons Biltmore, Santa Barbara, CA |
| 7) | 2/ 26- 3/1/1996 | Ocean Reef Club, Key Largo, Florida |
| 8) | 8/ 12-16/ 1996 | The Broadmoor Hotel, Colorado Springs, CO |
| 9) | 2/ 24-28/ 1997 | Ocean Reef Club, Key Largo, Florida |
| 10) | 9/ 22-26/ 1997 | La Costa Resort and Spa, Carlsbad, CA |
| 11) | 2/ 23-27/ 1998 | Ocean Reef Club, Key Largo, Florida |
| 12) | 8/17-21/ 1998 | Beaver Run Resort, Breckenridge, CO |
| 13) | 2/8-12/ 1999 | Sanibel Harbour Resort & Spa, Fort Meyers, FL |
| 14) | 9/ 20-24/ 1999 | La Costa Resort and Spa, Carlsbad, CA |
| 15) | 2/14-18/ 2000 | Sanibel Harbour Resort & Spa, Fort Meyers, FL |
| 16) | 10/16-20/ 2000 | Camelback Inn Golf Club & Spa, Scottsdale AZ |
| 17) | 3/19-23/ 2001 | Amelia Island Plantation, Amelia Island, FL |
| 18) | 11/4-9/2001 | The Orchid Resort, Kohala Coast, HI |
| 19) | 2/25-3/1/2002 | Sanibel Harbour Resort & Spa, Fort Meyers, FL |
| 20) | 10/21-25/2002 | Ocean Reef Club, Key Largo, Florida |

**Past and Present PEER REVIEWER for MEDICAL PUBLICATION**

1.  American Journal of Roentgenology (AJR)
    Waverly Press
    428 E. Preston Street
    Baltimore, MD 21202

2.  Journal of Computed Assisted Tomography (JCAT)
    Raven Press, Ltd.
    1185 Avenue of the Americas
    New York, NY 10036

3.  Radiology
    550 North Broadway, Suite 206
    Baltimore, MD 21205

4.  Journal of Minimally Invasive Gynecology (JMIG)
    (Formerly:Journal of the American Association of Gynecologic Laparoscopists)
    also, Editorial Advisory Board 2009 - 2011
    13021 East Florence Avenue
    Santa Fe Springs, CA 90670

5.  Gynecological Endocrinology
    Taylor and Francis Group
    Mortimer House
    37-41 Mortimer Street
    London, W1T 3JH, England

6.  European Journal of Obstetrics & Gynecology and Reproductive Biology
    Elsevier Science
    360 Park Avenue South
    New York, NY 10010

## COPYRIGHTS

1; The Sexual pattern inventory (S.P.I.): a psychological test to assess sexual functioning. By Fred Burbank. 10 p. e Fred Burbank; 25Bay76; A750U57. Library of Congress. Copyright Office. Catalog of Copyright Entries 1976 Books and Pamphlets Jan-June 3D Ser Vol 30 Pt 1 Sec 2 (Volume Catalog of Copyright Entries 3D Ser Vol 30 Pt 1 Sec 2), (page 379 of 495)

2. SPISCOR 05: a computer program to score the sexual pattern inventory (S.P.I.) for males, females, or couples. By Fred Burbank. 1 v. 6 Fred Burbaak; 25Bay76; A750156. Library of Congress. Copyright Office. Catalog of Copyright Entries 1976 Books and Pamphlets Jan-June 3D Ser Vol 30 Pt 1 Sec 2 (Volume Catalog of Copyright Entries 3D Ser Vol 30 Pt 1 Sec 2), (page 379 of 495)

## PATENTS

Following pages:

Fred H. Burbank
Laguna Niguel, CA USA

| Patent (or) Publication Number | Title & Description | Filing Date | Published |
|---|---|---|---|
| US9,017,273B2 | Devices and Methods for Treating Restless Leg Syndrome: An exemplary system for generating a counter-stimulation in a patient suffering from RLS includes a device configured and arranged to generate a counter-stimulation in a patient suffering from RLS, the counter-stimulation of a amplitude, intensity, and time duration lower than that which would wake the patient and higher than that sufficient to relieve RLS, or sufficient to relieve RLS symptoms and allow the patient to return to sleep, a controller configured an arranged to drive the counter-stimulation generation device, the controller being in communication with the counter-stimulation device, and a base configured and arranged to hold the counter-stimulation generation device adjacent to a patient, the counter-0simulation device attached to the base. | 3/2/2009 | April 28, 2015 |
| US20130046329 | Sleep apnea therapy with naso-phyrangeal bypass: Naso-pharyngeal devices for treating sleep apnea can perform two functions simultaneously: keeping an open airway through an inner lumen of the device; and support for the tissue in the airway, because keeping the tissue from completely collapsing creates the possibility of some air movement around the device in the critical areas associated with obstructive sleep apnea. | 9/25/12 | February 21, 2013 |
| US20120277626 | Methods and apparatus for securing medical instruments to desired locations in a patient's body: A medical device for localization of tissue at a target site in a patient's body includes a tube having a distal end, a proximal end, and a longitudinal axis. The medical device is configured for placement of the distal end at the target site. A fixation device is disposed on the distal end. The affixation device is configured to mechanically fix the distal end of the medical device to tissue at the target site. | 7/6/12 | November 1, 2012 |
| US20120253189 | Cavity-filling biopsy site markers: The invention provides materials, devices and methods for marking biopsy sites for a limited time. The biopsy-marking materials are ultrasound-detectable bio-resorbable powders, with powder particles typically between about 20 microns and about 800 microns in maximum dimension, more preferably between about 300 microns and about 500 microns. The powders may be formed of polymeric materials containing cavities sized between about 10 microns and about 500 microns, and may also contain binding agents, anesthetic agents, hemostatic agents, and radiopaque markers. Devices for delivering the powders include tubes configured to contain the powders and to fit within a biopsy cannula, the powders being ejected by action of a syringe. Systems may include a tube containing powder, and a syringe containing sterile saline. The tube may be configured to fit within a biopsy cannula such as a Mammotome® or SenoCor 360™ cannula. | 06/13/2012 | October 4, 2012 |
| US8277391 | Methods and devices for defining and marking tissue: In order to later identify the location of a biopsy or surgery, various means and methods for permanently and non-surgically marking selected tissue in the human body are used. Later visualization of the markers is readily accomplished using state-of-the-art imaging systems. | 8/7/02 | October 2, 2012 |
| US20120196358 | Device for removing cumulus from oocytes: Disclosed herein are devices, methods, and kit of parts adapted for stripping cumulus from a plurality of oocytes contained therein. | 5/27/10 | August 2, 2012 |
| US8229553 | Methods and apparatu for securing medical instruments to desired locations in a patient's body: Devices and methods are provided for securely affixing a medical instrument to desired tissue in a patient's body, using a fixation agent. Such medical instruments may comprise localization wires or tissue acquisition instruments, such as biopsy instruments, for example. In the case of tissue acquisition instruments, the inventors have discovered significant advantages for securely affixing the distal end of the tissue acquisition instrument to a particular tissue target area. For example, such an approach permits the imaging environment to be uncoupled from the procedural environment so that expensive and often unavailable imaging equipment, such as stereotactic imaging equipment, need not be used. In a preferred embodiment, a bonding agent, such as adhesive, surgical glue, or a solvent, is used as the fixation agent. | 2/17/05 | July 24, 2012 |
| US8224424 | Tissue site markers for in vivo imaging: The invention is directed biopsy site markers and methods of marking a biopsy site, so that the location of the biopsy cavity is readily visible by conventional imaging methods, particularly by ultrasonic imaging. The biopsy site markers of the invention have high ultrasound reflectivity, presenting a substantial acoustic signature from a small marker, so as to avoid obscuring diagnostic tissue features in subsequent imaging studies, and can be readily distinguished from biological features. The several disclosed embodiments of the biopsy site marker of the invention have a high contrast of acoustic impedance as placed in a tissue site, so as to efficiently reflect and scatter ultrasonic energy, and preferably include gas-filled internal pores. The markers may have a non-uniform surface contour to enhance the acoustic signature. The markers have a characteristic form which is recognizably artificial during medical imaging. The biopsy site marker may be accurately fixed to the biopsy site so as to resist migration from the biopsy cavity when a placement instrument is withdrawn, and when the marked tissue is subsequently moved or manipulated. | 7/13/09 | July 17, 2012 |
| US8219182 | Cavity-filling biopsy site markers: An ultrasound-detectable biopsy marker mass has a detectable in-vivo lifetime during which the marker mass remains readily detectable by ultrasound imaging. The ultrasound-detectable biopsy marker mass is formed of particles of a bio-resorbable material having bubble cavities and having a particle size between about 200 microns and about 500 microns. | 8/6/10 | July 10, 2012 |
| US8152737 | Tissue specimen encapsulation device and method thereof:  A device for encapsulating tissue specimens includes a wand assembly, a sheath, and a guide assembly. The guide assembly pulls, draws, or otherwise moves the sheath about the tissue specimen. The wand assembly is disposed proximate to the tissue specimen, typically either adjacent or through the specimen. In an aspect of the encapsulating device, the guide assembly has sheath deployment members that are disposed about the tissue specimen. The sheath, which is attached to ends of the sheath deployment members and the wand assembly, is drawn over the tissue specimen as the sheath deployment members are pushed or pulled. The guide assembly is an arm or a housing that rotates about the tissue specimen. The sheath, which is secured at one end to the guide assembly and at another end to the wand assembly, is drawn over the tissue specimen as the guide assembly rotates. | 6/12/07 | April 10, 2012 |
| US8147487 | Apparatus and method for accessing a body site: A device and method of using the device to access a desired tissue site within a patient's body and separating a tissue specimen from the tissue site suitable for evaluation. The device includes a probe member having an arcuate tissue-cutting RF powered electrode secured to and distally spaced from the distal end of the probe and a small dimensioned distal extremity which when an inner lumen thereof is subjected to a vacuum, secured tissue for the specimen to the surface of the distal extremity. A circular tissue-cutting blade preferably secured to the distal end of a supporting tube is configured to rotate and move longitudinally along the shaft of the probe member effective to sever a tissue specimen from tissue secured to the surface of the distal extremity of the probe member. The supporting tube covers the separated specimen, and may be disposed within an accessing cannula. | 5/25/07 | April 3, 2012 |

Fred H. Burbank
Laguna Niguel, CA USA

| | | | |
|---|---|---|---|
| US8137346 | Electrosurgical lesion location device: A device for localizing a target tissue mass in a body includes a tubular trocar portion having a distal end and a proximal end portion that is removably attachable to a handle portion. The trocar portion contains at least a first plurality of locator wires that are movable between a retracted position within the trocar and a deployed position extending radially from the trocar. The first plurality of locator wires mounted for axial movement within the trocar portion between a proximal retracted position and a deployed distal position. The second plurality of locator wires is mounted for movement between a distal retracted position and a proximal deployed position. The locator wires are electrically energized to facilitate their deployment electrosurgically. | 8/6/07 | March 20, 2012 |
| US8052718 | [WITHDRAWN PATENT AS PER THE LATEST USPTO WITHDRAWN LIST] Method and apparatus for the detection and occlusion of blood vessels: A non-invasive blood vessel occlusion device includes a pair of pressure-applying members with opposed tissue-contacting surfaces, a supporting shaft configured to adjust the distance between tissue-contacting surfaces, and at least one sensor for locating a blood vessel disposed on at least one pressure-applying member. Blood vessels may be occluded by indirectly compressing the artery by compressing tissue near to an artery. The occlusion device finds use in, for example, treating uterine disorders and conditions which may be treated by occlusion of the uterine arteries. A uterine artery may be accessed via a body cavity, such as a patient's vagina, and may be occluded by compressing a portion of the vaginal wall around a portion of a uterine artery. | 11/19/02 | November 8, 2011 |
| US20110207112 | Automated system for cryopreservation of oocytes, embryos, or blastocysts: An automated system and method of cryopreservation and reanimation of oocytes, embryos, or blastocysts is disclosed. One or more oocytes or embryos are positioned in a processing container, the processing container being configured to allow fluid to flow into and out of the processing container, where two or more fluids flow into and out of the processing container with oocytes or embryos therein. The temperature of the fluid may be controlled in the processing container according to predetermined requirements. The flowing of the fluids may be controlled by a central controller adapted to control one or more valves. | 7/22/09 | August 25, 2011 |
| US7981050 | Methods and devices for automated biopsy and collection of soft tissue: Instruments for performing percutaneous biopsy procedures are disclosed, which have advantageous features for improving functionality and performance over prior art devices. These instruments comprise two types, single-use devices, and multiple-use devices having active tissue capture capability. Improved features include the ability to retrieve and evaluate multiple tissue samples during a single insertion procedure, without physical handling of the samples, as well as constructional features, such as a molded tissue cassette housing, variant vacuum port embodiments suited for different tissue environments, and a method for backflushing the instrument to remove biological debris, among others. | 2/6/07 | July 19, 2011 |
| US20110160611 | Methods and devices for biopsy and collection of soft tissue: A biopsy device may include a housing and a disposable biopsy assembly releasably received in the housing. The disposable biopsy assembly may include a cutter coaxially disposed with respect to a needle, and a plurality of gears may be engaged when the disposable biopsy sample is inserted in the housing. A tissue sample holder may be disposed within housing. | 3/11/11 | June 30, 2011 |
| US20110092815 | Marker or filler forming fluid: A system for at least partially filling and marking a cavity at a site within a patient's body includes a marker delivery device having a chamber configured to contain a marking substance and having a mechanism configured to expel the marking substance. A quantity of the marking substance is contained within the chamber of the marker delivery device. The marking substance is configured to at least partially fill the cavity and form therein a porous bioabsorbable body. A delivery tube is coupled in fluid communication with the chamber of the marker delivery device. The delivery tube has a distal end with a discharge port through which the marking substance is expelled. A releasable remotely detectable distal tip is coupled to the distal end of the delivery tube and is configured to be released to remain within the porous bioabsorbable body within the cavity upon the formation thereof. | 12/14/2010 | April 21, 2011 |
| US7918803 | Methods and devices for automated biopsy and collection of soft tissue: A biopsy device and related method are disclosed. The biopsy device disclosed includes a needle having a lateral opening for receiving tissue. The needle may be rotatable with respect to a portion of the biopsy device, such as a housing of the biopsy device, and the needle may be offset from a center of the housing. A hollow cutter is disclosed for cutting tissue received in the lateral opening of the needle. | 8/4/09 | April 5, 2011 |
| US7877133 | Marker or filler forming fluid: A solution for forming a marker or filler mass for an intracorporeal site. The solution contains a polar, water soluble non-aqueous solvent such as dimethyl sulfoxide and a bioabsorbable, essentially water insoluble polymer such as polylactic acid, or copolymers of lactic acid and glycolic acid. The solution may be delivered to the biopsy site by a suitable syringe and delivery tube. The delivery tube is preferably provided with a releasable radiopaque element on the distal tip which can be released within the polymeric marker mass formed in the biopsy cavity. | 5/23/03 | January 25, 2011 |
| US7875036 | Short term treatment for uterine disorder: A method and device for treating a female patient's uterine disorder by occluding one or both of the patient's uterine artery. The treatment involves occluding one or both of the patient's uterine arteries with an intravaginal device to form a thrombus within the occluded uterine arteries and administering an agent which will prolong the occlusion of the artery or arteries after removal of the occluding device or initiate or accelerate fibroid cell apoptosis (programmed cell death). The intravaginal device has a pair of pivotally connected occluding members, with at least one of the occluding member having a movable occluding element on a distal shaft section of the occluding member. | 10/24/05 | January 25, 2011 |
| US20100324416 | Cavity-filling biopsy site markers: The invention provides materials, devices and methods for marking biopsy sites for a limited time. The biopsy-marking materials are ultrasound-detectable bio-resorbable powders, with powder particles typically between about 20 microns and about 800 microns in maximum dimension, more preferably between about 300 microns and about 500 microns. The powders may be formed of polymeric materials containing cavities sized between about 10 microns and about 500 microns, and may also contain binding agents, anesthetic agents, hemostatic agents, and radiopaque markers. Devices for delivering the powders include tubes configured to contain the powders and to fit within a biopsy cannula, the powders being ejected by action of a syringe. Systems may include a tube containing powder, and a syringe containing sterile saline. The tube may be configured to fit within a biopsy cannula such as a Mammotome® or SenoCor 360™ cannula. | 8/6/10 | December 23, 2010 |
| US20100298698 | Tissue site markers for in vivo imaging: The invention is directed biopsy site markers and methods of marking a biopsy site, so that the location of the biopsy cavity is readily visible by conventional imaging methods, particularly by ultrasonic imaging. The biopsy site markers of the invention have high ultrasound reflectivity, presenting a substantial acoustic signature from a small marker, so as to avoid obscuring diagnostic tissue features in subsequent imaging studies, and can be readily distinguished from biological features. The several disclosed embodiments of the biopsy site marker of the invention have a high contrast of acoustic impedance as placed in a tissue site, so as to efficiently reflect and scatter ultrasonic energy, and preferably include gas-filled internal pores. The markers may have a non-uniform surface contour to enhance the acoustic signature. The markers have a characteristic form which is recognizably artificial under medical imaging. The biopsy site marker may be accurately fixed to the biopsy site so as to resist migration from the biopsy cavity when a placement instrument is withdrawn, and when the marked tissue is subsequently moved or manipulated. | 5/25/10 | November 25, 2010 |

Fred H. Burbank
Laguna Niguel, CA USA

| | | | |
|---|---|---|---|
| US20100242967 | Sleep apnea therapy with naso-phyrangeal bypass: Naso-pharyngeal devices for treating sleep apnea can perform two functions simultaneously: keeping an open airway through an inner lumen of the device; and support for the tissue in the airway, because keeping the tissue from completely collapsing creates the possibility of some air movement around the device in the critical areas associated with obstructive sleep apnea. | 3/17/10 | September 30, 2010 |
| US7794411 | Methods and devices for automaed biopsy and collection of soft tissue: Instruments for performing percutaneous biopsy procedures are disclosed, which have advantageous features for improving functionality and performance over prior art devices. These instruments comprise two types, single-use devices, and multiple-use devices having active tissue capture capability. Improved features include the ability to retrieve and evaluate multiple tissue samples during a single insertion procedure, without physical handling of the samples, as well as constructional features, such as a molded tissue cassette housing, variant vacuum port embodiments suited for different tissue environments, and a method for backflushing the instrument to remove biological debris, among others. | 10/31/07 | September 14, 2010 |
| US7792569 | Cavity-filling biopsy site markers: The invention provides materials, devices and methods for marking biopsy sites for a limited time. The biopsy-marking materials are ultrasound-detectable bio-resorbable powders, with powder particles typically between about 20 microns and about 800 microns in maximum dimension, more preferably between about 300 microns and about 500 microns. The powders may be formed of polymeric materials containing cavities sized between about 10 microns and about 500 microns, and may also contain binding agents, anesthetic agents, hemostatic agents, and radiopaque markers. Devices for delivering the powders include tubes configured to contain the powders and to fit within a biopsy cannula, the powders being ejected by action of a syringe. Systems may include a tube containing powder, and a syringe containing sterile saline. The tube may be configured to fit within a biopsy cannula such as a Mammotome® or SenoCor 360™ cannula. | 11/16/04 | September 7, 2010 |
| US7771357 | Device and methods for occlusion of the uterine arteries: Devices and methods are disclosed for treating a uterine disorder which receive its blood supply from a uterine artery. In particular, uterine fibroids are effectively treated by occluding the uterine arteries using trans-vaginal, trans-uterine, transrectal, or retroperitoneal approaches. The devices and methods are advantageous because the inventive procedures may be performed by a patient's gynecologist in the course of treatment, avoiding the need for referrals to specialist practitioners and for more radical treatments, such as hysterectomies. The methods include both temporary and permanent occlusion of the arteries. A cannula carries an imaging device and a member which will easily penetrate tissue, the member including a device which partially or completely, and temporarily or permanently, occludes a uterine artery. | 6/10/03 | August 10, 2010 |
| US20100198059 | Remotely activated marker: A biopsy site marker having at least one small marker body or pellet of bioresorbable material such as gelatin, collagen, polylactic acid, polyglycolic acid which has a radiopaque object which is deposited into the biopsy site, by a delivery device that includes an elongated tubular body with a piston slidable within the tubular body. One end of the tube is placed into the biopsy site. At least one but preferably several marker bodies or pellets are deposited sequentially into the biopsy site through the tube. At least the bioresorbable materials of the detectable markers remain present in sufficient quantity to permit detection and location of the biopsy site at a first time point (e.g., 2 weeks) after introduction but clear from the biopsy site or otherwise do not interfere with imaging of tissues adjacent the biopsy site at a second time point (e.g., 5-7 months) after introduction. | 4/6/10 | August 5, 2010 |
| US20100113920 | Methods for defining and marking tissue: In order to later identify the location of a biopsy or surgery, various means and methods for permanently and non-surgically marking selected tissue in the human body are used. Later visualization of the markers is readily accomplished using state-of-the-art imaging systems. | 11/24/09 | May 6, 2010 |
| US768817 | Occlusion device for asymmetrical uterine artery anatomy: An occluding device is disclosed for occluding a female patient's uterine arteries which have unsymmetrical anatomy with respect to the patient's uterine cervix. The occluding device has a pair of pivotally connected occluding members, with at least one of the occluding member having a movable occluding element on a distal shaft section of the occluding member. The position and orientation of the occluding elements on the distal shaft sections may be adjusted by operative members on the proximal shaft sections of the occluding members to accommodate for asymmetrical uterine artery anatomy. The occluding elements have pressure applying surfaces with one or more blood flow sensors such as Doppler chips which help the physician to better identify the uterine artery and to monitor blood flow therein. A tenaculum-like guiding element configured to be secured within the patient's uterine cervix, may be provided to guide the occluding device to the patient's cervix. | 11/25/03 | March 30, 2010 |
| US20100063415 | Methods and devices for automated biopsy and collection of soft tissue: A biopsy device and related method are disclosed. The biopsy device disclosed includes a needle having a lateral opening for receiving tissue. The needle may be rotatable with respect to a portion of the biopsy device, such as a housing of the biopsy device, and the needle may be offset from a center of the housing. A hollow cutter is disclosed for cutting tissue received in the lateral opening of the needle. | 8/4/09 | March 11, 2010 |
| US7651511 | Vascular clamp for caesarian section: The invention provides devices, systems and methods for clamping arteries which are useful in reducing or abolishing blood flow in an artery, and may be used to control hemorrhage following a caesarian delivery. A clamping device embodying features of the invention includes a pair of clamping members with opposed pressure-applying members having facing pressure-applying surfaces, at least one of which is a yieldable pressure-applying surface. The yieldable pressure-applying surface is preferably resilient. The clamping members are configured to adjust the distance between pressure-applying surfaces, and a blood flow sensor is disposed on at least one of the pressure applying members to aid in locating the target artery and also to monitor blood flow through the artery. The clamping device is particularly suitable for occluding uterine arteries by compressing the broad ligament which contains the uterine artery and which is connected to the patient's uterus with the arterial clamp. | 2/5/03 | January 26, 2010 |
| US20100010342 | Tissue site markers for in vivo imaging: The invention is directed biopsy site markers and methods of marking a biopsy site, so that the location of the biopsy cavity is readily visible by conventional imaging methods, particularly by ultrasonic imaging. The biopsy site markers of the invention have high ultrasound reflectivity, presenting a substantial acoustic signature from a small marker, so as to avoid obscuring diagnostic tissue features in subsequent imaging studies, and can be readily distinguished from biological features. The several disclosed embodiments of the biopsy site marker of the invention have a high contrast of acoustic impedance as placed in a tissue site, so as to efficiently reflect and scatter ultrasonic energy, and preferably include gas-filled internal pores. The markers may have a non-uniform surface contour to enhance the acoustic signature. The markers have a characteristic form which is reciprocally artificial during medical imaging. The biopsy site marker may be accurately fixed to the biopsy site so as to resist migration from the biopsy cavity when a placement instrument is withdrawn, and when the marked tissue is subsequently moved or manipulated. | 7/13/09 | January 14, 2010 |
| US7645284 | Doppler directed suturing andcompression device and method: A compression and ligation device Includes a pair of jaws including one or more Doppler chips oriented to send and receive Doppler signals across the jaws, to assist a practitioner in determining whether or not a uterine artery is between the jaws. A suture leader with an attached suture can be pushed through a channel on one of the jaws, through tissue behind the uterine artery, into another channel on the other jaw, and proximally out the device so that the practitioner can ligate the artery and effect hemostasis. | 11/22/05 | January 12, 2010 |

Fred H. Burbank
Laguna Niguel, CA USA

| US7625397 | Methods for defining and marking tissue: In order to later identify the location of a biopsy or surgery, various means and methods for permanently and non-surgically marking selected tissue in the human body are used. Later visualization of the marker is readily accomplished using state-of-the-art imaging systems. | 9/18/01 | December 1, 2009 |
|---|---|---|---|
| US7625347 | Electrosurgical biopsy device and method: An electrosurgical biopsy device includes a stylet and a cannula movably mounted on a base. The stylet has a shaft with a head at its distal end and a stylet ablation element extending distally from the head. The stylet shaft is disposed through the cannula for axial translation therein between withdrawn and extended positions. In use, the stylet and the cannula are pushed through the skin and the underlying tissue until the stylet head is adjacent a targeted tissue mass. Next, the stylet is extended distally from the distal end of the cannula so that its head penetrates the tissue mass. The cannula ablation element is then activated, and the cannula is pushed through the tissue mass toward the stylet head, thereby cutting a "core" through the tissue mass that is captured as a tissue specimen within the distal end of the cannula. | 8/27/03 | December 1, 2009 |
| US20090287078 | Marker or filler forming fluid: A solution for forming a marker or filler mass for an intracorporeal site. The solution contains a polar, water soluble non-aqueous solvent such as dimethyl sulfoxide and a bioabsorbable, essentially water insoluble polymer such as polylactic acid, or copolymers of lactic acid and glycolic acid. The solution may be delivered to the biopsy site by a suitable syringe and delivery tube. The delivery tube is preferably provided with a releasable radiopaque element on the distal tip which can be released within the polymeric marker mass formed in the biopsy cavity. | 6/24/08 | November 19, 2009 |
| US20090287088 | Luminal clip applicator with sensor and methods for occluding body lumens: A method for occluding a body lumen includes providing a clamping device having a pair of opposed pressure applying jaws, providing a sensor on one of the pressure applying jaws for sensing blood flow through a body lumen, and releasably securing a luminal clip between the pressure applying jaws. The method includes using the sensor for detecting blood flow through the body lumen for locating the body lumen, positioning the luminal clip adjacent the located body lumen, and closing the pressure applying jaws for clamping the luminal clip over the body lumen for at least partially occluding blood flow through the body lumen. | 7/28/09 | November 19, 2009 |
| US7616979 | Uterine tissue monitoring device and method: The invention provides a devices, methods and systems to measure and record uterine tissue environment components such as pH during the course of uterine artery occlusion. The uterus becomes ischemic due to the occlusion thereof, and its pH drops sharply within minutes of uterine artery occlusion and remains relatively low for a period of time. The return of normal pH is an indicator of return of blood to the ischemic tissue. In use, a catheter with a pH measuring tip is advanced through the patient's vaginal canal and into the patient's uterine cavity until the pH measuring active electrode on the distal end of the catheter contacts or penetrates the uterine fundus. The active electrode detects the pH and a signal representing pH is transmitted to a pH recording and monitoring device which preferably displays the pH. The signal may be transmitted through a conductor or by a radio transmitter. Components other than pH may be monitored such a pCO2, and pO2. | 4/28/06 | November 10, 2009 |
| US7594890 | Multi-axial uterine artery identification, characterization, nd occlusion devices: A system is provided for compressing one or both of the uterine arteries of a patient which is at least in part shaped to complement the shape of the exterior of the cervix, which allows the system to be self-positioning. One or more Doppler chips can be mounted or incorporated into the system which permit the practitioner to better identify the uterine artery and monitor blood flow therein. A tenaculum-like element can be further included which secures the system to the patient's cervix. | 3/28/02 | September 29, 2009 |
| US20090221943 | Devices and methods for treating restless leg syndrome: A system 100 and methods for generating a counter-stimulation in a patient suffering from RLS. | 3/2/09 | September 3, 2009 |
| US7565191 | Tissue site markers for in vivo imaging: The invention is directed biopsy site markers and methods of marking a biopsy site, so that the location of the biopsy cavity is readily visible by conventional imaging methods, particularly by ultrasonic imaging. The biopsy site markers of the invention have high ultrasound reflectivity, presenting a substantial acoustic signature from a small marker, so as to avoid obscuring diagnostic tissue features in subsequent image studies, and can be readily distinguished from biological features. The several disclosed embodiments of the biopsy site marker of the invention have a high contrast of acoustic impedance as placed in a tissue site, so as to efficiently reflect and scatter ultrasonic energy, and preferably include gas-filled internal pores. The markers may have a non-uniform surface contour to enhance the acoustic signature. The markers have a characteristic form which is recognizably artificial during medical imaging. The biopsy site marker may be accurately fixed to the biopsy site so as to resist migration from the biopsy cavity when a placement instrument is withdrawn, and when the marked tissue is subsequently moved or manipulated. | 9/29/05 | July 21, 2009 |
| US20090131825 | Imageable biopsy site marker: A biopsy site marker having at least one marker body or pellet of bioresorbable material such as gelatin, collagen, polylactic acid, polyglycolic acid which has a radiopaque object, preferably with a non-biological configuration. The at least one bioresorbable body or pellet with a radiopaque object is deposited into the biopsy site, by a delivery device that includes an elongated tubular body with a piston slidable within the tubular body. One end of the tube is placed into the biopsy site. At least one but preferably several marker bodies or pellets are deposited sequentially into the biopsy site through the tube. At least the bioresorbable materials of the detectable markers remain present in sufficient quantity to permit detection and location of the biopsy site at a first time point (e.g., 2 weeks) after introduction but clear from the biopsy site or otherwise do not interfere with imaging of tissues adjacent the biopsy site at a second time point (e.g., 5-7 months) after introduction. | 12/18/08 | May 21, 2009 |
| US7488295 | Tissue acquisition system and method of use: A tissue acquisition system includes radio frequency (RF) cutter loops which are extendable out a cannula to cut cylindrical tissue samples from a tissue of interest in a patient. The cannula includes inner and outer cannulae which are mutually rotatable and include cutouts through which the cutting loop can be rotated and longitudinally extended to perform the cuts. The tissue samples are then aspirated proximally through the cannula for collection. | 10/16/01 | February 10, 2009 |
| US7479145 | Tenaculum-like device for intravaginal instrument delivery: The invention is directed to tenaculum-like devices and systems for the intravaginal delivery of therapeutic or diagnostic devices and particularly for occluding a female patient's uterine arteries in order to treat uterine disorders. Included are methods for grasping, manipulating and retaining tissue. The tenaculum-type device has a distal portion with a sound configured to enter a cervical os without causing undue trauma or discomfort to the patient, and a retention or tissue grasping mechanism with a grasping element such as a spike configured to engage and retain a patient's cervix. The tenaculum-type devices embodying features of the invention may have an expandable distal tip to more securely be engaged within the patient's uterine cervical canal. | 11/18/03 | January 20, 2009 |
| US20080287828 | Biopsy anchor device with cutter: A device for accessing and for isolating a desired site within a patient's body, and for obtaining a body of tissue from a patient at the site that includes an electrosurgical cutting electrode near the distal tip of a shaft, an anchoring mechanism and an electrosurgical side-cutting device. Methods are provided for accessing a target site within a patient's body, anchoring a body of tissue at the site, and isolating the body of tissue, at the site. The method may be performed for a surgical biopsy or lumpectomy at the target site within a patient's body. | 4/23/08 | November 20, 2008 |

Fred H. Burbank
Laguna Niguel, CA USA

| | | | |
|---|---|---|---|
| US20080281323 | Tissue specimen isolating and damaging device and method: A device and method for treatment of a tissue specimen disposed in surrounding tissue has a tissue specimen isolating tool and a tissue specimen damager. The tissue specimen isolating tool isolates the tissue specimen from the surrounding tissue. The tissue specimen damager damages the tissue, with a possible end result being necrosis. The severing tool may have a cutting member that is extendable to an outwardly radially bowed position about device. The tissue specimen is isolated by rotating the cutting member about the tissue specimen. The cutting member may be functionally connected to a cutting member radio frequency generation source. The tissue specimen damager may damage the tissue specimen using ionizing radiation, cutting devices, thermal treatment devices, chemical treatment devices, or sealing an outer boundary of the tissue specimen. | 4/11/08 | November 13, 2008 |
| US20080200924 | Methods for minimally invasive, non-permanent occlusion of a uterine artery: A method of treating a uterine disorder comprising non-permanently occluding a uterine artery with a resorbable embolic mass for a therapeutically effective time period. The occluding step includes selectively positioning the resorbable embolic mass within the uterine artery, and monitoring positioning of the resorbable embolic mass at a desired location within the uterine artery. The monitoring step may include using ultrasound or magnetic resonance imaging (MRI) for positioning the resorbable embolic mass at the desired location within the uterine artery. The resorbable embolic mass may be swellable and may be formed of a polymeric material selected from the group consisting of polylactic acid, polyglycolic acid, polyethylene glycol, or copolymers thereof. | 4/22/08 | August 21, 2008 |
| US7404821 | Treatment for post partum hemorrhage: The invention is directed to instruments and procedures using such instruments for temporarily reducing or terminating blood flow through a female patient's uterine artery to treat post partum hemorrhage (PPH). The uterine artery is occluded by a clamping device which includes a pair of pivotally connected clamping members, with each of the clamping members having a handle and a clamping element at the distal end of the handle. The clamping elements are inclined with respect to the longitudinal axes of the handles at an included obtuse angle between about 130° and 160°, preferably between about 130° and 160°. An artery locating sensor is provided on the distal end of at least one of the clamping elements. Preferably, the artery locating sensor is a Doppler ultrasound blood flow sensor. After birth, the clamping device is inserted into the female patient's post partum vaginal canal and advanced therein until one of the clamping elements Is in the patient's uterine cervix and the other clamping element is on the exterior of the uterine cervix. The clamping element on the exterior of the patient's uterine cervix is pressed against the patient's vaginal fornix and the clamping device closed so as to occlude the uterine artery disposed within tissue grasped by the clamping device. The clamping device is locked in the closed configuration and maintained in the condition until the patient's uterus is sufficiently clotted up to ensure termination of the hemorrhaging, typically about 5 minutes to about 7 hours. | 1/30/03 | July 29, 2008 |
| US20080154151 | Methods and devices for automated biopsy and collection of soft tissue: Instruments for performing percutaneous biopsy procedures are disclosed, which have advantageous features for improving functionality and performance over prior art devices. These instruments comprise two types, single-use devices, and multiple-use devices having active tissue capture capability. Improved features include the ability to retrieve and evaluate multiple tissue samples during a single insertion procedure, without physical handling of the samples, as well as constructional features, such as a molded tissue cassette housing, variant vacuum port embodiments suited for different tissue environments, and a method for backflushing the instrument to remove biological debris, among others. | 10/31/07 | June 26, 2008 |
| US7377902 | Biopsy anchor device with cutter: A device for accessing and for isolating a desired site within a patient's body, and for obtaining a body of tissue from a patient at the site that includes an electrosurgical cutting electrode near the distal tip of a shaft, an anchoring mechanism and an electrosurgical side-cutting device. Methods are provided for accessing a target site within a patient's body, anchoring a body of tissue at the site, and isolating the body of tissue at the site. The method may be performed for a surgical biopsy or lumpectomy at the target site within a patient's body. | 1/23/02 | May 27, 2008 |
| US20080097473 | Treatment for post partum hemorrhage: The invention is directed to instruments and procedures using such instruments for temporarily reducing or terminating blood flow through a female patient's uterine artery to treat post partum hemorrhage (PPH). The uterine artery is occluded by a clamping device which includes a pair of pivotally connected clamping members, with each of the clamping members having a handle and a clamping element at the distal end of the handle. The clamping elements are inclined with respect to the longitudinal axes of the handles at an included obtuse angle between about 120° and about 170°, preferably between about 130° and 160°. An artery locating sensor is provided on the distal end of at least one of the clamping elements. Preferably, the artery locating sensor is a Doppler ultrasound blood flow sensor. After birth, the clamping device is inserted into the female patient's post partum vaginal canal and advanced therein until one of the clamping elements Is in the patient's uterine cervix and the other clamping element is on the exterior of the uterine cervix. The clamping element on the exterior of the patient's uterine cervix is pressed against the patient's vaginal fornix and the clamping device closed so as to occlude the uterine artery disposed within tissue grasped by the clamping device. The clamping device is locked in the closed configuration and maintained in the condition until the patient's uterus is sufficiently clotted up to ensure termination of the hemorrhaging, typically about 5 minutes to about 7 hours. | 07/30/2007 | April 24, 2008 |
| US7357801 | Tissue specimen isolating and damaging device and method: A device and method for treatment of a tissue specimen disposed in surrounding tissue has a tissue specimen isolating tool and a tissue specimen damager. The tissue specimen isolating tool isolates the tissue specimen from the surrounding tissue. The tissue specimen damager damages the tissue, with a possible end result being necrosis. The severing tool may have a cutting member that is extendable to an outwardly radially bowed position about device. The tissue specimen is isolated by rotating the cutting member about the tissue specimen. The cutting member may be functionally connected to a cutting member radio frequency generation source. The tissue specimen damager may damage the tissue specimen using ionizing radiation, cutting devices, thermal treatment devices, chemical treatment devices, or sealing an outer boundary of the tissue specimen. | 1/13/04 | April 15, 2008 |
| US7354444 | Occlusion device with deployable paddles for detection and occlusion of blood vessels: Devices, systems and methods for temporarily reducing or abolishing blood flow by occluding blood vessels are provided. A blood vessel-occlusion device embodying features of the invention includes a deployable pressure-applying member with a location sensor, and an applicator. The location sensor is configured to detect a blood vessel, which may be occluded by compression from the pressure-applying member. A pressure-applying member may be released from the applicator, with blood-vessel compression maintained after release. The applicator is configured to engage a guide, such as a tenaculum, to aid in the placement and operation of the applicator. A pressure-applying member may also engage the guide. The invention finds use in, for example, treating uterine disorders and conditions which may be treated by occlusion of the uterine arteries, such as uterine fibroids, dysfunctional uterine bleeding, post-partum hemorrhage, and bleeding associated with caesarian section. | 11/19/02 | April 8, 2008 |

Fred H. Burbank
Laguna Niguel, CA USA

| | | | |
|---|---|---|---|
| US20080077045 | Tissue speciment encapsulation device and method thereof: A device for encapsulating tissue specimens includes a wand assembly, a sheath, and a guide assembly. The guide assembly pulls, draws, or otherwise moves the sheath about the tissue specimen. The wand assembly is disposed proximate to the tissue specimen, typically either adjacent or through the specimen. In an aspect of the encapsulating device, the guide assembly has sheath deployment members that are disposed about the tissue specimen. The sheath, which is attached to ends of the sheath deployment members and the wand assembly, is drawn over the tissue specimen as the sheath deployment members are pushed or pulled. The guide assembly is an arm or a housing that rotates about the tissue specimen. The sheath, which is secured at one end to the guide assembly and at another end to the wand assembly, is drawn over the tissue specimen as the guide assembly rotates. | 6/12/07 | March 27, 2008 |
| US7333844 | Uterine tissue monitoring device and method: The invention provides a devices, methods and systems to measure and record uterine tissue environment components such as pH during the course of uterine artery occlusion. The uterus becomes ischemic due to the occlusion thereof, and its pH drops sharply within minutes of uterine artery occlusion and remains relatively low for a period of time. The return of normal pH is an indicator of return of blood to the ischemic tissue. In use, a catheter with a pH measuring tip is advanced through the patient's vaginal canal and into the patient's uterine cavity until the pH measuring active electrode on the distal end of the catheter contacts or penetrates the uterine fundus. The active electrode detects the pH and a signal representing pH is transmitted to a pH recording and monitoring device which preferably displays the pH. The signal may be transmitted through a conductor or by a radio transmitter. Components other than pH may be monitored such a pCO2, and pO2. | 3/28/03 | February 19, 2008 |
| US7329265 | Uterine artery occlusion clamp: The invention is directed to a uterine artery clamp and the relatively non-invasive treatment procedure utilizing this clamp. The uterine clamp includes a clamping member having a jaw with tissue-contacting surfaces for applying pressure to target tissue and a stabilizing member which is configured to be inserted in the patient's uterine cervical canal. The clamp may be provided with elongated handles to manually adjust the spacing between the jaw and stabilizer and thereby apply pressure to a uterine artery bundle a bundle of tissue held between the jaw and stabilizer. Uterine clamps embodying features of the invention by be used in procedures for treating uterine disorders such as fibroids, DUB, PPH and the like. | 5/6/03 | February 12, 2008 |
| US7329228 | Methods and apparatus for securing medical instruments to desired locations in a patient's body: Devices and methods are provided for securely affixing a medical instrument to desired tissue in a patient's body, using a fixation agent. Such medical instruments may comprise localization wires or tissue acquisition instruments, such as biopsy instruments, for example. In the case of tissue acquisition instruments, the inventors have discovered significant advantages for securely affixing the distal end of the tissue acquisition instrument to a particular tissue target area. For example, such an approach permits the imaging environment to be uncoupled from the mechanical environment so that expensive and often unavailable imaging equipment, such as stereotactic imaging equipment, need not be used. In a preferred embodiment, a bonding agent, such as adhesive, surgical glue, or a solvent, is used as the fixation agent. | 7/11/05 | February 12, 2008 |
| US7325546 | Uterine artery occlusion device with cervical receptacle: An intravaginal uterine artery occlusion device is used for treating uterine disorders such as fibroids, dysfunctional uterine bleeding, postpartum hemorrhage and the like. A occlusion device has a cervical receptacle with an open distal end for receiving the patients uterine cervix, an elongated shaft having a distal end secured to the closed proximal end of the cervical receptacle, and an inner lumen extending to the distal end of the shaft. The patient's uterine cervix is held within the interior of the receptacle by the application of a vacuum to the interior of the receptacle through the inner lumen of the shaft while the leading edge(s) of the cervical receptacle press against the patient's vaginal fornix to occlude the uterine artery. A blood flow sensor may be provided on the leading edge of the receptacle to aid in locating a uterine artery and to monitor blood flow through the uterine artery. | 11/20/03 | February 5, 2008 |
| US7322938 | Breast biopsy system and methods: An apparatus and method are provided for precisely isolating a target lesion in a patient's body tissue, resulting in a high likelihood of "clean" margins about the lesion when it is removed for diagnosis and/or therapy. This approach advantageously will often result in the ability to both diagnose and treat a malignant lesion with only a single percutaneous procedure, with no follow-up percutaneous or surgical procedure required, while minimizing the risk of migration of possibly cancerous cells from the lesion to surrounding tissue or the bloodstream. In particular, the apparatus comprises a biopsy instrument having a distal end adapted for entry into the patient's body, a longitudinal shaft, and a cutting element disposed along the shaft. The cutting element is actuatable between a radially retracted position and a radially extended position. Advantageously, the instrument is rotatable about its axis in the radially extended position to isolate a desired tissue specimen from surrounding tissue by defining a peripheral margin about the tissue specimen. The specimen may be encapsulated and removed as an intact piece. | 8/13/01 | January 29, 2008 |
| US7322939 | Breast biopsy system and methods: An apparatus and method are provided for precisely isolating a target lesion in a patient's body tissue, resulting in a high likelihood of "clean" margins about the lesion when it is removed for diagnosis and/or therapy. This approach advantageously will often result in the ability to both diagnose and treat a malignant lesion with only a single percutaneous procedure, with no follow-up percutaneous or surgical procedure required, while minimizing the risk of migration of possibly cancerous cells from the lesion to surrounding tissue or the bloodstream. In particular, the apparatus comprises a biopsy instrument having a distal end adapted for entry into the patient's body, a longitudinal shaft, and a cutting element disposed along the shaft. The cutting element is actuatable between a radially retracted position and a radially extended position. Advantageously, the instrument is rotatable about its axis in the radially extended position to isolate a desired tissue specimen from surrounding tissue by defining a peripheral margin about the tissue specimen. Once the tissue specimen is isolated, it may be segmented by further manipulation of the cutting element, after which the tissue segments are preferably individually removed from the patient's body through a cannula or the like. Alternatively, the specimen may be encapsulated and removed as an intact piece. | 11/21/03 | January 29, 2008 |
| US7322940 | Breast biopsy system and methods: An instrument assembly and method are described for isolating a target lesion in a patient's body tissue, resulting in a high likelihood of "clean" margins about the lesion when it is removed for diagnosis and/or therapy. This approach advantageously will often result in the ability to both diagnose and treat a malignant lesion with only a single percutaneous procedure, with no follow-up percutaneous or surgical procedure required. In particular, the instrument assembly has a distal end adapted for entry into the patient's body, a longitudinal shaft, and a cutting element disposed along a distal portion of the shaft. The cutting element is actuatable between a retracted position within an electrically insulating recess and a radially extended position and is rotatable about its axis in the radially extended position to isolate a desire tissue specimen from surrounding tissue by defining a peripheral margin about the tissue specimen. | 3/1/04 | January 29, 2008 |
| US20080021449 | Electrosurgical lesion location device: A device for localizing a target tissue mass in a body includes a tubular trocar portion having a distal end and a proximal end portion that is removably attachable to a handle portion. The trocar portion contains at least a first plurality of locator wires that are movable between a retracted condition within the trocar and a deployed position extending radially from the trocar. The first plurality of locator wires mounted for axial movement within the trocar portion between a proximal retracted position and a deployed distal position. The second plurality of locator wires is mounted for movement between a distal retracted position and a proximal deployed position. The locator wires are electrically energized to facilitate their deployment electrosurgically. | 8/6/07 | January 24, 2008 |

Fred H. Burbank
Laguna Niguel, CA USA

| | | | |
|---|---|---|---|
| US7282034 | Tissue accessing and anchoring device and method: The invention provides systems, methods and a node accessing and anchoring device, comprising an elongated shaft, a tissue cutting member, at least one anchoring element extending from a position at or near the distal end of the shaft; and a radiation detector. The radiation detector is effective to locate and identify sentinel lymph nodes following injection of radioactive material into a primary lesion site within a patient. The tissue cutting member, which may be activated with radio frequency energy, is effective to allow access of the elongated shaft to a sentinel lymph node. The anchoring elements are effective to anchor the device to or adjacent a sentinel lymph node accessed by the device. Anchoring elements may assume radially, longitudinally, or mixed radially and longitudinally curved or coiled configurations when deployed. | 12/5/03 | October 16, 2007 |
| US20070232955 | Apparatus and method for accessing a body site: A device and method of using the device to access a desired tissue site within a patient's body and separating a tissue specimen from the tissue site suitable for evaluation. The device includes a probe member having an arcuate tissue-cutting RF powered electrode secured to and distally spaced from the distal end of the probe and a small dimensioned distal extremity which when an inner lumen thereof is subjected to a vacuum, secured tissue for the specimen to the surface of the distal extremity. A circular tissue-cutting blade preferably secured to the distal end of a supporting tube is configured to rotate and move longitudinally along the shaft of the probe member effective to sever a tissue specimen from tissue secured to the surface of the distal extremity of the probe member. The supporting tube covers the separated specimen, and may be disposed within an accessing cannula. | 5/25/07 | October 4, 2007 |
| US7264596 | Methods and apparatus for securing medical instruments to desired locations in a patient's body: Devices and methods are provided for securely affixing a medical instrument to desired tissue in a patient's body, using a fixation agent. Such medical instruments may comprise localization wires or tissue acquisition instruments, such as biopsy instruments, for example. In the case of tissue acquisition instruments, the inventors have discovered significant advantages for securely affixing the distal end of the tissue acquisition instrument to a particular tissue target area. For example, such an approach permits the imaging environment to be uncoupled from the procedural environment so that expensive and often unavailable imaging equipment, such as stereotactic imaging equipment, need not be used. In a preferred embodiment, a bonding agent, such as adhesive, surgical glue, or a solvent, is used as the fixation agent. | 12/4/01 | September 4, 2007 |
| US20070203505 | Methods for minimally invasive, non-permanent occlusion of a uterine artery: Non-permanent occlusion of the uterine arteries is sufficient to cause the demise of uterine myomata without unnecessarily exposing other tissues and anatomical structures to hypoxia attendant to prior permanent occlusion techniques. A therapeutically effective transient time of occlusion of a uterine artery to treat uterine fibroid tumors is from 1 hours to 24 hours, and preferably is at least about 4 hours. A therapeutically effective temporary time of occlusion of a uterine artery to treat uterine fibroid tumors from 1 day (24 hours) to 7 days (168 hours), and preferably is about 4 days (96 hours). By invaginating the tissues of the vaginal wall up to or around a uterine artery, collapse of the uterine artery can be achieved without penetrating tissue of the vagina. | 1/16/07 | August 30, 2007 |
| US7261712 | Electrosurgical lesion location device: A device for localizing a target tissue mass in a body includes a tubular trocar portion having a distal end and a proximal end portion that is removably attachable to a handle portion. The trocar portion contains at least a first plurality of locator wires that are movable between a retracted position within the trocar and a deployed position extending radially from the trocar. In a preferred embodiment, the trocar portion has an electrosurgical cutting element at its distal end, and first and second pluralities of locator wires that, when deployed, respectively define first and second locating perimeters. | 9/28/01 | August 28, 2007 |
| US20070173863 | Deployable constrictor for uterine artery occlusion: Devices, systems and methods for occluding blood vessels include a deployable constrictor having opposed pressure-applying portions, a delivery shaft configured to intravaginally advance the constrictor to the patient's cervix, a location sensor configured to detect a blood vessel, a deployment member for deploying the constrictor about the patient's cervix, and optionally a guide. The constrictor has a first configuration to receive a cervix and a second configuration to apply pressure to the cervical area to occlude a uterine artery by compression from the pressure-applying members. The pressure-applying members may be released from the cervix after a limited therapeutically effective time. The invention finds use in, for example, treating uterine disorders and conditions which may be treated by occlusion of the uterine arteries, such as uterine fibroids, dysfunctional uterine bleeding, post-partum hemorrhage, and bleeding associated with caesarian sections. | 2/6/07 | July 26, 2007 |
| US20070156064 | Method and devices for automated biopsy and collection of soft tissue: Instruments for performing percutaneous biopsy procedures are disclosed, which have advantageous features for improving functionality and performance over prior art devices. These instruments comprise two types, single-use devices, and multiple-use devices having active tissue capture capability. Improved features include the ability to retrieve and evaluate multiple tissue samples during a single insertion procedure, without physical handling of the samples, as well as constructional features, such as a molded tissue cassette housing, variant vacuum port embodiments suited for different tissue environments, and a method for backflushing the instrument to remove biological debris, among others. | 2/6/07 | July 5, 2007 |
| US7229465 | Method and apparatus for the detection and ligation of uterine arteries: The invention provides devices, systems and methods for occluding arteries without puncturing skin or vessel walls. The devices, systems and methods for occluding arteries are configured to be applied to arteries externally of the arteries. Occlusion may be temporary or permanent, and may be partial or complete. Clamping a device to tissue near to an artery is effective to compress tissue around the artery and to indirectly compress the artery. The methods, devices and systems of the invention find use in, for example, treatment of uterine disorders and conditions which may be treated by occlusion of the uterine arteries. A uterine artery may be accessed via a patient's vagina by compressing a portion of the vaginal wall around a portion of a uterine artery to occlude a uterine artery. Clamping of an artery may also be performed by clamping a device directly onto an artery. | 3/28/02 | June 12, 2007 |
| US7229418 | Tissue specimen encapsulating device and method thereof: A device for encapsulating tissue specimens includes a wand assembly, a sheath, and a guide assembly. The guide assembly pulls, draws, or otherwise moves the sheath about the tissue specimen. The wand assembly is disposed proximate to the tissue specimen, typically either adjacent or through the specimen. The guide assembly has sheath deployment members that are disposed about the tissue specimen. The sheath, which is attached to ends of the sheath deployment members and the wand assembly, is drawn over the tissue specimen as the sheath deployment members are pushed or pulled. In another aspect of the device, the guide assembly is an arm or a housing that rotates about the tissue specimen. The sheath, which is secured at one end to the guide assembly and at another end to the wand assembly, is drawn over the tissue specimen as the guide assembly rotates. | 1/14/03 | June 12, 2007 |
| US7229439 | Apparatus and method for accessing a body site: A device and method of using the device to access a desired tissue site within a patient's body and separating a tissue specimen from the tissue site suitable for evaluation. The device includes a probe member having an arcuate tissue-cutting RF powered electrode secured to and distally spaced from the distal end of the probe and a small dimensioned distal extremity which when an inner lumen thereof is subjected to a vacuum, secured tissue for the specimen to the surface of the distal extremity. A circular tissue-cutting blade preferably secured to the distal end of a supporting tube is configured to rotate and move longitudinally along the shaft of the probe member effective to sever a tissue specimen from tissue secured to the surface of the distal extremity of the probe member. The supporting tube covers the separated specimen, and may be disposed within an accessing cannula. | 5/21/04 | June 12, 2007 |